IN THE SUPREME COURT OF NORTH CAROLINA

No. 316A19

Filed 13 December 2024

STATE OF NORTH CAROLINA

v.

SEAGA EDWARD GILLARD

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge Paul C. Ridgeway on 4 March 2019 in Superior Court, Wake County, upon a jury verdict finding defendant guilty of two counts of first-degree murder. Heard in the Supreme Court on 31 October 2023.

*Joshua H. Stein, Attorney General, by Heidi M. Williams, Assistant Attorney General, for the State-appellee.*

*Glenn Gerding, Appellate Defender, by Amanda Zimmer, Assistant Appellant Defender, and Aaron Johnson, Assistant Appellate Defender, for defendant-appellant.*

BERGER, Justice.

Defendant was convicted of two counts of first-degree murder and sentenced to death. He raises several issues on appeal, including admission and use of Rule 404(b) evidence, adequacy of jury instructions, and improper challenges for cause during jury selection, along with other perfunctory arguments. We address each in turn and conclude that defendant received a fair trial free from error. In addition, the trial court's judgment that defendant should be sentenced to death based upon the jury's recommendation during the sentencing phase was free from error.

## I.    Factual and Procedural Background

In the early morning hours of 2 December 2016, Dwayne Garvey and April Holland were shot and killed at a Raleigh hotel.  Surveillance footage showed two men were the perpetrators.  Raleigh Police released still photographs of the suspects, and an anonymous tip reported that defendant and Brandon Hill were involved.  Police arrested defendant in his home on 3 December 2016.

Text messages showed that at approximately 3:30 a.m. on 2 December 2016, defendant contacted Holland[1] stating that he was seeking sexual services.  Holland replied with her price and provided defendant with the address for the hotel.  Defendant informed Holland of his arrival around 4:38 a.m., and Holland responded with her room number.

Surveillance footage showed defendant and Hill enter the hotel through a side door, and they began walking towards Holland's room.  The two men were seen pacing in the hallway prior to defendant entering Holland's room.  The footage showed Garvey, who served as Holland's protector, walk past defendant and Hill in the hallway.  An extraction report of Garvey's phone showed that he texted Holland "I saw two dudes. . . . Let me know you good."

Approximately four minutes later, the footage showed Garvey banging on the door to Holland's room.  Hill then reentered the hallway carrying a gun and Garvey tried swatting at it before putting his hands in the air.  The footage showed Hill shoot

---

[1] Holland and Garvey both received the text messages using Google Voice.

Garvey several times. Defendant exited Holland's room and fired two shots into the room.

Both Garvey and Holland sustained multiple gunshot wounds and were dead when officers arrived. The autopsy of Garvey showed that the fatal shot severed his aorta. Holland's autopsy revealed that she was twelve weeks pregnant at the time and had suffered two gunshot wounds, one to the right side of her face and a fatal shot to her chest.

As part of their investigation, police obtained a search warrant for defendant's home. During the search, officers seized two cell phones. An extraction report of defendant's phones showed he had conducted an internet search for female escorts on the morning of the murders, followed by a search for the address of the hotel where Garvey and Holland were located. His browsing history also showed that shortly after the murders occurred, defendant searched multiple times for "man wanted for shooting," "man wanted for shooting, Raleigh, NC," "two men wanted in Raleigh," and "[h]ow much can you face for double homicide?" He also accessed a webpage concerning state laws on fetal homicide.

On 23 January 2017, defendant was indicted by a Wake County grand jury on two counts of first-degree murder, and the State subsequently announced its intent to seek the death penalty. Defendant filed numerous pretrial motions seeking to prohibit the State from introducing evidence of prior criminal activity by defendant against multiple victims, to suppress witnesses' pretrial identifications of defendant,

and to prohibit the imposition of the death penalty on various grounds.

A Wake County jury found defendant guilty of two counts of first-degree murder, and he was sentenced to death on 4 March 2019 following the jury's recommendation. Defendant timely appealed to this Court pursuant to N.C.G.S. § 7A-27(a). We find no prejudicial error in defendant's conviction and affirm the trial court's death sentence.

## II.    Analysis

### A. Admission of 404(b) Evidence of Prior Acts Against Bessie A. and Rachel B.[2]

Defendant first argues that the trial court erred in admitting the State's 404(b) evidence regarding prior criminal acts that defendant committed against Bessie A. and Rachel B.

Approximately two months before the murders of Garvey and Holland, Bessie A. was contacted by a man who was seeking sexual services. Bessie A. agreed to meet the man at a low-budget hotel in Raleigh, and she was ambushed when two men entered her room brandishing firearms. The men forced Bessie A. to remove her clothes and then stole her purse, bank card, driver's license, tablet, and cell phone. One of the men, whom Bessie A. recalled wearing a red hat and having a tattoo on his hand, raped her at gunpoint. The men then tied Bessie A.'s feet and hands

---

[2] Throughout this opinion, we have chosen to use first names and initials to identify sexual assault victims who provided 404(b) evidence to ensure that their experiences are not anonymized or diminished, while at the same time respecting their privacy.

together using pillowcases, threw blankets on top of her, and fled the scene. Bessie A.'s license was discovered by police in Hill's possession, and she later identified both defendant and Hill as the perpetrators. Bessie A. specifically named defendant as the individual who had raped her.

Less than two weeks later, on 28 October 2016, Rachel B. was also contacted by a man who planned to meet her at a low-budget hotel for sexual services. When Rachel B. opened the door to greet the man, she was ambushed by two men with guns. The two men began going through her personal items, forced her to undress, tied her hands and feet together, and then took turns raping her. The men then strangled her with a phone cord and took turns kicking her in the face. The two men stole Rachel B.'s ID, Social Security card, birth certificate, cell phone, clothes, and other personal items before leaving the hotel room. During this incident, Rachel B. noticed one man had a foreign accent and spider tattoos on his calf. She later identified this individual as defendant.

After the State disclosed its intent to call Bessie A. and Rachel B. as witnesses, defendant filed motions in limine to exclude this evidence. In its order on the admissibility of 404(b) evidence concerning the Bessie A. incident, the trial court made the following findings of fact:

> 11. On October 16, 2016, [Bessie A.] was raped and robbed in a hotel. The night of the rape, [Bessie A.] had been prostituting herself and had agreed to meet up with a potential "John." To [Bessie A.]'s surprise, two black males arrived and forced her into the hotel bedroom.

12. Both assailants had pistols, one silver and one black, and told her to get on the hotel bed. The men continued to yell at [Bessie A.] and demand for her to tell them where her money and belongings were. They took her I.D. and her debit card from her purse and forced her to reveal her PIN.

13. The men stripped her of her clothes, bound her hands and feet with the telephone cord, and the first man proceeded to rape her.

14. After the first man was finished, he disposed of the condom in the toilet. The second man was unwilling to penetrate because he did not have a condom. The two men then wrapped [Bessie A.] in a blanket and left her naked and restrained on the bed.

15. [Bessie A.] was able to make her way downstairs to the hotel lobby and was aided by the staff, and later, the police.

16. [Bessie A.] was able to identify Defendant and Co-Defendant Hill as her assailants with 80% certainty from a properly-administered police photo lineup.

17. Through further police investigation, [Bessie A.]'s I.D. and debit card were found in the car used by co-defendant Brandon Hill.

18. Defendant and co-defendant Brandon Hill are known associates, having been identified as such by the video of the Holland/Garvey crime scene . . . .

19. As to the victims, [Bessie A.] and Holland were both prostitutes in Raleigh who agreed to have sex with a single male in exchange for payment.

20. Rather than a single male, two black males showed up to the scene where [Bessie A.] and Holland were assaulted.

21. In each instance, the two assailants were armed with pistols used to threaten [Bessie A.] and Holland.

22. Both of the assaults took place in low-budget hotels in

Raleigh, North Carolina.

> 23. The criminal activity against [Bessie A.] and Holland/Garvey occurred 47 days apart in Raleigh, North Carolina.

The trial court then concluded that this evidence was admissible pursuant to Rule 404(b) of the North Carolina Rules of Evidence, for the following reasons:

> 4. The similarities in the events between [Bessie A.] and Holland show motive and a common scheme or plan: a plan that starts with the luring of a prostitute into a low-budget hotel room and ends with a robbery and sexual assault, and sometimes violence, if Defendant's plan meets a hurdle as apparently it did with Holland.
>
> 5. The two events are close enough in proximity of time and similarity of facts that this Court concludes that the evidence of the robbery and sexual assault of [Bessie A.] is probative of a motive and common scheme or plan of Defendant, as well as Defendant's identity, with respect to the crimes charged in this trial.

In a similar 404(b) order concerning the admissibility of Rachel B.'s testimony, the trial court made the following findings of fact:

> 11. On October 28, 2016, [Rachel B.] reported she had been raped in the early morning hours in a Microtel hotel in Morrisville, NC by two black males.
>
> 12. The morning of the rape, [Rachel B.] had been prostituting herself by using a website called "Backpage." After a smoke break outside of the hotel, [Rachel B.] was grabbed by two men and forced back into her hotel room.
>
> 13. Both assailants had pistols, one silver and one black, and told her to get on the hotel bed. The assailants continued to yell at [Rachel B.] and demanded her to tell them where her money and belongings were. They took her I.D. and her Social Security card from her bag.

14. The assailants stripped [Rachel B.] of her clothes, "hogtied" her hands and feet with the telephone cord, covered her head with a pillow case and stuffed her underwear in her mouth. Threatening her with hand guns, both men raped her and perpetrated other sexual offenses against her. After the assailants were finished, they told [Rachel B.] to stay put and said they were going to get their friends to have "more fun with her." After the assailants left, [Rachel B.] was able to escape and make her way downstairs to the hotel lobby where she was aided by the staff, and later, the police.

15. [Rachel B.] reported that the assailants were black males and that one, the more violent of the two, had a foreign accent and had a tattoo of three spiders on his lower right leg, and a tattoo of a sunset on his lower left leg. She further reported that the assailants had a black "camera case" styled box that was full of firearms.

16. Defendant, a native of St. Lucia, has a Caribbean Island accent. He also has a tattoo of three spiders on his lower right leg and a tattoo of a sunset on his lower left leg.

. . . .

20. As to the victims, [Rachel B.] and Holland were both prostitutes in Wake County, North Carolina (Raleigh/Morrisville) who agreed to have sex with different men in exchange for payment and utilized the Backpage website to solicit clients.

21. Two assailants were involved in the assaults on both [Rachel B.] and Holland/Garvey, and both involved unprovoked violence.

22. Both assailants were armed with pistols used in the commission of the crimes against [Rachel B.] and Holland.

23. Both of the assaults took place in low-budget hotels in Wake County, North Carolina.

> 24. The criminal activity against [Rachel B.] and Holland/Garvey occurred 35 days apart.

The trial court concluded that the evidence regarding Rachel B. was admissible pursuant to Rule 404(b), because:

> 4. The similarities in the events between [Rachel B.] and Holland/Garvey show motive and a common scheme or plan: a plan that starts with the confinement of a prostitute in a low-budget hotel room and ends with a robbery and sexual assault, and sometimes violence, if Defendant's plan meets a hurdle as it apparently did with Holland/Garvey.
>
> 5. The two events are close enough in proximity of time and similarity of facts that this Court concludes that the evidence of the robbery and sexual assault of [Rachel B.] is probative of a motive and common scheme or plan of Defendant, as well as Defendant's identity, with respect to the crimes charged in this trial.

The trial court also considered the proffered evidence of both witnesses in light of Rule 403, concluding that,

> [a]fter weighing the probative value of the proffered evidence against the danger of unfair prejudice, confusion of the issues, misleading the jury, and considerations of undue delay, waste of time, or needless presentation of cumulative evidence . . . the proffered evidence should not be excluded under Rule 403.

Both Bessie A. and Rachel B. subsequently testified at defendant's trial. Defendant requested that the trial court give a limiting instruction related to their testimony, and the trial court gave essentially the same limiting instruction to the jury for both witnesses, stating:

> This evidence was received solely for the following purposes: the identity of the person who committed the

crime charged in this case, if committed; that the defendant had a motive for the commission of the crime charged in this case, if committed; and that there existed in the mind of the defendant a plan, scheme, system, or design involving the crime charged in this case, if committed. If you believe this evidence, you may consider it but only for the limited purposes for which it was received. You may not consider it for any other purpose.

On appeal, defendant raises several arguments contesting the admissibility of this evidence. First, defendant contends that the admission of the evidence of the prior acts with Bessie A. and Rachel B. did not fall within the proper bounds of Rule 404(b) evidence. Second, defendant asserts that even if this evidence was proper under Rule 404(b), it should have been excluded under Rule 403 for its cumulative prejudicial impact. Third, defendant argues that the trial court's limiting instructions did not appropriately limit the jurors' use of the evidence. And fourth, defendant asserts that the focus on this "highly disturbing evidence" derailed the jurors' consideration of the actual events, influencing the jury's verdict. We disagree.

## 1. *404(b) Evidence*

Rule 404(b) is a "general rule of inclusion of relevant evidence of other crimes, wrongs or acts by a defendant." *State v. Coffey*, 326 N.C. 268, 278–79 (1990) (cleaned up); *see also State v. Carpenter*, 361 N.C. 382, 386 (2007). While this type of evidence may not be admitted "to prove the character of a person in order to show that he acted in conformity therewith," such evidence may be admitted "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." N.C.G.S. § 8C-1, Rule 404(b) (2023).

But because there lies a risk of the jury "giv[ing] excessive weight to the vicious record of [a] crime," *State v. Al-Bayyinah*, 356 N.C. 150, 154 (2002) (quoting 1A John H. Wigmore, *Evidence* § 58.2 (Peter Tillers ed. 1983)), there are safeguards in place to ensure that evidence admitted under Rule 404(b) is proper. Specifically, 404(b) evidence is "constrained by the requirements of similarity and temporal proximity." *Al-Bayyinah*, 356 N.C. at 154 (citing *State v. Lloyd*, 354 N.C. 76, 88 (2001); *State v. Lynch*, 334 N.C. 402, 412 (1993)).

Prior acts are sufficiently similar under Rule 404(b) if the facts "tend to support a reasonable inference that the same person committed both the earlier and later acts." *State v. Stager*, 329 N.C. 278, 304 (1991). These facts need not "rise to the level of unique and bizarre." *State v. Beckelheimer*, 366 N.C. 127, 131 (2012) (cleaned up). Rather, the ultimate question is one of "logical relevancy." *State v. McClain*, 240 N.C. 171, 177 (1954) (explaining that there must be a logical connection between the prior bad act and the crime charged); *see also State v. Fowler*, 230 N.C. 470, 473 (1949) ("The touchstone is logical relevancy."); *State v. Felton*, 283 N.C. 368, 372 (1973); *State v. Hunt*, 305 N.C. 238, 246 (1982).

Once a trial court determines that the requirements of Rule 404(b) have been met, it must then "balance the danger of undue prejudice against the probative value of the evidence, pursuant to Rule 403." *Carpenter*, 361 N.C. at 388–89. "When the trial court has made findings of fact and conclusions of law to support its 404(b) ruling, we look to whether the evidence supports the findings and whether the

findings support the conclusions." *Beckelheimer*, 366 N.C. at 130. "We review de novo the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b)." *Id.*

Here, defendant contests several of the trial court's findings of fact and conclusions of law in both 404(b) orders. First, defendant asserts that finding of fact No. 21 in the Bessie A. Order is not supported by the evidence.[3] Specifically, defendant contends that because the hotel surveillance footage did not show defendant entering Holland's room with a gun in his hand or otherwise threaten Holland prior to Hill shooting Garvey, and because there were no signs of struggle or restraint against Holland, "the evidence did not support a finding that [defendant] used his gun to threaten Holland after entering the room."

But defendant reads into the finding that he threatened Holland *before* Hill shot and killed Garvey. This finding does not distinguish the point in time defendant used his weapon to threaten Holland, whether before or after Hill shot Garvey, and is overwhelmingly supported by competent evidence as the surveillance footage alone showed defendant stepping out of Holland's hotel room with his gun in hand, and then shooting and killing her.

Defendant next argues that finding of fact No. 21 in the Rachel B. Order was not supported by competent evidence. Defendant concedes that there was no

---

[3] In his brief, defendant concedes that the trial "court's finding as to [Rachel B.] is more accurate as it states at finding [of fact No.] 22 that '[b]oth assailants were armed with pistols used in the commission of the crimes against [Rachel B.] and Holland.'"

provocation for the crimes committed against Rachel B., but he argues that his shooting of Holland was provoked by Hill's shooting of Garvey in the hallway.

Provocation "must ordinarily amount to an assault or threatened assault by the victim against the perpetrator." *State v. Watson*, 338 N.C. 168, 176 (1994), *cert. denied*, 514 U.S. 1071 (1995), *overruled in part on other grounds by State v. Richardson*, 341 N.C. 585 (1995). Thus, finding of fact No. 21 in the Rachel B. Order was supported by competent evidence as neither the shooting of Garvey by someone acting in concert with defendant nor defendant's shooting of Holland were committed in response "to an assault or threatened assault by the victim[s]." The surveillance footage showed Garvey banging on Holland's hotel door when he was approached by Hill, who was brandishing a firearm. In response, Garvey attempted to swat at the gun, but then put his hands up in the air and backed up against the wall in submission to Hill before he was shot and killed. Garvey's actions resulted exclusively from Hill's escalation of force by the introduction of a firearm into this encounter. Thus, as Garvey neither threatened nor assaulted Hill, it cannot be said that Hill's actions were provoked by the victim's response. *See Watson*, 338 N.C. at 176. This evidence alone was sufficient to support the challenged finding.

But even assuming *arguendo* that Hill's killing of Garvey was sufficiently "provoked" by Garvey's actions, the killing of an individual by a co-defendant cannot amount to legal provocation to kill another person when there is no evidence that the second victim posed any threat. Holland was naked and defenseless at the time of

her murder, and there is no evidence that she threatened or assaulted defendant such that she provoked her murder.

Defendant next challenges three portions of the trial court's 404(b) conclusions of law in the Bessie A. Order. First, defendant argues that the portion of conclusion of law 4—that each victim was lured to a low-budget hotel—is not supported by the evidence. Defendant essentially asserts that the women could not have been lured to a hotel because they were already located there for their work as prostitutes.

First, we note that this portion of conclusion of law No. 4 is more properly categorized as a finding of fact, and as such we review whether competent evidence supports this finding. *State v. Johnson*, 269 N.C. App. 76, 81–82 ("[F]indings of fact normally involve logical reasoning through the evidentiary facts." (cleaned up)), *aff'd* 378 N.C. 236 (2021); *Williams v. Marchelle Isyk Allen, P.A.*, 383 N.C. 664, 672–73 (2022) ("Any determination reached through logical reasoning from the evidentiary facts is more properly classified a finding of fact." (cleaned up)); *Beach v. McLean*, 219 N.C. 521, 525 (1941) ("If it is a mixed question of fact and law it is likewise conclusive, provided there is sufficient evidence to sustain the element of the fact involved.").

Defendant is correct that both Bessie A. and Holland were located at low-budget hotels by nature of their work as prostitutes. However, we disagree with his contention that because the women were already located at low-budget hotels, his actions could not constitute "luring." Defendant contacted both women on the pretext of obtaining consensual prostitution services for himself. Thus, defendant was the

cause of their presence at each location at the relevant, agreed upon times.

Moreover, neither woman was aware that defendant would arrive with a companion and that the two men would rob them and perpetrate violent acts against them. The evidence of the pretextual initiations of these visits to both Bessie A. and Holland as one which would include consensual sexual services with one man sufficiently support the trial court's finding that defendant enticed or otherwise caused these women to utilize hotels for the purposes of robbing and sexually assaulting them. *See State v. Howell*, 343 N.C. 229, 236 (1996) ("These facts are so strikingly similar as to permit [the victim's friend, a fellow prostitute, to testify] for the purpose of proving defendant's identity as well as showing a common opportunity, plan, and *modus operandi* to defendant's attacks.") *See also State v. Pruitt*, 94 N.C. App. 261, 267 (1989) (concluding that testimony from the defendant's former lovers was admissible to prove the defendant's modus operandi, plan, motive and intent concerning defendant's actions to lure his victims by pretextually befriending them before assaulting them); *State v. Morrison*, 85 N.C. App. 511, 514 (1987) (stating that defendant lured his victims to the crime scene on the pretext of changing clothes before they went out on a date).

Defendant also challenges additional portions of conclusion of law No. 4 for both the Bessie A. and Rachel B. Orders, asserting that the evidence does not support a finding that the common scheme "ends with a robbery and sexual assault, and sometimes violence, if [d]efendant's plan meets a hurdle as it apparently did with

Holland." Defendant contends that because "[n]o hurdles came up in the [Bessie A.] and [Rachel B.] incidents," the State could not show that "Hill and [defendant] had a plan to use violence if someone other than the woman they were meeting showed up and presented an obstacle to their activity." Defendant concedes that he and Hill "used violence to control" both Bessie A. and Rachel B.

As with the portion of the Bessie A. Order conclusion of law No. 4 discussed above, these portions of the Bessie A. and Rachel B. Orders are better categorized as findings of fact, as they demonstrate the trial court's "logical reasoning from the evidentiary facts." *See Williams*, 383 N.C. at 672–73. Thus, we analyze to determine whether competent evidence supports the finding that defendant's actions against both Bessie A. and Rachel B. would end with "violence, if [d]efendant's plan meets a hurdle."

One could argue that defendant's narrow reading of the finding—that these encounters would "sometimes" end in "violence if [d]efendant's plan me[t] a hurdle as apparently it did with Holland"—may not be supported by the evidence. Defendant concedes, however, that these incidents *always* involved violence regardless of whether defendant's plan met a hurdle. We therefore "examine whether the remaining findings support the trial court's determination" that both Bessie A.'s and Rachel B.'s encounters "show[ed] motive and a common scheme or plan" under Rule 404(b).

Defendant argues that the trial court erred in concluding that there was

sufficient similarity between the Bessie A., Rachel B., and Holland incidents "to show a common scheme or plan." Defendant concedes that there were many similarities between the events, such as the facts that "all three women were working as prostitutes out of cheap hotels, . . . using Backpage to set up meetings, and" only expecting a single male client when two men appeared armed with pistols. But defendant argues that these "do not show that the events leading to Holland's death were part of a common scheme or plan." Rather, defendant encourages us to focus on the differences in the incidents, arguing that because defendant and Hill both immediately forced their way into Rachel B.'s and Bessie A.'s rooms, while only defendant entered Holland's room in this case, and because there were no signs of struggle or injury to Holland before she was shot, these prior acts should not have been admitted under Rule 404(b).

But the trial court correctly concluded that defendant's prior acts against Bessie A. and Rachel B. and the charged crime were "close enough in proximity of time and similarity of facts" to demonstrate a common scheme or plan.

While defendant is correct in his assertion that there are a few minor differences between these three occurrences, "the correct analysis for the admissibility of Rule 404(b) evidence involves focusing on the similarities and not the differences between the two incidents." *State v. Pickens*, 385 N.C. 351, 359 (2023). "Our Rule 404(b) standard does not require identical or even near-identical circumstances between the charged offense and the prior bad act for evidence of the

prior bad act to be admissible." *Id.* But all that is required is some logical connection in both the prior bad act and the charged crime. *See McClain*, 240 N.C. at 177; *Fowler*, 230 N.C. at 473.

Here, all three women were prostitutes working out of low-budget hotels in the Raleigh and Wake County areas; they were operating through Backpage; defendant and Hill appeared together at the hotels before each crime took place; and both men were armed with pistols which were used to threaten the women in some capacity. Further, Bessie A., Rachel B., and Holland were contacted by one man, who then unexpectedly arrived with a companion. These facts are sufficient in both temporal proximity and similarity to demonstrate a common plan or scheme to rape and rob Holland on the night she was murdered. And because "Rule 404(b) allows the use of extrinsic conduct evidence so long as the evidence is relevant for *some purpose* other than to show . . . propensity," we need not consider whether this evidence was also sufficient to demonstrate motive. *State v. Cummings*, 326 N.C. 298, 310 (1990) (emphasis added) (quoting *State v. Morgan*, 315 N.C. 626, 637 (1986)).

## 2. *Rule 403 Analysis*

Once it is established that "a prior bad act is both relevant and meets the requirements of Rule 404(b), the trial court must balance the danger of undue prejudice against the probative value of the evidence, pursuant to Rule 403." *Carpenter*, 361 N.C. at 388–89. Otherwise admissible evidence may be excluded under Rule 403 "if its probative value is substantially outweighed by the danger of

unfair prejudice, confusion of the issues, or misleading the jury." N.C.G.S. § 8C-1, Rule 403 (2023).

It goes without saying that "evidence probative of the State's case is always prejudicial to the defendant," *Stager*, 329 N.C. at 310 (citing *Coffey*, 326 N.C. at 281), but this is not the threshold for exclusion. Rather, it must be unfairly prejudicial in that it has "an undue tendency to suggest decision on an improper basis." *State v. DeLeonardo*, 315 N.C. 762, 772 (1986) (cleaned up). We review a trial court's Rule 403 determination for abuse of discretion and will only disturb it when it is "manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Richardson*, 385 N.C. 101, 133 (2023) (quoting *State v. Hennis*, 323 N.C. 279, 285 (1988)).

Defendant contends that the trial court abused its discretion because the "prejudicial impact of the evidence on the jury cannot be viewed separately as to each incident, but rather must be viewed as to the cumulative impact of the evidence" regarding Bessie A. and Rachel B. Further, defendant contends that the emotional impact of Bessie A.'s and Rachel B.'s testimonies was unfairly prejudicial because it most likely influenced "[a]ny juror who might have harbored a reasonable doubt that [defendant] acted with premeditation and deliberation in shooting Holland, or a reasonable doubt that [defendant] had attempted to rape or rob Holland" on the night she was murdered.

But this evidence was not unfairly prejudicial, nor did it substantially

outweigh the highly probative value, because it was introduced to establish defendant's common scheme or plan. A review of the record shows that the trial court carefully considered the Rachel B. and Bessie A. evidence, and then provided multiple limiting instructions to the jury during trial, as will be discussed below. As such, it cannot be said that the trial court's ruling is "manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Richardson*, 385 N.C. at 133 (quoting *Hennis*, 323 N.C. at 285).

### 3. *Limiting Instruction*

Defendant next asserts that the trial court plainly erred in its limiting instructions regarding Bessie A.'s and Rachel B.'s Rule 404(b) evidence. Specifically, defendant contends that because the limiting instructions did not sufficiently advise the jury that the 404(b) evidence could only be considered on the issues of attempted robbery or rape, the jury was permitted to consider the evidence for purposes of defendant's state of mind when shooting Holland.

However, not only did defendant fail to object to these limiting instructions, but to the contrary, he requested them. After review, there was no error in the trial court's limiting instructions. But even if there was error, it was invited error as "[a] criminal defendant will not be heard to complain of a jury instruction given in response to his own request." *State v. Duke*, 360 N.C. 110, 124 (2005) (alteration in original) (quoting *State v. McPhail*, 329 N.C. 636, 643 (1991)); *see also State v. Wilkinson*, 344 N.C. 198, 214 (1996) ("Since defendant asked for the exact instruction

that he now contends is prejudicial, any error was invited error." (cleaned up)); *State v. Miller*, 289 N.C. App. 429, 433 (2023) ("[T]he invited error doctrine [applies] when a defendant's affirmative actions directly precipitate error.").

**B. Evidence of a Prior Assault with a Firearm on Kara L.**

Next, defendant argues that the trial court plainly erred under Rules 401 and 403 of the Rules of Evidence by admitting evidence at trial regarding a prior assault on Kara L. Defendant filed a motion in limine to exclude the evidence but failed to renew this objection at trial. As such, defendant's unpreserved claim is subject to plain error review. *See State v. Lawrence*, 365 N.C. 506, 516 (2012).

### 1. *Kara L.'s Testimony*

In November 2016, Kara L. met defendant through a website on which she was advertising herself for prostitution. Kara L. and defendant met at defendant's home and had consensual sex. At the time, defendant introduced himself as "Carlos" online, but Kara L. later discovered his identification card with the name "Seaga Gillard" listed on it.

After three days of being together, defendant told Kara L. that he was going to advertise her online for prostitution and that she was going to make money for him and his friend, "B." When Kara L. protested, defendant threatened to kill her family. Over the course of the next few days, defendant transported Kara L. to a hotel in Raleigh and told her to call him after she made $1,000.00.

Once Kara L. informed defendant that she had earned sufficient money,

defendant and "B" picked her up, took her back to defendant's home, and told her that she was required to make an additional $5,000.00 for them. Kara L. objected to this request and asked to be taken home. In response, defendant took out his gun, told Kara L. to show her teeth, and placed the gun up to her mouth. Defendant told Kara L. that she did not have a choice, and that "if he did not love her[,] her blood would be all over the room." During this time, Kara L. heard defendant refer to his gun by the name of "Lemon Squeeze."

Prior to defendant's trial, the State noticed its intent to introduce evidence of the incident between defendant and Kara L. In response, defendant filed a pretrial motion to prohibit the State from introducing this evidence during both the guilt-innocence and sentencing phases of trial. The trial court held a hearing to determine whether the proposed evidence was admissible and entered an order that permitted the State to elicit testimony from Kara L. to identify defendant and/or the weapon he used on the night she was assaulted. However, the trial court excluded evidence that may have constituted the offenses of human trafficking, kidnapping, assault, and other wrongs because the evidence was "too dissimilar to the charges" of first-degree murder.

At trial, Kara L. testified regarding her experience with defendant. Defendant did not object to Kara L.'s testimony, but instead requested that the trial court give the State a cautionary instruction based upon the order limiting Kara L.'s testimony. The trial court instructed the State and Kara L. that Kara L. should not testify about

defendant forcing her to engage in prostitution or taking money in connection with prostitution.

During Kara L.'s trial testimony, she vaguely recounted meeting defendant online, staying at his house for a few days, and then subsequently discovering that his name was "Seaga Gillard." Kara L. confirmed that during her stay at defendant's house, she met defendant's friend named "B," and that both defendant and "B" had guns. Kara L. further testified as follows:

> [The State]. Did he have a name for his gun?
>
> [Kara L.]. Lemon Squeeze.
>
> . . . .
>
> [The State]. At some point, did an incident occur with his gun and you?
>
> [Kara L.]. Yes, ma'am.
>
> [The State]. What did he do with his gun?
>
> [Kara L.]. He put the gun to my face, told me to show [my] teeth, and said, "If [I] d[idn]'t love [him], my blood would be all over the walls."
>
> [The State]. And you said he told you to show your teeth?
>
> [Kara L.]. Yes, ma'am.
>
> [The State]. What did he do with his gun when you showed your teeth?
>
> [Kara L.]. He put it up to my mouth.

Kara L. then identified defendant and "B" as the two perpetrators in the still

photographs taken from the hotel surveillance footage on the night of the murders.

Defendant did not object to Kara L.'s testimony or the identification, but instead requested a limiting instruction "concerning the gun to the mouth" incident. The trial court granted this request, giving the following limiting instruction to the jury:

> All right. Ladies and gentlemen, I'll give you a brief instruction regarding a portion of the evidence you heard. Evidence has been received tending to show that this defendant held a firearm in the face of this witness, and this evidence was received solely for the following purposes: for the purpose of showing the identity of the person that committed the crime charged in this case, if it was committed, and the identity of a firearm used in the crime charged in this case, if it was committed. If you believe this evidence, you may consider it but only for the limited purposes for which it was received. You may not consider it for any other purpose.

The trial court gave this limiting instruction once again during the final jury charge as well, stating:

> Evidence has been received tending to show that the defendant assaulted or threatened Kara [L.] with a firearm. This evidence was received solely for the purposes of showing, A, the identity of the person who committed the crimes charged in this case and, B, the identity of a firearm which may have been related to the crimes charged in this case. If you believe the evidence, you may consider it but only for the limited purposes for which it was received. You may not consider it for any other purpose.

Defendant now contends that the trial court committed plain error by permitting Kara L. to testify that defendant assaulted her with a firearm. Specifically, defendant argues that Kara L.'s testimony that defendant had a gun,

and that he used the gun to threaten her, "had no relevance to identifying the gun used in the shooting of Holland, and hence did not meet the requirements of Rule 401" or Rule 403. Defendant argues that this amounted to plain error because "[a] juror who had not been swayed by the emotional impact of the evidence of the assault of [Kara L.] might well have convicted [defendant] of second-degree murder."

### 2. *Plain Error Review*

This Court applies the plain error standard of review for "unpreserved instructional or evidentiary error[s]" which occur at trial. *Lawrence*, 365 N.C. at 518. Plain error is an extreme remedy and "should be used sparingly, only in exceptional circumstances, to reverse criminal convictions on the basis of unpreserved error." *Id.* at 517 (quoting *State v. Odom*, 307 N.C. 655, 661 (1983)).

Recently, this Court reiterated the standard for plain error review, clarifying that for a defendant to succeed, three things must be shown:

> First, the defendant must show that a fundamental error occurred at trial. Second, the defendant must show that the error had a probable impact on the outcome, meaning that absent the error, the jury probably would have returned a different verdict. Finally, the defendant must show that the error is an exceptional case that warrants plain error review, typically by showing that the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*State v. Reber*, 386 N.C. 153, 158 (2024) (cleaned up).

This exacting standard demands that even if error exists under step one, a defendant must still demonstrate "that a jury *probably would have* reached a

different result," which "requires a showing that the outcome is significantly more likely than not." *Id.* at 159. Even then, defendant must show that this is the exceptional case in which plain error review is warranted because the purported error affects "the fairness, integrity or public reputation of judicial proceedings." *Id.* at 158 (quoting *Lawrence*, 365 N.C. at 518).

Further, plain error review is unavailable for issues that fall "within the realm of the trial court's discretion," *State v. Steen*, 352 N.C. 227, 256 (2000), such as Rule 403 determinations. *See State v. Murillo*, 349 N.C. 573, 602 (1998) (holding exclusion of evidence under Rule 403 "is a matter left to the sound discretion of the trial court"); *see also State v. Norton*, 213 N.C. App. 75, 81 (2011) ("Because our Supreme Court has held that discretionary decisions of the trial court are not subject to plain error review, we need not address [defendant]'s argument on this issue." (cleaned up)); *State v. Smith*, 194 N.C. App. 120, 126–27 (2008) ("Our Supreme Court has held, however, that discretionary decisions by the trial court are not subject to plain error review."); *State v. Cunningham*, 188 N.C. App. 832, 837 (2008) ("[W]e do not apply plain error 'to issues which fall within the realm of the trial court's discretion.' " (quoting *Steen*, 352 N.C. at 256)).

We, therefore, decline to address defendant's Rule 403 argument for plain error. However, because a "trial court's rulings on relevancy are technically not discretionary," we must review defendant's challenge under Rule 401. *State v. Lane*, 365 N.C. 7, 27 (2011).

Evidence is "relevant" to a case if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (2023). "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of North Carolina, by Act of Congress, by Act of the General Assembly or by" our Rules of Evidence. N.C.G.S. § 8C-1, Rule 402 (2023). While a trial court's relevancy determinations are not discretionary, "we accord them great deference on appeal." *Lane*, 365 N.C. at 27.

As a general rule "[w]eapons may be admitted in evidence where there is evidence tending to show that they were used in the commission of a crime." *State v. Wilson*, 280 N.C. 674, 678 (1972). And in cases where "no weapon is found in a defendant's possession at the time of his arrest or thereafter, testimony that defendant had once owned or possessed a weapon becomes *especially* relevant." *State v. Mlo*, 335 N.C. 353, 376 (1994) (emphasis added); *see also State v. Smith*, 357 N.C. 604, 614 (2003) ("Because the weapon used to murder the victim was never found, evidence that defendant carried a knife with him at times had some relevance to the case.").

Here, defendant's argument that the trial court committed plain error under Rule 401 is without merit. First, the gun used by defendant to shoot Holland was never recovered. Therefore, Kara L.'s testimony about defendant's possession of, preference for, and prior assault with a firearm was relevant as it made the fact that

defendant possessed and used the weapon to kill Holland more probable. *See Mlo*, 335 N.C. at 376. Thus, the trial court did not err in admitting relevant evidence, and because there was no "fundamental error," there can be no plain error. *Reber*, 386 N.C. at 158.

However, even if the admission of Kara L.'s statement regarding defendant's assault with a firearm was not relevant, defendant cannot show that a jury "probably would have reached a different result," or that this purported error affects "the fairness, integrity or public reputation of judicial proceedings." *Reber*, 386 N.C. at 158–59. At trial, the State presented overwhelming evidence of defendant's guilt—including video footage of Hill and defendant shooting Garvey and Holland. Thus, defendant cannot demonstrate plain error in the trial court's admission of this evidence.

## C. Evidence of the Abusive Backgrounds of Prior Women Victimized by Defendant

Defendant next argues that the admission of testimony regarding background information of witnesses Angel Holland, Rachel B., Keyona T., and Keyana M. was plain error because it was irrelevant and highly prejudicial. The evidence regarding the personal background information of Holland and Rachel B. was introduced during the guilt-innocence phase of trial, while the evidence related to Keyona T. and Keyana M. was introduced during the capital sentencing phase. We address each in turn.

### 1. Guilt-Innocence Phase

Among the many witnesses called by the State during the guilt-innocence

phase of trial were Rachel B. and the victim's sister, Angel Holland. Angel Holland

was asked on direct examination if something had happened when she and her sister

were young "that kind of put April on a . . . downward spiral." Defendant objected

and requested to be heard outside the presence of the jury, arguing that the question

solicited victim-impact testimony in violation of a pretrial order. According to

defendant, testimony regarding the victim's childhood was irrelevant and violative of

this Court's precedent in *State v. Hembree*, 368 N.C. 2 (2015).

The State responded to the objection, arguing that it was not

> asking her about how this has affected her or anything like
> that. I think that what has been clear in this trial is that
> April was at a point in her life where she was prostituting,
> and I think, as part of that story, kind of understanding
> what got her there would make some sense to this jury and
> would be relevant. I don't plan on going very far into that
> but just kind of where she was and how that got her to a
> point where she began to prostitute.
>
> We've had no evidence so far that she actually was
> prostituting, and this is actually where the police found
> this out . . . from her family, which is exactly why we then
> start researching crimes against prostitutes. It kind of
> starts that whole spiral into this investigation.

The trial court responded that

> the fact that this victim was engaged in prostitution . . . i[s]
> relevant to the jury to give some context to get to how she
> came to be at the place she was that night, engaging with
> a stranger over the Back Page ad. I think its probative to
> give the context of why she was engaged in that type of
> conduct.
>
> I will caution the witness that characterizations of your
> sister as, you know, a kind person or a loving person or all

of those things . . . would not be relevant at this stage of the proceedings. So I'll ask you to listen carefully to the questions that are asked of you and answer them—answer specifically what's being asked of you . . . .

The direct examination of Angel Holland continued:

[Angel:] When she was around seven or eight, she was molested, and from there things started changing with her, in a couple years of the incident.

[The State:] And as far as, kind of, as that starts to change her, did she begin to date much older men?

[Angel:] Yes, she did.

[The State:] Would you say that those relationships were abusive?

[Angel:] Yes.

[The State:] Yes?

[Defendant:] Objection.

The Court: Overruled.

[The State:] Did you know that your sister began to prostitute?

[Angel:] It took a while for me to find out, but she did — told — within a year, sort of.

On appeal, defendant again argues that "[t]he evidence that April Holland was sexually abused as a child, engaged in abusive relationships with older men, and began sex work as a teenager . . . had no relevance to the issues before the jury." Because defendant preserved his argument, which does not relate to a federal constitutional right, we review pursuant to N.C.G.S. § 15A-1443(a). Thus, defendant

has the burden of demonstrating that the trial court erred, and "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." N.C.G.S. § 15A-1443(a) (2023).

During the guilt-innocence phase of trial, evidence concerning a victim's character is generally not relevant. *See Hembree*, 368 N.C. at 16 ("Evidence of a victim's character, or the effect of the victim's death on others, is only rarely relevant when making a determination of guilt."). On the other hand, this Court has held that evidence of a victim's history or habits may be "relevant to explain the particular circumstances of the crime." *See State v. Barden*, 356 N.C. 316, 349 (2002) (holding that evidence that a victim worked late nights and kept cash in his wallet was relevant to explaining why he was robbed and killed at his workplace in the middle of the night). However, even if evidence is deemed to meet the low threshold for relevance, it must "still be excluded when its probative value is substantially outweighed by the danger of unfair prejudice." *Hembree*, 368 N.C. at 17 (citing N.C.G.S. § 8C-1, Rule 403).

Here, Angel's testimony about her sister's abusive background and subsequent prostitution was not character evidence, as it did not relate to April Holland's disposition or traits. In fact, the trial court cautioned Angel to avoid testifying about any "characterizations of your sister as, you know, a kind person or a loving person or all of those things." Instead, the evidence revealed the factual circumstances of April Holland's life relevant to explaining why she was engaging in prostitution on

the night she was murdered by defendant at the hotel. *See Barden*, 356 N.C. 316.

Further, because Angel Holland was the first witness for the State to directly reveal

that April Holland was engaging in prostitution, coupled with the fact that her

testimony was extremely limited in scope, the probative value of this testimony was

not substantially outweighed by the risk of unfair prejudice against defendant. Thus,

because there was no error, there can be no plain error. *Reber*, 386 N.C. at 158.

Defendant next argues that the trial court plainly erred by allowing Rachel B.

to testify about her abusive childhood and subsequent experience as a prostitute.

Specifically, defendant contends that portions of Rachel B.'s testimony were

irrelevant "to proving Gillard's identity, whether he acted as part of a common

scheme or plan or his motive in the events that led to Holland's murder." Because

defendant failed to object to this portion of Rachel B.'s testimony at trial, we review

for plain error. *See Reber*, 386 N.C. at 158.

As discussed above, Rachel B.'s 404(b) testimony was "probative of a motive or

common scheme or plan of [d]efendant, as well as [d]efendant's identity." But before

recounting defendant's prior acts against her, Rachel B. testified that she was put

into foster care and lived in group homes or with other family members when she was

a child due to her mother's drug addiction. Rachel B. also testified that she discovered

that a family member had been filming her while she was showering or using the

bathroom, and then masturbating to the videos of her. Rachel B. also testified that

as a child, her mother trafficked her in exchange for drugs. As a result of these

events, Rachel B. stated that she turned to stripping and prostitution where she was subjected to physical violence. After discussing her background, Rachel B. then testified about her encounter with defendant in October of 2016.

While defendant objected to Rachel B.'s 404(b) testimony, he did not object to the testimony concerning her abusive childhood, subsequent prostitution, and the violence she experienced as a sex worker. This may have been part of defendant's trial strategy because defense counsel cross-examined Rachel B. regarding the violence she experienced as a prostitute, probing beyond the State's line of questioning. Defendant now argues that this testimony was irrelevant and highly prejudicial, such that it constitutes plain error.

But a defendant cannot raise the issue of plain error on appeal for evidence which he elicited during cross-examination of the witness. *See State v. Rivers*, 324 N.C. 573, 575–76 (1989) ("It is clear . . . that the testimony of which the defendant now complains was elicited by counsel for the defendant during cross-examination of the witness and that he did not object to the testimony in any way or move to have it stricken at trial. 'Any error thus was invited and defendant cannot complain of such error on appeal.'" (quoting N.C.G.S. § 15A-1443(c) (1988))).

Even so, "[i]t is elementary that when a witness has been sworn and takes the stand, preliminary questions are properly put to him as to name, residence, knowledge of the case, etc." *State v. Sports*, 41 N.C. App. 687, 690, *disc. rev. denied*, 298 N.C. 205 (1979) (holding that evidence of a witness's orphan status, epileptic

history, scholarship assistances and summer employment was relevant for "introductory and general purposes [and] as an explanation as to why the witness was . . . walking home alone on the night in question"); *see also* 1 Kenneth S. Broun et al., *Brandis & Broun on North Carolina Evidence* § 167 (8th ed. 2018). Introductory evidence of a witness is relevant if it helps identify the witness, their knowledge of the case at hand, or to give context as to why they were in a particular situation. *See Pittman v. Camp*, 94 N.C. 283, 284–85 (1886) ("The question 'where do you live?' . . . was not irrelevant, because it tended to identify the witness, and to show in some slight degree, his opportunity to be informed in respect to the matter about which he was testifying.").

The reviewable portions of Rachel B.'s testimony relate to Rachel B. being removed from her mother's care at age ten, being sold out to men in exchange for drugs by her mother, the incident of being secretly filmed by a family member, and her living in group and foster homes for most of her childhood. This introductory evidence—though lengthy—provided context to the jury for how Rachel B. crossed paths with defendant on the night he attacked her and was relevant. As such, there is no error. Moreover, because defendant failed to object at trial, we cannot review this evidence for whether the risk of unfair prejudice substantially outweighed its probative value under Rule 403. *See Steen*, 352 N.C. at 256.

### 2. Sentencing Phase

Keyona T. and Keyana M. were among the witnesses called during the

sentencing phase, both of whom testified as to defendant's prior violence against them. Similar to the testimony of Rachel B. and Angel Holland, Keyona T. and Keyana M. shared information with the jury regarding the difficult circumstances of their childhoods before testifying about defendant's violence against them. Defendant objected to their background testimony as irrelevant and unfairly prejudicial, preserving the issues for appeal.

But "[t]he rules of evidence do not apply in sentencing proceedings, and any competent evidence which the court deems to have probative value may be received." *State v. Augustine*, 359 N.C. 709, 731 (2005) (cleaned up) (citing N.C.G.S. § 8C-1, Rule 1101(b)(3) (2003); N.C.G.S. § 15A-2000(a)(3) (2003)); *see also State v. Smith*, 352 N.C. 531, 557 (2000); *State v. Atkins*, 349 N.C. 62, 94 (1998). These less restrictive standards afford the trial court "considerable leeway and discretion in governing the conduct of a sentencing proceeding." *Smith*, 352 N.C. at 557. "Evidence may be presented as to any matter that the court deems relevant to sentenc[ing], and may include matters relating to any of the aggravating or mitigating circumstances." *State v. Golphin*, 352 N.C. 364, 464 (2000) (quoting N.C.G.S. § 15A-2000(a)(3) (1999)). Because of this considerable leeway, "trial courts are not required to perform the Rule 403 balancing test during a sentencing proceeding." *Id.* (quoting *State v. Flippen*, 349 N.C. 264, 273 (1998), *cert. denied*, 526 U.S. 1135 (1999)). Further, during the sentencing phase, "the jury is properly permitted to consider all the evidence

presented during the guilt-innocence phase." *State v. Moseley*, 338 N.C. 1, 41 (1994).[4]

    *a.  Keyona T. & Keyana M.*

The State called Keyona T. and Keyana M. to testify at the sentencing hearing about their prior violent encounters with defendant.  This evidence was presented to establish the aggravating factor: "The murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and that included the commission by the defendant of other crimes of violence against another person or persons."  N.C.G.S. § 15A-2000(e)(11) (2023).  However, before testifying about the violence they had endured at defendant's hands, both witnesses briefly recounted details of their troublesome upbringings.  On appeal, defendant contests the admission of the background information as irrelevant and unfairly prejudicial.

Keyona T. testified that she was raised by her mother, but that her mother was not present during her upbringing.  Keyona T. stated that she was sexually abused

---

[4] The dissent expresses disagreement with North Carolina's established procedures in the sentencing phase, preferring instead to limit consideration by the jury of relevant evidence that may be beneficial in reaching a sentencing recommendation.  Although the dissent acknowledges that use of this evidence does not violate North Carolina law, the dissent contends specifically that the death sentences here should be overturned.  More generally though, the dissent asserts that the sentencing scheme imposed by the General Assembly and sanctioned by this Court should be cast aside based primarily on citation to law review articles.

    We also note that the dissent attempts to engage in a proportionality review of defendant's death sentence by incorporating arguments from his pretrial Motion to Strike Death Penalty because the Death Penalty Violates the Evolving Standards of Decency in this Community.  This motion included a host of irrelevant information, including polling results.  The motion was denied by the trial court and defendant failed to object to the trial court's ruling.  Defendant failed to preserve this argument, and the issue is not properly before the Court.  N.C. R. App. P. 28.

by one of her mother's boyfriends, and both she and her siblings were physically abused by another. As a result, DSS removed Keyona T. from the home three times. She further testified that she suffered from PTSD and became a prostitute after she was forced to drop out of college. Ultimately, Keyona T. identified defendant in court and testified about a violent encounter she had with him while she was a prostitute.

Keyana M. likewise discussed her difficult childhood before ultimately testifying about a night when she was tied up, raped, and robbed by defendant at a hotel. Keyana M. briefly testified that as a child, her parents left her to be raised by her grandmother, and that around age twelve she was sexually assaulted. She then stated that at around age eighteen, she began engaging in prostitution, which is how she met defendant.

The challenged testimony was used to introduce each witness to the jury, and it related to the aggravating circumstance under N.C.G.S. § 15A-2000(e)(11) as it showed a course of conduct by defendant of engaging in violent acts against vulnerable women and prostitutes. *See Golphin*, 352 N.C. at 464. Because of the highly deferential standard in which trial courts are afforded "considerable leeway and discretion" during the sentencing phase, we find no error. *See Smith*, 352 N.C. at 557.

### b. *Permitted to Consider Evidence from Guilt Phase*

Defendant argues that because the jury was told they could consider the evidence from the guilt phase of trial during their sentencing deliberations, Gillard's

right to a fair capital sentencing hearing was undermined by the "the unfairly inflammatory evidence of the traumatic and abusive backgrounds of Holland, [Rachel B.], [Keyona T.], and [Keyana M.]."

But there is "nothing in the instant case to suggest that the jury's decision to recommend a sentence of death was based on any unfair prejudice that may have been created by [admission of this evidence]." *State v. Moody*, 345 N.C. 563, 572 (1997). The trial court instructed the jury during the sentencing phase that "[a]ll of the evidence which you hear[d] in both phases of the case is competent for your consideration in recommending punishment." Defendant did not object to this instruction, and as such, this unpreserved claim is subject to plain error review. *See Reber*, 386 N.C. at 158. However, because an instruction during the sentencing phase "to consider all the evidence presented during the guilt-innocence phase," *Moseley*, 338 N.C. at 41, is not erroneous, there can be no plain error. *Reber*, 386 N.C. at 158.

## D. Admission of Photographic Evidence

Defendant next argues that the trial court abused its discretion in admitting nine photos as part of nearly one hundred photos in the State's Exhibit 3 over defense counsel's objection in light of other evidence admitted at trial. Specifically, defendant argues that photos 63, 64, 66, 69, 70, 71, 72, 75, and 76 were "unnecessarily repetitive and cumulative," and that their probative value, in light of the rest of the photos and the crime scene video, was so substantially outweighed by the danger of inflaming the passions of the jury that they should have been excluded under Rule

403. *See* N.C.G.S. § 8C-1, Rule 403.

When tasked with determining whether photographic evidence should be admitted, "the trial court must weigh the probative value of the photographs against the danger of unfair prejudice to defendant." *State v. Blakeney*, 352 N.C. 287, 309 (2000) (citing *State v. Goode*, 350 N.C. 247, 258 (1999)). Because this determination lies within the sound discretion of the trial court, "the trial court's ruling should not be overturned on appeal unless the ruling was manifestly unsupported by reason or was so arbitrary that it could not have been the result of a reasoned decision." *Id.* (cleaned up).

Generally, "[p]hotographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury." *Hennis*, 323 N.C. at 284 (citing *State v. Murphy*, 321 N.C. 738 (1988)). "The number of photographs alone is an insufficient measure of their capacity to prejudice and inflame the jury." *State v. Phipps*, 331 N.C. 427, 454 (1992). And while there is "no definitive test for the admissibility of photographs alleged to be inflammatory and unduly prejudicial," *Mlo*, 335 N.C. at 374, this Court has discussed certain factors which may be helpful in making this determination. "What a photograph depicts, its level of detail and scale, whether it is color or black and white, a slide or a print, where and how it is projected or presented, the scope and clarity of the testimony it accompanies," *Hennis*, 323 N.C. at 285, and "whether

the photographs are unnecessarily duplicative of other testimony," *Richardson*, 385 N.C. at 133, must be considered when determining whether a photograph's probative value is substantially outweighed by its prejudicial impact.

This Court has emphasized that "[w]hen a photograph adds nothing to the State's case, then its probative value is nil, and nothing remains but its tendency to prejudice." *Hennis*, 323 N.C. at 286 (cleaned up) (quoting *State v. Temple*, 302 N.C. 1, 14 (1981)). However, the State is permitted to present, consistent with the rules, evidence which it contends conveys a full perspective of the victim's injuries and a defendant's actions. Thus, when photographs are admitted which show different angles of a victim's injuries and the surrounding crime scene, they are not unnecessarily duplicative and excessive—even if similar—so long as they contribute individual value to the State's case. *See State v. Kandies*, 342 N.C. 419, 443 (1996) (multiple photographs, including autopsy photographs, were admissible to show "various angles of the lacerations to the head as well as the injuries to the vaginal area and properly illustrated the nature of the wounds and the manner of killing"); *Richardson*, 385 N.C. at 139–46 (holding that eighty-eight photographs of a victim's body were admissible because they "accurately reflected the reality of the crimes with which [the] defendant was being tried and were probative to the issues before the jury"); *State v. Pierce*, 346 N.C. 471, 488 (1997) ("Given the number, nature, and extent of the victim's injuries . . . the trial court did not abuse its discretion by admitting twenty-six photographs of the victim's body."); *State v. Haselden*, 357 N.C.

1, 16 (2003) ("[E]ach photograph was taken at a different angle, offering a unique perspective on the nature and location of [the victim]'s wounds.").

Defendant argues that photos 63, 64, 66, 69, 70, 71, 72, 75, and 76 in State's Exhibit 3 were unnecessarily repetitive and cumulative because other evidence presented at trial showed that Holland was found naked by the door of the hotel room, that her cause of death was a bullet wound to the chest, and that shell casings were found near her body. Ultimately, defendant asserts that because these photographs "depicted substantially the same scene" as other photographs, their probative value was "nil." We disagree.

At trial, the State presented all of the color photographs by displaying a PowerPoint onto a small television for the jury to view. Photographs 63 and 64 were not unnecessarily duplicative of photograph 62. Photograph 62 was taken from the hallway into the hotel room, and illustrated how Holland's body was partially blocking the door upon entry into the room. Photograph 63 was the first close-up of Holland's body lying in a pool of blood, which demonstrated the scene that first-responders observed upon arrival. Photograph 64 was a different angle from both 62 and 63 and was used to illustrate the distance between Holland's body and the main portion of the hotel room where the bed was located.

We likewise reject defendant's argument that photograph 66 was unnecessarily duplicative of photograph 65. Photograph 65 provided an all-encompassing view of Holland's body and surrounding footprints, whereas

photograph 66 only showed a portion of Holland's body and zoomed in on the footprints found in the blood next to Holland's body.

Further, photographs 69, 70, and 71, while similar, demonstrated different angles of Holland's injuries. Photograph 69 was a close-up of the bullet wound and surrounding blood splatter on Holland's chest and was the only close-angle photograph taken of Holland's chest at the crime scene. Photograph 70 was a close-up of the bullet wound to Holland's face and did not show Holland's chest at all. Photograph 71 was taken from a side-angle and illustrated both bullet wounds and their locations in relation to each other.

Finally, photographs 72, 75, and 76 were properly admitted as well. Photograph 72 depicted Holland's body relative to the discovery of a shell casing between her body and the door. Photograph 75 depicted crime scene markers placed beside the footprints in the blood to the right of Holland's body, and photograph 76 depicted a marker placed beside an additional footprint which was discovered by the door.

The trial court overruled defendant's objection to these photographs, determining that it was "satisfied that each [photograph had] independent evidentiary value that shows the different angles or provides scale, distances, location of items of evidence, and specifically what the officers observed when they were on the scene." Thus, these photographs provided sufficiently distinct information of independent value to the State's case, making them neither unnecessarily duplicative

nor excessive, *see Kandies*, 342 N.C. at 443, and the admission of these photographs was not "manifestly unsupported by reason or . . . so arbitrary that it could not have been the result of a reasoned decision." *Blakeney*, 352 N.C. at 309 (cleaned up).

## E. Failing to Dismiss Charges for First-Degree Murder of Holland

Defendant next argues that the trial court erred by denying defendant's motion to dismiss the charge of first-degree murder against Holland on both theories of felony murder and premeditation and deliberation on the basis of insufficient evidence. The trial court denied this motion, and defendant was thereafter found guilty of first-degree murder of Holland on both theories. We address each theory in turn.

When ruling on a motion to dismiss, "the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *State v. Golder*, 374 N.C. 238, 249 (2020) (quoting *State v. Winkler*, 368 N.C. 572 (2015)). Put another way, "[i]f there is more than a scintilla of competent evidence to support the allegations in the warrant or indictment, it is the court' s duty to submit the case to the jury." *State v. Horner*, 248 N.C. 342, 344–45 (1958). "The terms 'more than a scintilla of evidence' and 'substantial evidence' are in reality the same and simply mean that the evidence must be existing and real, not just seeming or imaginary." *State v. Earnhardt*, 307 N.C. 62, 66 (1982).

The trial court must consider the evidence "in the light most favorable to the State, giving the State the benefit of all reasonable inferences." *State v. Fritsch*, 351

N.C. 373, 378–79 (2000). "In other words, if the record developed at trial contains substantial evidence, whether direct or circumstantial, or a combination . . . the case is for the jury and the motion to dismiss should be denied." *Golder*, 374 N.C. at 250 (cleaned up). Whether the State presented substantial evidence to support each element of a crime is a question of law, and thus, we review a trial court's denial of a motion to dismiss de novo. *Id.*

### 1. Felony Murder

Defendant first argues that there was insufficient evidence to prove that Holland was murdered during the commission of an attempted rape or robbery. Specifically, defendant contends that the State failed to show that he intended to rape or rob Holland and the use of circumstantial evidence under Rule 404(b) could not remedy this alleged error.

A killing which is "committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree." N.C.G.S. § 14-17(a) (2023). As is relevant here, "[t]he elements of an attempt to commit a crime are: (1) the intent to commit the substantive offense, and (2) an overt act done for that purpose which goes beyond mere preparation, but (3) falls short of the completed offense." *State v. Baker*, 369 N.C. 586, 595 (2017) (cleaned up).

Because "[i]ntent is an attitude or emotion of the mind and is seldom, if ever,

susceptible of proof by direct evidence, it must ordinarily be proven by circumstantial evidence, i.e., by facts and circumstances from which it may be inferred." *State v. Gammons*, 260 N.C. 753, 756 (1963). This Court has upheld the use of Rule 404(b) evidence for proving the intent of a defendant to commit an underlying felony. *See State v. Williams*, 355 N.C. 501, 581–82 (2002) (affirming a trial court's denial of defendant's motion to dismiss when, among other things, "Rule 404(b) evidence tended to show that defendant lured his victims to isolated locations where he would assault them . . . while raping or attempting to rape them"); *Al-Bayyinah*, 359 N.C. at 748 (evidence of a defendant's statement that he "wanted to go back to prison" was "substantially probative of defendant's motive and intent" to commit the underlying robbery).

Further, in proving an overt act, the State must demonstrate that a defendant has taken a "direct movement towards the commission [of the offense] *after* the preparations are made." *State v. Melton*, 371 N.C. 750, 760 (2018) (cleaned up) (emphasis added). This threshold has been defined as a "subsequent step in a direct movement towards the commission of the offense after the preparations are made," but it need not be "the last proximate act" before the crime occurs. *Id.* at 757 (quoting *State v. Miller*, 344 N.C. 658, 668 (1996)). Instead, it is sufficient once a defendant has "begun to execute the criminal design that he helped concoct." *Id.* at 762 (cleaned up).

We turn first to the attempted crime of rape. To prove intent, the State must

produce evidence that the "defendant intended to gratify his passion on the person of the woman." *Gammons*, 260 N.C. at 755. "Sexual intent may be proved circumstantially by inference, based upon a defendant's actions, words, dress, or demeanor." *State v. Cooper*, 138 N.C. App. 495, 498 (2000) (citing *State v. Robbins*, 99 N.C. App. 75, 80, *aff'd*, 327 N.C. 628 (1990)). Giving the State the benefit of all reasonable inferences based on the evidence presented at trial, a reasonable juror could believe that defendant intended to rape Holland on the night she was murdered.

First, contrary to defendant's assertion, 404(b) evidence may be considered when determining whether the State has presented sufficient evidence of a defendant's intent to commit an underlying crime. *See Williams*, 355 N.C. at 581–82. Here, Bessie A.'s and Rachel B.'s 404(b) testimonies demonstrated that defendant had a common scheme or plan to rape and rob prostitutes. This plan began with either defendant or Hill contacting the women over Backpage, posing as an individual man seeking sexual services, and ended with both men arriving at low-budget hotels armed with pistols, forcing the women to undress, tying them up, and raping them. In addition to the 404(b) evidence, the State also provided evidence that on the morning Holland and Garvey were murdered, defendant sent a text to Hill after setting up his appointment with Holland that he had "got one." Considering the evidence in the light most favorable to the State and giving it all reasonable inferences, a reasonable juror could accept that defendant intended to rape Holland before he was interrupted by Hill's shooting of Garvey in the hallway.

Next, based on this same evidence, a rational juror could believe that defendant intended to rob Holland prior to being interrupted by the shooting of Garvey. "An attempted robbery with a dangerous weapon occurs when a person, with the specific intent to unlawfully deprive another of personal property by endangering or threatening his life with a dangerous weapon, does some overt act calculated to bring about this result." *Miller*, 344 N.C. at 667–68 (quoting *State v. Allison*, 319 N.C. 92, 96 (1987)).

Bessie A.'s and Rachel B.'s 404(b) evidence demonstrated that defendant had a particular scheme or plan associated with raping and robbing prostitutes. Both Rachel B. and Bessie A. testified that they were forced to undress, were tied up with bedsheets, and were raped by the men, who would rummage through the women's personal items either before or after raping them.[5] While there was no direct evidence that Holland's personal items had been pillaged through or taken, this is not a requirement for proving intent. *See State v. Davis*, 340 N.C. 1, 12–13 (1995) (concluding that intent existed even though defendant did not demand money or take any money or valuables from the scene after shooting the victim).

Defendant entered the room with a loaded weapon and a sheet was found near

---

[5] The dissent takes issue with the admission of what it terms, "unadjudicated offenses" under Rule 404(b), even though the dissent concedes that use of this evidence does not violate any rule or statute. Instead, the dissent relies on two law review articles in an effort to impose a new per se restriction on the use of relevant evidence. But the simple fact that an individual was not charged with an offense or convicted of a crime does not mean that the incident did not occur. Rule 404(b) thus focuses on logically connected conduct, not convictions.

Holland's body, evidence from which the jury could infer that defendant was executing a similar plan as he had before with Bessie A. and Rachel B. Additionally, at the time that the murders occurred, defendant had only been in Holland's room for approximately four minutes, suggesting that had Garvey not interrupted and subsequently been shot by Hill, defendant and Hill would have proceeded with the robbery and rape of Holland. Thus, considering this evidence in the light most favorable to the State and giving it the benefit of every reasonable inference, the State provided substantial evidence of defendant's intent to rob Holland with his firearm on the night she was murdered.

Finally, the State's evidence also demonstrated defendant's overt acts toward the commission of both the attempted rape and robbery of Holland. Defendant argues that although his scheduling of the meeting with Holland, his arrival at the hotel, and his entry of the room support a finding that he "devised the means necessary for the commission of the offense," it was only proof of mere preparation, not the overt act.

However, defendant's actions went beyond mere preparation. Defendant and Hill traveled to the hotel armed with weapons, and surveillance footage showed defendant and Hill pacing in the hallway outside of Holland's room, engaging in a brief discussion. Even if we assume defendant's travel to the hotel did not constitute an overt act, defendant's entry into Holland's room was a "direct movement towards the commission of the offense" necessary to constitute an overt act, *Melton*, 371 N.C.

at 757 (cleaned up), as it would have "result[ed] in the commission of the offense in the ordinary and likely course of things." *Id.* at 762 (cleaned up). As such, defendant's argument is without merit.

### 2. *Premeditated Murder*

In addition to felony murder, the jury was also instructed on the theory of premeditation and deliberation. Defendant asserts that because the killing of Garvey and Holland "lasted less than 30 seconds," there was no time for him to sufficiently "weigh the consequences of his actions" to deem this premeditated and deliberate. As such, he asserts there was insufficient evidence for this theory to be submitted to the jury. We disagree.

"First-degree murder is the intentional and unlawful killing of a human being with malice and with premeditation and deliberation." *State v. Thomas*, 350 N.C. 315, 346 (1999). "[M]alice is presumed where the defendant intentionally assaults another with a deadly weapon, thereby causing the other's death." *State v. McNeill*, 346 N.C. 233, 238 (1997). Premeditation occurs when "the act was thought over beforehand for some length of time, however short." *State v. Leazer*, 353 N.C. 234, 238 (2000) (cleaned up). A killing is deliberate when it is "carried out in a cool state of blood" and is not "under the influence of a violent passion, suddenly aroused by legal provocation or lawful or just cause." *State v. Trull*, 349 N.C. 428, 448 (1998).

Because premeditation and deliberation are "mental processes that are not readily susceptible to proof by direct evidence," they are often proven through

circumstantial evidence. *State v. Childress*, 367 N.C. 693, 695 (2014) (quoting *State v. Sierra*, 335 N.C. 753, 758 (1994)). This Court has provided examples of evidence which may support a finding of premeditation and deliberation, including the absence of provocation on the part of the deceased, the nature and number of the victim's wounds, a defendant's arrival at the scene with a weapon, and whether a defendant discharged or otherwise utilized a weapon multiple times. *See Childress*, 367 N.C. at 695–96; *State v. Olson*, 330 N.C. 557, 565 (1992); *State v. Taylor*, 362 N.C. 514, 531 (2008). Further, "lack of provocation by the victim supports an inference of premeditation and deliberation." *Miller*, 339 N.C. 663, 682 (1995); *see also Olson*, 330 N.C. at 565.

Here, there was more than sufficient evidence for the charge of first-degree murder on the basis of premeditation and deliberation to be submitted to the jury. To begin, malice is "presumed" because defendant's shooting of Holland was intentional. *See McNeill*, 346 N.C. at 238. Further, defendant arrived at the hotel with a loaded weapon, suggesting not only that he anticipated the potential need to use the weapon, but also that he was prepared to use it. *See Taylor*, 362 N.C. at 531.

In addition, there was no provocation on the part of Holland as she was unarmed at the scene and surveillance footage did not show that she posed any threat to defendant. *See Childress*, 367 N.C. at 695. Defendant ultimately fired two shots at Holland, one striking her in the face and the other in the chest, with each shot sufficient to demonstrate an intent to kill on the part of defendant. *See Olson*, 330

N.C. at 565–66 (concluding that evidence that "the wounds were fatal in nature" supported a finding of premeditation and deliberation); *State v. DeGregory*, 285 N.C. 122, 130 (1974) ("The deadly shots through the heart after each victim had been felled . . . almost require[ ] the legitimate inference of premeditation and deliberation."). Given the extent of this evidence and viewing it in the light most favorable to the State, a rational juror could have concluded that defendant's killing of Holland was premeditated and deliberate, and therefore, defendant's argument is without merit.

**F. Failing to Dismiss Charges for First-Degree Murder of Garvey**

Defendant argues that the trial court erred by failing to dismiss the first-degree murder charge against him for co-defendant Hill's killing of Garvey on the theories of felony murder and premeditation and deliberation. Defendant contends that the State failed to provide substantial evidence that defendant and Hill were acting in concert when Hill shot and killed Garvey.

"The acting in concert doctrine allows a defendant acting with another person for a common purpose of committing some crime to be held guilty of a murder committed in the pursuit of that common plan . . . ." *State v. Roache*, 358 N.C. 243, 306 (2004). Concert of action may "be shown by circumstances accompanying the unlawful act and conduct of the defendant subsequent thereto." *In re J.D.*, 376 N.C. 148, 156 (2020) (cleaned up).

In *State v. Blankenship*, this Court, straying from over 160 years of established

precedent on acting in concert, held that "one may not be criminally responsible under the theory of acting in concert for a crime like premeditated and deliberated murder, which requires specific intent, unless he is shown to have the requisite specific intent." 337 N.C. 543, 558 (1994). Nonetheless, just three years later in *State v. Barnes*, this Court explicitly overruled *Blankenship* and returned to the "well established principle" that where

> two persons join in a purpose to commit a crime, each of them . . . is not only guilty as a principal if the other commits that particular crime, but he is also guilty of *any other crime* committed by the other in pursuance of the common purpose or as a natural or probable consequence thereof.

345 N.C. 184, 232–33 (1997) (cleaned up) (emphasis added).

Defendant asks this Court to overrule *Barnes* and reinstate *Blankenship*. But *Blankenship* was an outlier, and we decline defendant's invitation to abandon the "well established principle" in *Barnes*.

### 1. *Felony Murder*

The State presented sufficient evidence that defendant and Hill had engaged in a common plan or scheme to commit rape and robbery with a dangerous weapon against Holland through the State's Rule 404(b) evidence. Even though Garvey was not the intended victim of this common scheme or plan, he was killed in pursuit thereof. Because a defendant can be "held guilty of a murder committed in the pursuit of [a] common plan," *Roache*, 358 N.C. at 306, we conclude that the trial court properly submitted this issue to the jury.

## 2. *Premeditated Murder*

Defendant also argues that the State failed to produce sufficient evidence that he intended to kill Garvey, and that the trial court erred by submitting the charge of first-degree murder on the theory of premeditation and deliberation to the jury.

During execution of the plan to rape and rob Holland, Garvey sought to intervene and was shot and killed by Hill in the hallway. The surveillance footage showed Hill threaten Garvey with the gun, and he ultimately fired nine rounds at Garvey, despite Garvey putting his hands in the air in submission. Hill's violence against Garvey was unprovoked, Garvey was unarmed, and nine separate rounds were fired by Hill, with multiple gunshot wounds to Garvey's body. Thus, the evidence demonstrates that Garvey's murder resulted from premeditation and deliberation on the part of Hill. *See Leazer*, 353 N.C. at 238; *Barnes*, 345 N.C. at 233.

It is certainly foreseeable that a prostitute would have another individual monitoring business-related activity for safety and protection. Regardless of whether defendant knew of Garvey's presence, because Garvey's murder occurred in the pursuit of and as a natural and probable consequence of defendant and Hill's plan to rob and rape Holland, this charge was properly submitted to the jury. *Barnes*, 345 N.C. at 233.

## G. Finding of the Aggravating Circumstance that the Murders were Committed During the Commission of an Attempted Rape and Attempted Robbery

Defendant next argues that the State's evidence was insufficient to submit the

aggravating circumstance that the murders occurred during the "commission of, or flight after committing, the Attempted First-Degree Rape of April Holland and the Attempted Robbery with a Firearm of April Holland" to the jury. Defendant again contends that because the State's evidence was insufficient to demonstrate an attempted rape or armed robbery of Holland, it was similarly insufficient to submit this aggravating factor to the jury during the sentencing phase of trial.

Defendant failed to object to the introduction of this aggravating circumstance. Rule 10(a)(1) of the North Carolina Rules of Appellate Procedure ordinarily requires that a party present "to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling" in order to preserve an issue for appellate review. N.C. R. App. P. 10(a)(1). However, despite defendant's failure to object, this issue is nonetheless preserved for appeal pursuant to *State v. Canady*, 330 N.C. 398 (1991), and *State v. Meadows*, 371 N.C. 742 (2018), because the trial court knew or should have known that defendant was contesting the aggravating factor. *Canady*, 330 N.C. at 402 (holding that the issue was preserved because "[t]he defendant did not want the court to find the aggravating factor and the court knew or should have known it"); *Meadows*, 371 N.C. at 746–47 (holding that the sentencing issue was preserved because "the danger of gamesmanship was not present" and "the sentencing court knew or should have known defendant sought the minimum possible sentence" (cleaned up)).

But, again, the evidence of the attempted rape and armed robbery of Holland

was sufficient for its submission to the jury as an aggravating factor. Subsection 15A-2000(e)(5) of our General Statutes permits the jury to find as an aggravating factor that "[t]he capital felony was committed while the defendant was engaged, or was an aider or abettor, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any homicide, robbery, [or] rape." N.C.G.S. § 15A-2000(e)(5) (2023). The evidence presented by the State, discussed at length above, was sufficient to persuade a rational juror that the murders occurred while the defendant was engaged in the commission of an attempted rape and armed robbery.

## H. Trial Court's Failure to Submit the *Enmund/Tison* Issue to the Jury for the Murder of Garvey

Next, defendant argues that because he did not kill Garvey, the trial court erred by failing to submit an instruction to the jury under *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987). Because defendant failed to request the *Enmund/Tison* instruction, he is limited to plain error review. *Golphin*, 352 N.C. at 472; N.C. R. App. P. 10(c)(4).

This Court has succinctly explained the culpability requirements which the jury must consider for imposition of the death penalty as established by *Enmund* and *Tison*:

> In *Enmund*, the United States Supreme Court held that the Eighth Amendment forbids the imposition of the death penalty on a defendant who aids and abets in the commission of a felony in the course of which a murder is committed by others, when the defendant does not himself

-55-

kill, attempt to kill, or intend that a killing take place or that lethal force will be employed. In a later case [*Tison*], however, the Court further construed its holding in *Enmund* and held that major participation in the felony committed, combined with reckless indifference to human life, is sufficient grounds for the imposition of the death penalty.

Golphin, 352 N.C. at 473 (cleaned up).[6]

The defendant in *Enmund* was the getaway driver for co-defendants who shot and killed two victims and robbed them of their money. It was undisputed that the defendant was not present at the time of the robbery and murder. *Enmund*, 458 U.S. at 786, 788. The Supreme Court determined that imposition of the death penalty on those who had not manifested an intent to kill violates the Eighth Amendment. *Id.* at 798 ("The question before us is not the disproportionality of death as a penalty for murder, but rather the validity of capital punishment for [defendant]'s own conduct. The focus must be on *his* culpability, not on . . . those who . . . shot the victims . . . .").

The facts in *Tison*, however, are similar to those of the case *sub judice*. There, three brothers helped their father and another inmate escape from prison. *Tison*, 481 U.S. at 139. The group robbed and abducted a family in a highway encounter in the Arizona desert. *Id.* at 139–40. The father and inmate then killed the family of four, while the brothers watched, but declined to help the victims. *Id.* at 141.

---

[6] The dissent incorrectly suggests that *Enmund-Tison* is an "and" test, rather than an "or" test. A defendant is not required to meet the intent requirement in *Enmund and* the major participant and reckless indifference requirements in *Tison*. Either is sufficient to satisfy state and federal constitutional concerns.

The Supreme Court stated that merely looking at a defendant's intent to kill

for Eighth Amendment purposes

> is a highly unsatisfactory means of definitively distinguishing the most culpable and dangerous of murderers. Many who intend to, and do, kill are not criminally liable at all—those who act in self-defense or with other justification or excuse . . . . On the other hand, some nonintentional murderers may be among the most dangerous and inhumane of all—the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property. This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an 'intent to kill.' . . . [W]e hold that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

*Tison,* 481 U.S. at 157–58.

Both *Enmund* and *Tison* "explore[ ] the degree of culpability necessary for the

imposition of capital punishment in cases involving felony-murder convictions."

*Gilson v. Sirmons*, 520 F.3d 1196, 1212 (10th Cir. 2008). While *Enmund* focuses on

the intent of minor participants, *Tison* is more concerned with "the intermediate case

of the defendant whose participation is major and whose mental state is one of

reckless indifference to the value of human life." *Tison,* 481 U.S. at 152. The

Supreme Court essentially concluded that major participation in felonious conduct in

which there is a significant risk of death is no different for Eighth Amendment

-57-

purposes than the intent to kill issue that *Enmund* confronted. *See Ross v. Davis*, 29 F.4th 1028, 1043–44 (9th Cir.), *cert. denied sub nom. Ross v. Bloomfield*, 143 S. Ct. 375 (2022) (holding that the Eighth Amendment allows the death penalty to be imposed on "felony murderers" (1) "who actually killed, attempted to kill, or intended to kill," or (2) "whose participation in the felony is major and whose mental state is one of reckless indifference to the value of human life." (cleaned up)).

Consistent with the direction from the Supreme Court, this Court has clarified that an *Enmund/Tison* instruction is not required when a defendant is "found . . . guilty of first-degree murder on the basis of premeditation and deliberation under the theory that [he] committed all the elements or that he acted in concert." *Golphin*, 352 N.C. at 473. *See also State v. Fletcher*, 354 N.C. 455, 479 (2001); *State v. Gaines*, 345 N.C. 647, 682 (1997). Moreover, in *State v. Robinson*, this Court determined that an *Enmund/Tison* instruction is not required when a defendant is convicted "of first-degree murder upon the theory of premeditation and deliberation in addition to the felony murder theory." 342 N.C. 74, 88 (1995).

Here, as noted above, defendant was convicted of first-degree murder for the killing of Garvey based on both theories of felony murder and premeditation and deliberation. Unlike the defendant in *Enmund*, here, defendant was not a minor participant. Rather, like the brothers in *Tison*, he was a major participant in criminal conduct known to carry a grave risk of death. Defendant was actively involved in planning, arranging, and perpetrating an armed, violent felony that was likely to

result in the loss of life. In addition to possessing and using a firearm, defendant was physically present throughout the commission of these violent crimes, and his conduct was part of a prolonged criminal scheme.

Therefore, even if we assume that the trial court erred, defendant has not demonstrated plain error because a rational juror could find that defendant was not merely a minor participant in the crimes detailed herein.[7] The United States Supreme Court in *Tison* noted that there was "apparent consensus that substantial participation in a violent felony under circumstances likely to result in the loss of innocent human life may justify the death penalty even absent an 'intent to kill.' " 481 U.S. at 154 (cleaned up). As stated above, defendant was "a major participa[nt] in the felony committed" and demonstrated "a reckless indifference to human life, [which] is sufficient to satisfy the *Enmund* culpability requirement." *Id.* at 158. "[T]he reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing

---

[7] We also note that the trial court provided the jury with an instruction on malice. Specifically, the trial court informed the jury, "Malice means not only hatred, ill will, or spite, as it is ordinarily understood. To be sure, that is malice. But it also means the condition of mind which prompts a person to take the life of another intentionally or to intentionally inflict serious bodily harm which proximately results in another person's death without just cause, excuse, or justification." Thus, though not required for the reasons stated above, the trial court instructed the jury on the substance of an *Enmund/Tison* instruction. *See State v. Augustine*, 359 N.C. 709, 729 (2005) (holding that an instruction to the jury is sufficient if the substance of the instruction is provided).

judgment . . . ." *Id.* at 157–58. Defendant's actions underscore the notion that "the more purposeful is the criminal conduct, the more serious is the offense, and, therefore, the more severely it ought to be punished." *Id.* at 156.

Thus, any purported error did not have a probable impact on the outcome of his sentencing hearing and cannot satisfy the plain error standard set forth in *Reber*.

## I. Jury Instructions Regarding the Use of the Same Evidence to Support More Than One Aggravating Factor

Defendant next argues that the trial court erred by failing to instruct the jury that it could not use the same evidence to support more than one aggravating factor. Defendant failed to request that the jury be given this instruction, and as such, he must show plain error. *See Lawrence*, 365 N.C. at 518.

"In a capital case the trial court may not submit multiple aggravating circumstances supported by the same evidence." *State v. Lawrence*, 352 N.C. 1, 29 (2000). "This Court has held that the trial court should instruct the jury that it cannot use the same evidence as a basis for finding more than one aggravating circumstance." *State v. Conaway*, 339 N.C. 487, 530 (1995). However, "[a]ggravating circumstances are not considered redundant absent a *complete overlap* in the evidence supporting them." *State v. Moseley*, 338 N.C. 1, 54 (1994) (emphasis added). Moreover, a

> trial court's failure to instruct the jury that it could not use
> the same evidence to support more than one aggravating
> circumstance does not rise to the level of plain error. . . .
> [When there is] substantial separate evidence supporting
> each aggravating circumstance, it is improbable that the

jury would have reached a different result . . . .

*Conaway*, 339 N.C. at 531.

Here, the trial court instructed the jury that it could consider the subsection (e)(5) and subsection (e)(11) aggravating circumstances, and while these two aggravating factors are supported by similar evidence, there was not a complete overlap. *See* N.C.G.S. § 15A-2000(e)(5), (11). The subsection (e)(5) aggravating factor—that the murders of Holland and Garvey occurred during the attempt or flight after the attempt to commit first-degree rape or armed robbery against Holland—was supported by the 404(b) evidence of defendant's prior rapes and robberies of Bessie A. and Rachel B. under similar circumstances. Even though defendant's attempt to rape and rob Holland fell short of completion, additional facts, such as defendant's confirmation text to Hill that he had "got[ten] one" and the bedsheet found on the floor beside Holland's body, suggested that these killings occurred during the attempt and/or flight from the attempted rape and robbery of Holland.

On the other hand, the subsection (e)(11) factor—that the murders of Holland and Garvey were part of a course of conduct in which defendant was engaged—was supported by substantial separate evidence from additional victims that were subjected to the ongoing course of conduct that defendant was similarly engaged in on the night Holland and Garvey were murdered. Specifically, in both the guilt and sentencing phases of trial, the State presented evidence of additional women, Kara L., Keyona T., Keyana M., Serena S., and Asia G., all of whom were victimized by

defendant.

At trial, Kara L. testified that she had consensual relations with defendant until it turned violent with defendant holding a gun to her mouth threatening to kill her and her family. During the sentencing phase, Keyona T. testified that while prostituting herself at a low-budget hotel, she was attacked and tied up, sexually assaulted, and robbed by defendant and Hill. Keyana M. testified to a similar experience with defendant, stating that she was tied up with a phone cord, raped, and robbed of her personal possessions and money by defendant and his companion. Also, Serena S. testified that she was contacted by a single man but then was attacked by two armed men at the hotel, who tied her up and forced her to contact additional male clients whom the perpetrators could rob, and then was robbed herself. Asia G. testified that on the same morning Serena S. was attacked, she was tied up and robbed by defendant's companion, Hill, while defendant remained in the room with Serena S.

Therefore, while the 404(b) evidence of defendant's prior rapes and robberies of Bessie A. and Rachel B. was used to support aggravating circumstances under subsections (e)(11) and (e)(5), the subsection (e)(11) factor was supported by substantial additional evidence, and there is no error.

## J. Trial Court's Denial of Defendant's Motion to Suppress Keyona T.'s In-Court Identification

Defendant next argues that the trial court erred in denying his motion to suppress Keyona T.'s identification of defendant in court. Specifically, defendant

contends that Keyona T.'s in-court identification violated his due process rights.

Keyona T. testified during the sentencing phase that while working as a prostitute out of a low-budget motel in April of 2016, her friend, Lynda P., who was also working as a prostitute, was contacted by a man who set up an appointment with Lynda P. Keyona T. stated that her motel room shared a wall with Lynda P.'s and that as soon as the "client" arrived, she heard knocking and beating sounds coming from Lynda P.'s room. A few minutes later, two men entered Keyona T.'s room with Lynda P., holding Lynda P. at gunpoint. The two men forced Keyona T. and Lynda P. to undress, tied their hands with pillowcases, began rummaging through Keyona T.'s belongings, and then one of the men sexually assaulted her with a firearm. Keyona T. stated that she reported this incident to the police, but no action was ever taken.

Before Keyona T. testified at defendant's sentencing hearing, the trial court allowed voir dire regarding her identification of defendant. Keyona T. testified that in December of 2018, she was contacted about the incident by Detective Eric Gibney with the Raleigh Police Department. Gibney informed Keyona T. that he was investigating a homicide that might have been related to her earlier reported attack, and he described the crime as involving a pregnant mother and a father who had been killed. Keyona T. testified that Gibney did not show her a lineup or any photos of defendant but that he gave her a name of someone involved in the crime. Keyona T. stated that after her conversation with Gibney, she researched the crime on her own.

Keyona T. stated that she recognized defendant in the Google photos based on his "familiar face" from her previous encounter with him.

At the close of the voir dire, defendant objected to Keyona T. testifying at the sentencing hearing, arguing that the "government action . . . taint[ed] the identification in this case" and that it was not reliable. The trial court determined that Keyona T. was permitted to testify, as she "took it upon herself to . . . view the newspaper and, in looking at the photograph that was published in connection with this story, . . . she believed [defendant] was the person that committed these offenses," but the court reserved ruling on Keyona T.'s in-court identification.

At the sentencing hearing, Keyona T. testified to many of the same facts as she did on voir dire. In addition, she stated that she did not know defendant's name but that one of the perpetrators had an "island accent." Keyona T. also testified that she recognized defendant in the photos based on his "eyes and . . . nose," and knew him to be the man with the island accent who had sexually assaulted her and robbed her in April of 2016. Defendant's renewed objection to Keyona T.'s in-court identification was overruled. The trial court stated:

> I'm going to allow the in-court identification. I first find that the circumstances of this witness viewing the photograph were not the result of State action and so that there was no constitutional violation occasioned by that procedure.
>
> Secondly, the witness had significant opportunity to view the defendant or the perpetrator of the April 2016 events clearly, and she on her own accord viewed photographs in news media accounts and was able to

identify the defendant.

In listening to her testimony, I infer that the identification was relatively certain. She described the features that she found to be distinctive. It is also — the reliability of that identification is also bolstered by the fact that the person she identified also has a distinctive island accent, as was elicited from prior testimony. So I find this goes to the weight, not the admissibility that safeguards the cross-examination and instructions to the jury about the — I will instruct the jury during the charge that it is the State's burden to identify the defendant as the perpetrator of these alleged acts that are used in the sentencing phase beyond a reasonable doubt. I will so instruct the jury with respect to that.

And for all of those reasons, I believe that the safeguards that are inherent in our adversarial trial process are sufficient to test the reliability of her identification in this case. So I'm going to allow the in-court identification.

As a general rule, the reliability of evidence is for the jury, not the trial court, to decide. *State v. Malone*, 373 N.C. 134, 146 (2019). However, "due process considerations do place limitations upon the admission of eyewitness identification evidence obtained as the result of impermissible official conduct." *Id.* When tasked with determining whether impermissible official conduct has occurred, a court must "utilize a two-step process." *Id.* First, the court must "determine whether the identification procedures were impermissibly suggestive." *State v. Fowler*, 353 N.C. 599, 617 (2001). If so, the court must then determine "whether the procedures created a substantial likelihood of irreparable misidentification." *Id.* However, a court need not reach this two-step analysis if it first determines that the witness's pretrial

identification of the defendant did not arise from State action, as "suggestive pretrial identification procedures that do not result from state action do not violate [a] defendant's due process rights." *State v. Fisher*, 321 N.C. 19, 24 (1987).

Here, Detective Gibney did not show Keyona T. photographs of defendant, he did not refer her to any news articles containing defendant's pictures, he did not instruct nor encourage Keyona T. to conduct her own research, nor was he present or on the phone with Keyona T. when she researched the crime. Rather, Gibney merely provided a vague overview of the crimes committed against Holland and Garvey and informed Keyona T. that evidence from her reported attack had been recovered. And as Keyona T. confirmed in her testimony, "[she] looked it up on [her] own." Thus, given the attenuation between Gibney's phone call with Keyona T. and her subsequent independent research, Keyona T.'s identification was not a result of State action and does not violate defendant's due process rights. Questions concerning Keyona T.'s identification go to the weight to be given to her testimony, not its admissibility, and defendant's argument is without merit.

**K. Trial Court's Final Mandate for First-Degree Murder**

Defendant next argues that the trial court erred in its final mandate to the jury for first-degree murder under the theory of felony murder because the instruction failed to repeat the elements for the underlying felonies of attempted first-degree rape and attempted robbery with a dangerous weapon. Defendant failed to object to the trial court's alleged omission but argues that the argument is still preserved for

appeal. To support this contention, defendant cites *State v. Ross*, 322 N.C. 261 (1988), and *State v. Keel*, 333 N.C. 52 (1992), for the proposition that an alleged instructional error is preserved for appeal if the instruction was "promised" by the trial court but then never given to the jury.

In *Ross*, this Court held that, notwithstanding a defendant's failure to object at trial, a challenge to a jury instruction is preserved "where the requested instruction is subsequently promised but not given." 322 N.C. at 265. Likewise, in *Keel*, this Court held that "[t]he State's request [for a pattern jury instruction], approved by the defendant and agreed to by the trial court, satisfied the requirements of . . . the North Carolina Rules of Appellate Procedure and preserved this question for review on appeal." 333 N.C. at 56–57.

However, these two cases are inapposite. Here, during the charge conference, the trial court informed both parties that it planned to give the pattern instruction for first-degree murder found in North Carolina Pattern Jury Instructions for Criminal Cases (N.C.P.I.—Crim. 206.14). Both parties were given draft copies of the proposed jury instructions which contained the language that defendant now argues was improper. The State's only proposed changes were clerical, not substantive. Defendant had access to the specific language that was to be used by the trial court but concedes that he never proposed new instructions nor objected to them at the conclusion of the conference. The State also did not object to nor request any specific instructions. Therefore, both *Ross* and *Keel* are inapplicable, as there was no

requested instruction by either the State or defendant which was promised by the trial court but then was not given to the jury. As such, we review the trial court's final mandate to the jury for plain error. *See Lawrence*, 365 N.C. at 516.

Because the "[u]se of the pattern instructions is encouraged, but is not required," *State v. Garcell*, 363 N.C. 10, 49 (2009), the failure of a trial court to follow these instructions does not automatically constitute error, *State v. Bunch*, 363 N.C. 841, 846 (2010). Rather, an instruction is proper "as long as [it] adequately explains each essential element of an offense." *Id.* When reviewing a charge to the jury, it "is to be construed as a whole." *State v. McKinnon*, 306 N.C. 288, 300 (1982). In addressing the adequacy of a final mandate, this Court held that if the trial court "explained the underlying elements of the crimes [charged] just prior to the final mandate" and "it is sufficiently clear that no reasonable cause exists to believe that the jury was misled or misinformed," then a final mandate is sufficient even if it does not repeat the essential elements. *Id.*

The trial court instructed the jury on the requisite elements of first-degree murder under both premeditation and deliberation and felony murder. For the count of first-degree murder of Holland, the trial court explained that to find defendant guilty of first-degree murder on the basis of malice, premeditation, and deliberation, the State must have proved five things beyond a reasonable doubt:

> First, that the defendant intentionally and with malice killed April Holland with a deadly weapon. Malice means not only hatred, ill will, or spite, as it is ordinarily understood. To be sure, that is malice. But it also means

that condition of mind which prompts a person to take the life of another intentionally or to intentionally inflict a wound with a deadly weapon and which proximately results in her death without just cause, excuse, or justification.

If the State proves beyond a reasonable doubt the defendant intentionally killed the victim with a deadly weapon or intentionally inflicted a wound upon the victim with a deadly weapon that proximately caused her death, you may infer, first, that the killing was unlawful and, second, that it was done with malice, but you are not compelled to do so. You may consider the inference along with all other facts and circumstances in determining whether the killing was unlawful and whether it was done with malice.

I instruct you that a firearm is a deadly weapon.

Second, the State must prove that the defendant's act was a proximate cause of the victim's death. A proximate cause is a real cause, a cause without which the victim's death would not have occurred, and one that a reasonably careful and prudent person could foresee would probably produce such injury or some similar injurious result.

Third, that the defendant intended to kill the victim. Intent is a mental attitude seldom provable by direct evidence. It must ordinarily be proved by circumstances from which it may be inferred. An intent to kill may be inferred from the nature of the assault, the manner in which it was made, the conduct of the parties, and other relevant circumstances.

Fourth, that the defendant acted after premeditation, that is, that the defendant formed the intent to kill the victim over some period of time, however short, before the defendant acted.

And, fifth, that the defendant acted with deliberation, which means the defendant acted while the defendant was in a cool state of mind. This does not mean

that there had to be a total absence of passion or emotion. If the intent to kill was formed with a fixed purpose, not under the influence of some suddenly-aroused, violent passion, it is immaterial that the defendant was in a state of passion or excited when the intent was carried into effect.

The trial court also instructed the jury that in order to find defendant guilty of first-degree murder of Holland on the basis of felony murder, the State must have proved three things beyond a reasonable doubt:

First, that the defendant committed the offense of attempted robbery with a firearm and/or attempted first-degree rape of April Holland. To establish this first element, the State must prove two things beyond a reasonable doubt:

A, that the defendant intended to commit the crime of robbery with a firearm of April Holland. Robbery with a firearm occurs when one has in his possession a firearm and takes and carries away property from the person or presence of a person without her voluntary consent by endangering or threatening her life with the use or threatened use of a firearm, the perpetrator knowing that he was not entitled to take the property and intending to deprive the victim of its use permanently.

And, B, that at the time the defendant had this intent the defendant performed an act which was calculated and designed to bring about robbery with a firearm but which fell short of the completed offense and which in the ordinary and likely course of things the defendant would have completed that crime had the defendant not been stopped or prevented from completing the defendant's apparent course of action. Mere preparation or mere planning is not enough to constitute such an attempt, but the act need not be the last act required to complete the crime.

Alternatively, the State may prove this first element

by establishing beyond a reasonable doubt the following:

> That the defendant intended to commit the crime of first-degree rape of April Holland. First-degree rape occurs when one engages in vaginal intercourse with the victim by force and against her will while the perpetrator is displaying or employing a deadly or dangerous weapon.
>
> And, B, that at the time the defendant had this intent, the defendant performed an act which was calculated and designed to bring about first-degree rape but which fell short of the completed offense and which, in the ordinary and likely course of things, the defendant would have completed that crime had the defendant not been stopped or prevented from completing the defendant's apparent course of action. Mere preparation and mere planning is not enough to constitute such an attempt, but the act need not be the last act required to complete the crime.
>
> The second element the State must prove beyond a reasonable doubt to establish felony murder is that, while committing the offense of attempted robbery with a firearm or the offense of attempted first-degree rape, the defendant killed April Holland.
>
> And, third, that the defendant's act was a proximate cause of April Holland's death. A proximate cause is a real cause, a cause without which the victim's death would not have occurred.

The trial court then gave nearly identical instructions to the jury regarding the requisite elements for the count of first-degree murder of Garvey on the basis of felony murder, with the exception of changing the language to include "defendant or a person with whom the defendant was acting in concert" and further instructing the jury on the theory of acting in concert.

Upon recitation of the required elements for each basis of first-degree murder,

the trial court then gave the final mandates for both counts of first-degree murder.

Defendant only contests the trial court's final mandate as to felony murder, which

was as follows:

> Whether or not you find the defendant guilty of first-degree murder on the basis of malice, premeditation, and deliberation, you will also consider whether the defendant is guilty of first-degree murder under the first-degree felony murder rule. If you find from the evidence beyond a reasonable doubt that on or about the alleged date the defendant committed the offense of attempted robbery with a firearm *as that offense is defined above* or attempted first-degree rape *as that offense is defined above* and that, while committing attempted robbery with a firearm or attempted first-degree rape, the defendant killed [the victim] and that the defendant's act was a proximate cause of [the victim's] death, it would be your duty to return a verdict of guilty of first-degree murder under the felony murder rule.

(Emphasis added.)   Similarly, the trial court's final mandate for the first-degree

murder of Garvey under the theory of felony murder was as follows:

> Whether or not you find the defendant guilty of first-degree murder on the basis of malice, premeditation, and deliberation, you will also consider whether the defendant is guilty of first-degree murder under the first-degree felony murder rule. If you find from the evidence beyond a reasonable doubt that on or about the alleged date the defendant, acting either by himself or acting together with other persons, committed attempted robbery with a firearm or attempted first-degree rape and that while committing either or both of these offenses the defendant or a person with whom the defendant was acting in concert killed the victim and that the defendant's act or the act of the person with whom Defendant was acting in concert was the proximate because of Dwayne Garvey's death, it would be your duty to return a verdict of guilty of first-degree murder under the felony murder rule. If you do not so find or have a reasonable doubt as to one or more of these

things, you will not return a verdict of guilty of first-degree
murder under the felony murder rule.

Defendant contends that "the lack of definition of attempted robbery and attempted rape in the final mandate probably impacted the jury's decision to find [defendant] guilty of first-degree murder." However, "constru[ing] [it] as a whole," *McKinnon*, 306 N.C. at 300, our review of the transcript shows that the trial court thoroughly and correctly instructed the jury as to the elements of the underlying felonies. Therefore, "it is sufficiently clear that no reasonable cause exists to believe that the jury was misled or misinformed," *see id.*, and the final mandate was not improper.

## L. Cumulative Error in Denying Defendant a Fair Trial and Sentencing Hearing

Defendant argues that the cumulative prejudicial impact of "the erroneous admission of extensive character evidence, irrelevant victim impact evidence, and repetitive, graphic photo evidence; unsupported and incomplete instructions; and improper closing argument" entitle him to a new trial or sentencing hearing.

"Cumulative errors lead to reversal when taken as a whole the errors by the trial court deprived the defendant of his due process right to a fair trial free from prejudicial error." *State v. Wilkerson*, 363 N.C. 382, 426 (2009) (cleaned up)*; see also State v. Johnson*, 334 S.C. 78, 93 (1999) ("[Defendant] must demonstrate more than error in order to qualify for reversal on [cumulative error] ground[s]. Instead, the errors must adversely affect his right to a fair trial.). However, when "none of the

issues present error, [appellate courts will] decline to consider defendant's cumulative error argument." *State v. Betts*, 377 N.C. 519, 527 (2021). *See also State v. Thompson*, 359 N.C. 77, 106 (2004) (holding that because there was no error, defendant's cumulative error argument should not be considered); *Maldjian v. Bloomquist*, 275 N.C. App. 103, 125 (2020) (concluding that where an appellate court can "discern no error . . . , [a] trial court's rulings cannot cumulatively be deemed prejudicial error."); *see also Pham v. State*, 177 So. 3d 955, 962 (Fla. 2015) ("[W]here the alleged errors urged for consideration in a cumulative error analysis are individually either procedurally barred or without merit, the claim of cumulative error also necessarily fails." (cleaned up)). Indeed, cumulative error requires there be multiple significant errors before an appellate court can conclude that a defendant has met the high bar of demonstrating that he has been wholly "deprived . . . of his due process right to a fair trial free from prejudicial error." *Wilkerson*, 363 N.C. at 426 (cleaned up).

Here, however, there can be no cumulative error because the trial court did not err. *See Betts*, 377 N.C. at 527 ("Since we hold that none of the issues present error, we decline to consider defendant's cumulative error argument."); *see also State v. Spangler*, 314 N.C. 374, 388 (1985); *Thompson*, 359 N.C. at 106.[8]

## M. Excusing Jurors for Cause Based on Their Views on the Death Penalty

Defendant next asserts that the trial court abused its discretion when it

---

[8] The only arguable error committed by the trial court concerns the *Enmund-Tison* instruction. As we have discussed above, there can be no cumulative error.

excused prospective jurors McIlvane, Daniels, and Youngquist-Thurow for cause based on their death penalty views. Defendant argues that the three prospective jurors' hesitation in personally imposing a death sentence "did not show [that] they were substantially impaired."

"Challenges for cause in jury selection are matters in the discretion of the court and are not reviewable on appeal except for abuse of discretion." *State v. Kennedy*, 320 N.C. 20, 28 (1987). Reviewing courts "must defer to the trial court's judgment concerning whether the prospective juror would be able to follow the law impartially," *State v. Brogden*, 334 N.C. 39, 43 (1993), because it is the trial court "who has the opportunity to see and hear the juror on voir dire and to make findings based on the juror's credibility and demeanor," *Kennedy*, 320 N.C. at 26. Thus, the trial court's determination is only an abuse of discretion if it was " 'manifestly unsupported by reason' and is 'so arbitrary that it could not have been the result of a reasoned decision.' " *State v. Cummings*, 361 N.C. 438, 447 (2007) (quoting *State v. Lasiter*, 361 N.C. 299, 301–02 (2007)).

Criminal defendants are guaranteed the right to trial by an impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 24 of our State Constitution. *See Richardson*, 385 N.C. at 205 ("Both the United States Constitution and the North Carolina Constitution guarantee capital defendants have a right under the United States Constitution to trial by an impartial jury."); *see also State v. Crump*, 376 N.C. 375, 381 (2020) (citing N.C. Const.

art. I, § 24). The State also has a right to an impartial jury. *State v. Chandler*, 324

N.C. 172, 185–86 (1989); *see also State v. Garcia*, 358 N.C. 382, 407 (2004) ("The basic

concept in jury selection is that each party to a trial has the right to present his case

to an unbiased and impartial jury." (quoting *State v. Carey*, 285 N.C. 497, 506

(1974))). A crucial portion of crafting an impartial jury occurs during voir dire, where

the parties "typically may inquire into prospective jurors' morals, attitudes, and

beliefs." *Crump*, 376 N.C. at 381. "The primary goal of juror voir dire is to ensure

that only those persons are selected to serve on the jury who could render a fair and

impartial verdict." *Kennedy*, 320 N.C. at 26.

In a capital case, a prospective juror may not be excused because he or she

merely "voice[s] general objections to the death penalty." *Witherspoon v. Illinois*, 391

U.S. 510, 522 (1968). But the State has a "legitimate interest in excluding those

jurors whose opposition to capital punishment would not allow them to view the

proceedings impartially, and who therefore might frustrate administration of a

State's death penalty scheme." *Wainwright v. Witt*, 469 U.S. 412, 416 (1985). Thus,

the proper standard for determining whether a juror may be excused for his view on

the death penalty is "whether the juror's views would 'prevent or substantially impair

the performance of his duties as a juror in accordance with his instructions and his

oath.' " *Id.* at 424. This standard does not require that a juror's bias be "proved with

'unmistakable clarity.' " *Id.*

This Court has declined to find an abuse of discretion where jurors' voir dire

"responses are inconsistent or when jurors' answers regarding their ability to follow the law are equivocal." *Garcia*, 358 N.C. at 403; *see also State v. Berry*, 356 N.C. 490, 500 (2002) (holding that the trial court did not abuse its discretion by excusing a prospective juror for cause when his responses were "not consistent during *voir dire*, in that he sometimes stated that he could follow the law, while other times he qualified his answers by adding that he would require more than circumstantial evidence"); *State v. Jones*, 355 N.C. 117, 122 (2002) (concluding that the trial court did not abuse its discretion by excusing a prospective juror for cause when the "equivocating nature of her responses . . . led the trial judge to conclude that [she] would be unable to faithfully and impartially apply the law" (cleaned up)); *Smith*, 352 N.C. at 545 (holding that whether a prospective juror's bias makes him excusable for cause is "the court's decision, in the exercise of its sound discretion and judgment"). Further, "where the record shows the challenge is supported by the prospective juror's answers to the prosecutor's and court's questions, absent a showing that further questioning would have elicited different answers, the court does not err by refusing to permit the defendant to propound questions about the same matter." *State v. Gibbs*, 335 N.C. 1, 35 (1993) (cleaned up).

During voir dire, the trial court questioned prospective juror McIlvaine about his personal views on the idea of sentencing defendant to death. McIlvaine immediately responded that he "would be nervous about making that decision." The State further questioned McIlvaine, asking if he would be able to sentence defendant

to death if the facts and circumstances called for it:

> [The State]: . . . The main thing that we need to be sure of or convinced of is would you be able to consider this and would you be able to do that if the facts and circumstances called for it.
>
> Prospective Juror McIlvaine: That's a hard question to answer. I suppose so, but, I mean, I would have to be very convinced.
>
> . . . .
>
> [The State]: Okay. Do you believe that you would be more comfortable — you said nervous before about the death penalty. Would you be more comfortable considering a life sentence for this particular defendant?
>
> Prospective Juror McIlvaine: I would, yeah.
>
> [The State]: So then that brings us to the next step though. After going through this process and after considering all the evidence and the circumstances that were involved, if you were convinced beyond a reasonable doubt that the death penalty was appropriate in this particular case, after going through the evidence and the laws [the judge] gives you, do you believe that you would be able to personally vote for that kind of sentence?
>
> Prospective Juror McIlvaine: I just — I just don't know. I really don't think so.
>
> . . . .
>
> Prospective Juror McIlvaine: I just think I would have a hard time with it.
>
> . . . .
>
> [The State]: But what if you thought a death sentence was appropriate? Would you be able to stand up in open court and tell this judge that you thought that that was an

appropriate sentence?

Prospective Juror McIlvaine: Yeah, I would have a hard time with that.

[The State]: Do you believe you would be able to do that?

Prospective Juror McIlvaine: I'm not sure that I would.

Based on these responses, the trial court found that McIlvaine's views "would prevent or substantially impair the performance of [his] duties as a juror in accordance with his instructions and his oath." The trial court also ruled that there was a "lack of probability that further questioning w[ould] produce different answers from this juror" and dismissed him for cause.

Although McIlvaine at one point stated that he "supposed" he could vote for a sentence of death, his equivocal responses was enough to uphold his dismissal. *See Garcia*, 358 N.C. at 403. Further, because many of McIlvaine's responses demonstrated that he would not have been able to set aside his personal views, the trial court did not abuse its discretion by prohibiting defendant from questioning him further. *See Gibbs*, 335 N.C. at 35. Thus, we conclude that there was no abuse of discretion in the trial court's dismissal of McIlvaine.

We turn next to prospective juror Daniels. During voir dire, the State asked Daniels about her feelings on capital punishment:

[The State]: Have you had some time in the last couple of days to think through [capital punishment]?

Prospective Juror Daniels: Yes. I'm a[n] honest Christian lady, and I've spoken to my pastor about it, and my thought

is I don't believe in capital punishment.

. . . .

[The State]: And is this something that you feel like, even if you were asked to go through a process with the jury, that because of these feelings that you hold you just would not ever be able to consider the death sentence?

Prospective Juror Daniels: No, ma'am.

. . . .

Prospective Juror Daniels: No, ma'am, I would not be able to.

[The State]: And that's fair. That's fair. Is it fair to say that, even if you were asked to go through and to consider aggravating factors versus mitigating factors, there's really nothing that is going to change your mind? You are never going to say I'm okay with a death sentence?

Prospective Juror Daniels: Correct, I will not say it.

The trial court dismissed Daniels for cause, concluding that her "views would prevent or substantially impair the performance of [her] duties in accordance [with] her instructions and her oath" and that there was a "lack of probability that further questioning w[ould] produce different answers."

We conclude that the trial court properly exercised its discretion in allowing Daniels to be excused for cause. Daniels's unequivocal answers in opposition to the death penalty demonstrated that her personal views "would not allow [her] to view the proceedings impartially." *See Wainwright*, 469 U.S. at 416. And given the absolute nature of her answers, the trial court did not abuse its discretion by

prohibiting defendant from questioning her further. *See Gibbs*, 335 N.C. at 35.

Finally, during the voir dire of prospective juror Youngquist-Thurow, the trial court and the State questioned him about his views on the death penalty:

> The Court: So this is a capital case. . . . And so the question that I would ask of you before I pass you on to the lawyers is is there anything that's on your mind that you have said to yourself this is something that I just need the judge and the lawyers to know about me before we go any further? . . .
>
> Prospective Juror Youngquist-Thurow: Well, the death penalty issue is one that I would not want to consider. I have been a pacifist pretty much all of my life, registered as a conscientious objector draft-wise even though it didn't really affect me, but did that anyway. And I've always been more of a right-to-life choice than —
>
> . . . .
>
> [The State]: . . . I think the death penalty issue and capital punishment is one of those things that . . . people have very strong opinions one way or another, and that's fine. But what is required is to have people who will be willing to sit and weigh each option fairly.
>
> And there's people that . . . hold beliefs, whether they be personal, moral, religious, that . . . this is not the issue for them where they can do that.
>
> . . . .
>
> [The State]: . . . And I guess my question to you is is this that issue for you[?]
>
> Prospective Juror Youngquist-Thurow: I think it could be. When he explained the case, I remembered just that sinking feeling that, "Oh, no. I may have to make that decision," and just feeling uncomfortable with that right away. For me, it's a religious thing. I believe that's God's right, not my right to make that decision.

[The State]: Sure. And that's completely fair. Do you think that because of that kind of deep seated religious belief that you just would not be able to make that decision?

Prospective Juror Youngquist-Thurow: I think it would be very, very difficult for me to do that consciously.

. . . .

[The State]: Do you think that even though you have these beliefs that you could sit and go through the process and, if you determined that all of . . . the steps were met, that you could come in and say that the appropriate sentence was death?

Prospective Juror Youngquist-Thurow: I would have a hard time with that, I believe.

. . . .

[The State]: Sure. And is that that you feel like, because of that, you would just automatically lean towards a life without parole?

Prospective Juror Youngquist-Thurow: Correct.

[The State]: Instead of weighing the circumstances, you would automatically go to that?

Prospective Juror Youngquist-Thurow: Yes.

The trial court allowed Youngquist-Thurow to be excused for cause, finding that because he had "stated consistently that the imposition of the death penalty is very difficult for him . . . [and] instead of weighing the circumstances, [he] would automatically go towards a punishment of life without the possibility of parole," these views would "substantially impair the performance" of his duties. The trial court did

not allow for further questioning of Youngquist-Thurow due to the "lack of probability that further questioning w[ould] produce different answers."

We conclude that there was no abuse of discretion here because Youngquist-Thurow repeatedly emphasized that he was not comfortable with imposing the death penalty and then stated that even if all of the circumstances were met, he still would automatically impose a sentence of life without parole rather than the death penalty. These answers demonstrated that Youngquist-Thurow's "opposition to capital punishment would not allow [him] to view the proceedings impartially." *See Wainwright*, 469 U.S. at 416. Thus, the trial court properly exercised its discretion in excusing this juror for cause.

**N. Peremptory Instructions on Three Mitigating Circumstances**

Defendant next contends that the trial court erred by failing to give peremptory instructions on three out of the forty mitigating circumstances presented during the sentencing phase of trial. Defendant argues that uncontroverted evidence supported the following non-statutory mitigating circumstances, such that the peremptory instructions should have been given:

> Mitigating Circumstance # 11: "Seaga Gillard's childhood asthma prevented him from participating in the same physical activities and sports as his younger brother."

> Mitigating Circumstance # 21: "Seaga Gillard's home environment made it difficult for him to succeed in school."

> Mitigating Circumstance # 36: "Seaga Gillard suffers from Other Specified Trauma and Stressor Related Disorder."

A peremptory instruction directs the jury that if it finds the facts presented to be true, then it must find that a particular mitigating circumstance has been established. N.C.P.I.—Crim. 150.12. "Where *all* of the evidence in a capital prosecution, if believed, tends to show that a particular mitigating circumstance does exist, the defendant is entitled to a peremptory instruction on that circumstance." *State v. Gay*, 334 N.C. 467, 492 (1993) (cleaned up) (emphasis added). Nonetheless, where "the evidence is controverted or the evidence supporting the circumstance is not manifestly credible, the trial court *should not* give peremptory instructions." *State v. McLaughlin*, 341 N.C. 426, 449 (1995) (emphasis added) (citing *State v. Green*, 336 N.C. 142, 172–74 (1994)). Thus, we review for whether each mitigating circumstance was supported by uncontroverted evidence. *Id.*; *Golphin*, 352 N.C. at 475.

During the sentencing phase, the State originally stipulated to the three mitigating circumstances at issue, but it later withdrew the stipulations. We address each in turn to determine whether uncontroverted evidence supported each circumstance.

For non-statutory Mitigating Circumstance No. 11, the State withdrew its stipulation concerning defendant's asthma because there was testimony presented that he played soccer as a child. The State said it would agree to the peremptory instruction if the language of the circumstance was changed to "Seaga Gillard's childhood asthma *sometimes* prevented him from participating in the same physical

activities and sports as his younger brother," but defendant refused. The trial court then stated that it would not provide a peremptory instruction for Mitigating Circumstance No. 11.

We disagree with defendant's contention that the evidence to support Mitigating Circumstance No. 11 was uncontroverted. Evidence was presented that defendant suffered from asthma as a child and was unable to compete in sports at the same level as his brother, Khalid. Defendant's brother earned a scholarship to play in college. And while evidence was presented that defendant had an asthma attack while playing soccer, he still played sports notwithstanding his asthma. Moreover, defendant's asthma may or may not have had an impact on his ability to participate in similar physical activities as his younger brother; given that his brother was a college athlete, it is equally as likely that defendant simply lacked the athletic ability to participate at the same level. Therefore, even if defendant's asthma tended to flare up when he played soccer, he was not entirely prevented from "participating in the same physical activities and sports as his younger brother." As such, the trial court did not err by failing to provide the peremptory instruction for Mitigating Circumstance No. 11.

For non-statutory Mitigating Circumstance No. 21, the State withdrew its stipulation for the peremptory instruction because evidence was presented that multiple factors purportedly impacted his ability to succeed in school, not just his home life. Even so, the State offered to stipulate if the language of the circumstances

was changed to "Seaga Gillard's home environment *was a factor in making it* difficult for him to succeed in school," but defendant rejected this rephrasing. The trial court found that because the original proposed language of Mitigating Circumstance No. 21 was "stated fairly absolutely," it would permit the State's withdrawal of its stipulation and no peremptory instruction would be provided.

We disagree with defendant that the evidence to support Mitigating Circumstance No. 21 was uncontroverted. While evidence was presented regarding defendant's difficult home life, including that he grew up in extreme poverty, lacked consistent access to food, and often went without proper clothing or books for school, evidence was also presented that defendant began smoking around the age of ten and that he "spent most of his time with his friends on the street."

Thus, there was contradictory evidence presented concerning his ability to succeed in school. Home conditions certainly may be a factor in a child's ability to be successful but failure to attend school, being on the streets, and engaging in behavior that is not age appropriate can also be a contributing factor. Therefore, because the absolute language used in Mitigating Circumstance No. 21 was not uncontroverted, the trial court did not err by declining to submit the peremptory instruction. *McLaughlin*, 341 N.C. at 449.

For non-statutory Mitigating Circumstance No. 36, the State withdrew its stipulation concerning defendant's stressor-related disorder because records from the Ohio Department of Rehabilitation and Correction indicated that defendant did not

suffer from "any kind of mental health problems or depression." The trial court agreed and ruled that it would not give a peremptory instruction for Mitigating Circumstance No. 36.

The trial court did not err in its decision to withhold the peremptory instruction as to this mitigating circumstance. During the sentencing phase, Dr. Amy James, a clinical psychologist, testified that she was hired by defendant to provide "an evaluation for a mitigation and sentencing." Dr. James testified that she had diagnosed defendant with "other specified trauma and stressor related disorder." However, Dr. James also admitted that she had reviewed prior medical records from the Ohio Department of Rehabilitation and Correction from March 2012, which indicated that defendant did not suffer from "any kind of mental health problems." This alone demonstrates that there was competing evidence of whether defendant suffered from any mental disorder.

Moreover, this Court has repeatedly held that if evidence is "prepare[d] for testifying at trial, rather than to treat [a] defendant, it lacks the indicia of reliability based on the self-interest inherent in obtaining appropriate medical treatment." *State v. Bishop*, 343 N.C. 518, 557–58 (1996); *see also Barden*, 356 N.C. at 377 ("We have held that the testimony of an expert witness who has prepared an analysis of a defendant in preparation for trial lacks the indicia of reliability . . . and, because not manifestly credible, does not support a peremptory instruction as to this particular mitigating circumstance." (cleaned up)).

Here, even if the evidence concerning defendant's mental health was uncontroverted, Dr. James's testimony lacked the "indicia of reliability" to support the peremptory instruction because her diagnosis was developed in anticipation of trial rather than to aid in the treatment of defendant. *Bishop*, 343 N.C. at 557–58. Thus, defendant's argument is without merit.

## O. Defendant's Motion to Strike the Death Penalty

Defendant next argues that the trial court erred by denying his pretrial motion to strike the death penalty. Defendant contends that the State's decision to proceed capitally had a "chilling effect" on the exercise of his Fifth and Sixth Amendment rights under the United States Constitution and Article 1, Sections 23 and 24 of our State Constitution. Specifically, defendant challenges the District Attorney's discretion in seeking the death penalty and engaging in plea bargaining, asserting that it has created "a death penalty system that is functionally the same as when now repealed N.C.G.S. § 15-162.1 was in effect."[9]

---

[9] "Until 1969 North Carolina's death penalty statutes required that unless the jury in its unlimited and unbridled discretion recommended life imprisonment the death penalty would be imposed for convictions of first degree murder, rape, first degree burglary and arson." *State v. McKoy*, 327 N.C. 31, 39–40 (1990). However, under the statutory scheme of former N.C.G.S. § 15-162.1, criminal defendants charged with crimes eligible for the death penalty were permitted to enter a guilty plea in exchange for a sentence of life imprisonment. *State v. Anderson*, 281 N.C. 261, 267 (1972). Nonetheless, "[i]f the defendant plead[ed] not guilty . . . and the jury return[ed] a guilty verdict without recommending life imprisonment, the death sentence bec[ame] mandatory." *State v. Peele*, 274 N.C. 106, 110 (1968). Statutory schemes of this sort were struck down as unconstitutional in *United States v. Jackson*, 390 U.S. 570 (1968), and *Pope v. United States*, 392 U.S. 651 (1968), on the basis that a statutory mandate for the death penalty, absent a guilty plea by a defendant, unnecessarily impinged upon a defendant's constitutional rights to maintain their innocence and to a jury trial. As

Defendant's argument—that the State's prosecutorial discretion to seek a particular sentence or to engage in plea bargaining is unconstitutional—is unsupported by this Court's precedent. *See generally State v. Ward*, 354 N.C. 231, 260 (2001); *State v. Smith*, 359 N.C. 199, 225 (2005). Under our current statutory scheme,

> [t]he State, in its discretion, may elect to try a defendant capitally or noncapitally for first degree murder, even if evidence of an aggravating circumstance exists. The State may agree to accept a sentence of life imprisonment for a defendant at any point in the prosecution of a capital felony, even if evidence of an aggravating circumstance exists.

N.C.G.S. § 15A-2004(a) (2023).

Thus, there is no "mandate" for the death penalty here which would impermissibly burden a defendant's constitutional rights. Instead, decisions to seek the death penalty or engage in plea negotiations are left within the "purview of the exclusive and discretionary power of a district attorney," *State v. Diaz-Tomas*, 382 N.C. 640, 649 (2022), and we decline to interfere with the discretion afforded to these constitutional officers. The State is not required to offer a defendant a plea of any sort, and the fact that a plea is offered in which the defendant is given a choice between pleading guilty or having a trial by jury is not a constitutional violation.

**P. Lethal Injection as Cruel and Unusual**

---

such, N.C.G.S. § 15-162.1 was repealed by Act of Mar. 25, 1969, ch.117, § 1, 1969 N.C. Sess. Laws 104, 104. *See State v. Niccum*, 293 N.C. 276, 282 (1977).

Defendant asserts that North Carolina's method of lethal injection is cruel and unusual and therefore unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Section 27 of the North Carolina Constitution. Defendant concedes that "he cannot show how those drugs would cause needless suffering," yet asserts that the unknown risks of the procedure render it unconstitutional.

In North Carolina, "the mode of executing a death sentence must in every case be by administering to the convict or felon an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death and until the person is dead." N.C.G.S. § 15-188 (2023). The specific procedure is "determined by the Secretary of the Department of Adult Correction, who shall ensure compliance with the federal and State constitutions." *Id.*

The Supreme Court of the United States has held that "[w]hen a method of execution is authorized under state law, a party contending that this method violates the Eighth Amendment bears the burden of showing that the method creates an unacceptable risk of pain." *Glossip v. Gross*, 576 U.S. 863, 884 (2015). To meet this burden, a defendant must (1) "establish that the State's method of execution presents a substantial risk of serious harm—severe pain over and above death itself"; and (2) "identify an alternative method that is feasible, readily implemented, and in fact significantly reduces the risk of harm involved." *Nance v. Ward*, 597 U.S. 159, 164

(2022) (cleaned up).[10]  "Only through a comparative exercise . . . can a judge decide whether the State has cruelly superadded pain to the punishment of death."  *Id.* (cleaned up).   To raise constitutional concerns, the method of execution must "present[ ] a risk that is *'sure or very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently imminent dangers.' "  *Glossip*, 576 U.S. at 877 (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008)).  A defendant's challenge fails if they cannot "show that the risks they identified [are] substantial and imminent, and [if] they [have] not establish[ed] the existence of a known and available alternative method of execution that would entail a significantly less severe risk."  *Id.* at 878 (citing *Baze*, 553 U.S. at 56–60).

Here, defendant concedes that he has failed to meet his burden under *Glossip* and *Baze*.  Instead, he asks this Court to strike down the method of execution under N.C.G.S. § 15-188 based on hypothetical risks.  Because defendant has failed to articulate how North Carolina's lethal injection procedure creates a "substantial risk of serious harm" and has failed to "identify an alternative method that is feasible, readily implemented, and in fact significantly reduces the risk of harm involved," *see Nance*, 597 U.S. at 164 (cleaned up), we reject this argument.

## Q. Preservation Issues

Defendant raised two issues for preservation which he concedes have been

---

[10] The Supreme Court held that N.C.G.S. § 15-188, in addition to fourteen similar state statutes that "authorize only the use of lethal injection[,]" is a "more humane way[ ] to carry out death sentences."  *Nance*, 597 U.S. at 163 (quoting *Glossip*, 576 U.S. at 868).

repeatedly rejected by this Court: (1) that this Court should invalidate the death penalty in this State on the basis of international norms, human rights, and prevailing standards of decency; and (2) that the indictment was insufficient to make this a capital case because it did not include any elements which elevate the crime of murder from second-degree to first-degree or allege aggravating circumstances. Defendant presents these issues in order to "permit[ ] this Court to reexamine its prior holdings and to preserve these arguments for any possible further judicial review." *See Golphin*, 352 N.C. at 485.

We have thoroughly considered defendant's arguments as to these issues and find no compelling reason to depart from our prior holdings in *State v. Allen*, 360 N.C. 297 (2006), and *Golphin*, 352 N.C. 364. *See Golphin*, 352 N.C. at 397 ("[A]n indictment need not contain the aggravating circumstances the State will use to seek the death penalty and the trial court may not order the State to disclose the aggravating circumstances upon which it intends to rely." (citing *State v. Young*, 312 N.C. 669, 675 (1985); *Holden*, 321 N.C. at 153; *State v. Hunt*, 357 N.C. 454 (2003))).

Defendant has also raised two issues which he does not identify as preservation issues but which we consider to be of this sort. First, defendant urges us to hold that death qualification of the jury is unconstitutional. Specifically, defendant argues that death qualification violates his rights to a jury representative of fair cross-section of the community and to an impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution and coordinate rights under Article

I, Sections 19, 23, and 27 of the North Carolina Constitution.

However, the Supreme Court of the United States has explicitly stated that "the [United States] Constitution does not prohibit the States from 'death qualifying' juries in capital cases." *Lockhart v. McCree*, 476 U.S. 162, 173 (1986). This Court has likewise held that the North Carolina Constitution does not prohibit " 'death qualification' of juries in capital trials." *State v. Barts*, 316 N.C. 666, 677 (1986); *State v. King*, 316 N.C. 78, 80 (1986) (rejecting the defendant's argument that "the practice of 'death-qualifying' the jury deprives defendants of their right to be tried by a representative cross-section of the community"); *see also Holden*, 321 N.C. at 133 ("Defendant has given us no reason to disregard or overrule our decisions in *King* and *Barts*."); *State v. Waring*, 364 N.C. 443, 494 (2010) ("Although defendant asks that we reconsider *Barts*, we decline to do so."). Similarly here, there is no compelling reason to depart from these long-standing precedents.

Second, defendant argues that in light of evolving standards of decency, the death penalty is unconstitutional. Specifically, defendant argues that the death penalty violates the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Section 27 of the North Carolina Constitution because it is cruel and unusual punishment; that North Carolina's capital sentencing scheme is vague, overbroad, and overly discretionary; and that capital punishment is applied arbitrarily to discriminatory effects.

However, the Supreme Court of the United States considers settled the issue

of whether the death penalty is unconstitutional under the United States Constitution: "[W]e have time and again reaffirmed that capital punishment is not *per se* unconstitutional." *Glossip*, 576 U.S. at 881. In addition, "[t]his Court has previously considered and rejected these arguments." *State v. Maness*, 363 N.C. 261, 294 (2009) (citing *Duke*, 360 N.C. at 142); *State v. Hurst*, 360 N.C. 181, 205 (2006) ("This Court has held that the North Carolina capital sentencing scheme is constitutional."); *State v. Powell*, 340 N.C. 674, 695 (1995) (reiterating that the Court "ha[s] consistently rejected defendant's contention" that "North Carolina's death penalty statute is unconstitutional"). As there is nothing cruel and unusual under the Eighth Amendment or cruel or unusual under Article I, Section 27 about the imposition of the death penalty, standing alone, we find no compelling reason to depart from our exhaustive precedents.

**R. Ineffective Assistance of Counsel**

Lastly, defendant asserts that his trial counsel provided ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution. Specifically, defendant asserts that his trial counsel was "ineffective in failing to make legitimate objections" to: (1) Kara L.'s testimony regarding defendant's assault with a firearm; (2) the trial court's limiting instruction as to the jury's consideration of the Rule 404(b) evidence regarding Bessie A. and Rachel B. when determining whether defendant had the intent to commit rape or robbery; (3) the submission of the N.C.G.S. § 15A-2000(e)(5) aggravating circumstance that Gillard committed the

murders during an attempted rape and attempted robbery of Holland; (4) Rachel B.'s testimony regarding her violent childhood which subsequently led to her involvement in prostitution; (5) the State's closing argument regarding defendant's plan or scheme to rape and rob prostitutes; (6) the trial court's lack of an instruction to the jury that it was not permitted to consider the same evidence for more than one aggravating circumstance; and (7) the trial court's lack of an *Enmund/Tison* instruction. Defendant takes the position that these issues are "premature for decision on direct appeal" and requests that this Court dismiss these claims without prejudice so that he may reassert them during a subsequent MAR proceeding.

A criminal defendant's right to counsel pursuant to the Sixth Amendment to the United States Constitution "includes the right to the effective assistance of counsel." *State v. Braswell*, 312 N.C. 553, 561 (1985). "When a defendant attacks his conviction on the basis that counsel was ineffective, he must show that his counsel's conduct fell below an objective standard of reasonableness." *Id.* at 561–62. To make such a showing, a defendant must satisfy a two-part test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Prejudice is established by showing 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *State v. Campbell*, 359 N.C. 644, 690 (2005) (quoting *Strickland*, 466 U.S. at 694). "There exists a 'strong presumption that counsel's conduct falls within the wide range of professional assistance,' " but this presumption is rebuttable. *State v. Oglesby*, 382 N.C. 235, 243 (2022) (quoting *Strickland*, 466 U.S. at 689).

Because "[i]t is not the intention of this Court to deprive criminal defendants of their right to have [ineffective assistance of counsel] claims fully considered," IAC claims should only be decided on the merits in a direct appeal when "the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing." *State v. Fair*, 354 N.C. 131, 166–67 (2001). Because the "reasonableness" of counsel's performance at trial is a fact-intensive inquiry, "the proper course is generally to dismiss the claim without prejudice to allow for a hearing and further factfinding." *Oglesby*, 382 N.C. at 243 (citing *Fair*, 354 N.C. at 166).

Given the lack of information in the "cold record" relating to defendant's counsel's trial strategy and in keeping with this Court's general policy of affording

defendants the opportunity to rebut the reasonableness of their counsels' action, we dismiss these claims without prejudice.

### III.    Conclusion

For the foregoing reasons, we conclude that defendant received a fair trial and capital sentencing proceeding free of error, and the judgment of the trial court is affirmed.

AFFIRMED.

Justice EARLS concurring in part and dissenting in part.

I completely concur with the majority's judgment that Gillard's convictions for first-degree murder were proper. The overwhelming evidence presented at trial showed that Gillard was responsible for the tragic loss of two lives, those of a twelve-week pregnant woman and the man who was trying to protect her. These murders were heinous acts corroborated by more than enough evidence to establish Gillard's guilt. Evidence from other victims—victims who never got justice for the offenses committed against them individually—was rightly admitted to show Gillard's criminal scheme. Gillard preyed on sex workers by luring them to low-budget hotel rooms where he and an accomplice would rob them and sexually assault them, using violence when necessary, as happened in this case. Thus, I agree with the majority's decision to affirm the trial court on Gillard's conviction for these two murders.

But as the majority describes, there were two phases to this trial: a guilt phase and a sentencing phase. At sentencing, the jury had to choose how to penalize Gillard for the murders it just convicted him of. It could have chosen death or life imprisonment without parole. My grounds for this partial dissent, then, are narrow. I have specific concerns that Gillard did not receive a fair sentencing hearing, in light of errors across both phases of his trial. The majority differs and finds no errors with Gillard's sentencing proceeding. Thus, I dissent only on these narrow grounds and would remand this case for a second sentencing hearing free from those compounding

errors.

The death penalty is our "most severe punishment." *Miller v. Alabama*, 567 U.S. 460, 475 (2012). It is "qualitatively different from a sentence of imprisonment, however long." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). It is final and irreversible. *Furman v. Georgia*, 408 U.S. 238, 289 (1972) (Brennan, J., concurring). Once a person is executed, guilty or innocent, their punishment cannot be amended. *See id.*; *Woodson*, 428 U.S. at 305. Perhaps most salient is that "[t]he calculated killing of a human being by the State involves, by its very nature a denial of the executed person's humanity" in a way a term of imprisonment does not. *Furman*, 408 U.S. at 290 (Brennan, J., concurring). This is because while an incarcerated person retains certain rights, the person executed is denied "the right to have rights." *Id.*

The United States Supreme Court has determined that for the death penalty to be constitutional,[1] its application must be "consistent," and the procedures used must ensure "fairness to the accused." *Eddings v. Oklahoma*, 455 U.S. 104, 111 (1982). The reviewing court's "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Kyles v. Whitley*, 514 U.S. 419, 422 (1995) (quoting *Burger v. Kemp*, 483 U.S. 776, 785 (1987)). If a trial court fails to take careful measures in its rulings, the risk of an arbitrary death sentence

---

[1] Because I would find that the cumulative effect of the errors in this case warrants a new sentencing proceeding, I do not reach the issue Gillard raises of whether the death penalty as administered in North Carolina is constitutional under the United States Constitution and the North Carolina Constitution.

rises. An erroneous ruling which exacts unfair prejudice on the defendant can be the difference between life and death. *See State v. Sanderson*, 336 N.C. 1, 9 (1994) (noting the heightened need for fair and proper procedure "where the issue before the jury is whether a human being should live or die").

The risk of an arbitrary death sentence in Seaga Gillard's case is high. This case is riddled with procedural errors by way of: (1) unreliable witness identification; (2) erroneously admitted evidence, such as repetitive photos and irrelevant evidence about the lives of victims of other unprosecuted crimes; (3) the failure to give the jury proper instructions on mitigating and aggravating circumstances; and (4) the failure to give a proper jury instruction regarding Gillard's eligibility for the death penalty for Dwayne Garvey's murder pursuant to *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987). Additionally, the use of unadjudicated offense evidence during the sentencing phase of trial raises serious questions about the constitutionality of Gillard's death sentence and further increases the risk that his punishment was imposed arbitrarily and capriciously. *See Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). Put simply, sentencing a person to death based in part on incidents for which that person has not been convicted is in tension with our legal system's commitment to the presumption that all persons are innocent until proven guilty.

This concern for an arbitrary death sentence is compounded when Gillard's crimes are compared alongside other recent Wake County jury decisions in death

penalty cases. Following Byron Waring's death sentence in 2007, Wake County juries have rejected the death penalty in nine separate cases. Those cases included the following crimes:

- The murder of five people in separate incidents, and robbery with a dangerous weapon.

- The sexual assault and murder of a ten-month-old stepdaughter.

- The rape and murder of a stranger at the home where she was sleeping, in which the victim was killed with a heavy object.

- The murder of the defendant's ex-girlfriend to prevent her from marrying someone else and seeking custody of the defendant's child.

- The repeated stabbing of the defendant's wife until she died and elaborate efforts to cover-up the crime.

- Numerous armed robberies, which spanned over several months, and one first-degree murder during the course of one robbery as well as one attempted murder during the course of another.

- A murder which occurred during the course of a home invasion robbery, with an accomplice, in which the victim was beaten and stabbed to death.

- The double murder of the defendant's in-laws at their home and the attempted murder of the defendant's wife, who was shot through the heart and pistol whipped, in front of their children. This case also

involved allegations that the defendant shot at the police who were trying to apprehend him and violated a restraining order.

- The double murder of two men during the course of a home invasion robbery with an accomplice.

The Court has been clear in its mandate, that capital punishment "is reserved only for the most culpable defendants committing the most serious offenses." *Miller*, 567 U.S. at 476. But there is no reason to believe that the offenses Gillard was convicted of are dissimilar to those committed by defendants in other Wake County cases where the jury rejected that punishment. Instead, that the jury declined the death penalty in those cases yet imposed it here suggests that the procedural errors in this case, when taken together, impacted the jury's decision to sentence Gillard to death. Equally concerning is the State's use of unadjudicated offense evidence relating to other sexual assaults and robberies. Even though rape is not a death penalty eligible crime, *Coker v. Georgia*, 433 U.S. 584, 592 (1977), these offenses were used during sentencing to prove the course of conduct aggravating factor and to sentence Gillard to death.

Without question the State has an interest in bringing Gillard and others accused of serious crimes to trial. *See Sell v. United States*, 539 U.S. 166, 180 (2003). After all, it is through the application of our criminal laws that the government endeavors to protect "the basic human need for security." *Id.* At the same time, we cannot abandon the rule of law, especially in the hardest cases. Procedures must

ensure that criminal defendants receive fair trials and sentencing hearings. *See id.*; *Darden v. Wainright*, 477 U.S. 168, 178–83 (1986); *Gregg v. Georgia,* 428 U.S. 153, 188 (1976). In capital cases, where "a defendant's life is at stake," courts must be "particularly sensitive to ensure that every safeguard is observed." *Gregg*, 428 U.S. at 187 (first citing *Powell v. Alabama*, 287 U.S. 45, 71 (1932); and then citing *Reid v. Covert*, 354 U.S. 1, 77 (1957) (Harlan, J., concurring in result)). Meaningful appellate review in a capital-sentencing system "serves as a check against the random or arbitrary imposition of the death penalty." *Id.* at 206.

Thus, while I agree with my colleagues that Gillard's convictions are proper under North Carolina law, I disagree that a death sentence is the "appropriate punishment" in this "specific case." *See Woodson*, 428 U.S. at 305. Additionally, although I would not find that any single error in this case meets the plain error standard, the harmless error standard for federal constitutional issues, or the harmless error standard for issues not arising under the United States Constitution, I would hold that when viewed in the aggregate, the cumulative effect of those errors prejudiced Gillard's sentence. He is therefore entitled to a new sentencing hearing.

## I.    The Trial Court's Admission of Unadjudicated Offenses

In North Carolina, the jury that finds a defendant guilty or innocent of a capital offense is usually the very same jury that then decides whether that defendant receives a sentence of death or life imprisonment. N.C.G.S. § 15A-2000(a)(1)–(2) (2023). During that latter sentencing phase of a capital murder trial, the State may

introduce a defendant's unadjudicated criminal offenses: that is, evidence of a crime the defendant allegedly committed, but that has never been proven in a court of law. *See* Phyllis L. Crocker, *Concepts of Culpability and Deathworthiness: Differentiating Between Guilt and Punishment in Death Penalty Cases*, 66 Fordham L. Rev. 21, 29–30 (1997); Steven Paul Smith, Note, *Unreliable and Prejudicial: The Use of Extraneous Unadjudicated Offenses in the Penalty Phases of Capital Trials*, 93 Colum. L. Rev. 1249, 1250 (1993) [hereinafter Smith, *Unreliable and Prejudicial*]. North Carolina allows juries to consider such unadjudicated offense evidence, *in addition to* all evidence earlier presented in the guilt-innocence phase of the proceeding. N.C.G.S. § 15A-2000(a)(3) (2023); *State v. Holden*, 346 N.C. 404, 422 (1997). This means that unadjudicated offense evidence introduced at either phase of a defendant's capital trial can be prejudicial to the defendant's sentence, since evidence from either stage bears on the jury's recommendation of punishment. *See* N.C.P.I.—Crim. 150.10 (noting jury instructions that evidence submitted in either stage of a death penalty proceeding "is competent . . . [to the jury's] consideration in recommending punishment").

During closing arguments at the sentencing phase of this case, the State relied heavily on unadjudicated offense evidence and urged the jury to "consider all the evidence in this particular case, all of it, all the way back from the beginning." The State guided the jury in remembering the testimony of Bessie A., Rachel B., Kara L., Keyona T., Serena S., Asia G., and Keyana M. This testimony related to

unadjudicated offenses separate from the crime Gillard was on trial for and was used to support the course of conduct aggravating factor. *See* N.C.G.S. § 15A-2000(e)(11) (2023). Referring to those offenses, the State labeled Gillard as a "serial rapist" who "preys on the vulnerable" and claimed "[t]here is no doubt that he raped and brutalized seven other women."

While this evidence might have been admissible under our precedent to prove the course of conduct aggravating circumstance, *see State v. Cummings*, 332 N.C. 487, 507–10 (1992), that does not cure its constitutional infirmity. The use of unadjudicated offenses during the sentencing phase of capital trials raises questions regarding prejudice by way of substantive and procedural due process violations, and through the erosion of a defendant's presumption of innocence until proven guilty by a jury of his peers. Smith, *Unreliable and Prejudicial* at 1282–90; *see also In re Winship*, 397 U.S. 358, 363 (1970) ("[T]he presumption of innocence . . . [is a] bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law." (cleaned up)); William S. Laufer, *The Rhetoric of Innocence*, 70 Wash. L. Rev. 329, 361 (1995) [hereinafter Laufer, *Innocence*] ("Courts in the jurisdictions where evidence of unadjudicated crimes is used in penalty determinations have denied, ignored, or minimized the fact that all unadjudicated crimes carry a presumption of innocence."). Substantive due process requires that the

evidence used to determine a death sentence be reliable.[2] To ensure this, the United States Supreme Court has stated that the death penalty "may not be imposed under sentencing procedures that create a substantial risk that punishment will be inflicted in an arbitrary and capricious manner." *Godfrey*, 446 U.S. at 427 (citing *Furman v. Georgia*, 408 U.S. 238 (1972)); *see also Gregg*, 428 U.S. at 188–89. Yet, a jury's consideration of unadjudicated offenses at sentencing creates a risk that a death sentence will be imposed based on erroneous evidence, which has not been deemed trustworthy through the process of a criminal trial. Smith, *Unreliable and Prejudicial* at 1283; *cf.* David McCord & Hon. Mark W. Bennett, *The Proposed Capital Penalty Phase Rules of Evidence*, 36 Cardozo L. Rev. 417, 472–73 (2014) (proposing the requirement of an offer of proof by the prosecution before admitting unadjudicated offenses as a proposed rule of evidence for a capital penalty phase, in light of the "potential to cause a mistrial" if insufficient proof of such conduct exists). "The nature of [this] risk is compounded by the fact that the criminal history of the defendant is by far the most important factor used by the sentencer in capital trials in evaluating the appropriateness of the punishment." Smith, *Unreliable and Prejudicial* at 1283.

Importantly, because sentencing proceedings are not accompanied by the same

---

[2] "Substantive due process asks the question of whether the government's deprivation of a person's life, liberty, or property is justified by a sufficient purpose." Erwin Chemerinsky, *Substantive Due Process*, 15 Touro L. Rev. 1501, 1501 (1999). The key question then is whether there is "a good enough reason for such a deprivation." *Id.* In contrast, procedural due process "asks whether the government has followed the proper procedures when it takes away life, liberty, or property." *Id.*

procedural protections present during the guilt-innocence phase of trial, there is a heightened risk that a death sentence will be erroneously imposed. *Id.*; *see State v. Warren*, 347 N.C. 309, 325 (1997) (providing that the North Carolina Rules of Evidence do not apply during capital sentencing proceedings); *State v. Golphin*, 352 N.C. 364, 464 (2000) (same). When testimony is damaging to a defendant, our legal system trusts the adversarial process "to sort out the reliable from the unreliable evidence." *Barefoot v. Estelle*, 463 U.S. 880, 901 (1983). Yet during a capital sentencing hearing, this process necessarily requires the defendant to rebut allegations of other offenses by engaging in a series of mini trials before the very same jury that just convicted him of murder. Smith, *Unreliable and Prejudicial* at 1288–89. This process also has the effect of stretching defense counsel thin and raising the risk of a Sixth Amendment ineffective assistance of counsel claim. *Id.* For the more collateral attacks the State brings regarding offenses the defendant has not been convicted of, the more time the defense must devote to rebutting those attacks, necessarily reducing the time spent preparing for other portions of the penalty phase of trial. *See id.*

Moreover, the introduction of unadjudicated offense evidence belittles the criminal defendant's presumption of innocence. *Herrera v. Collins*, 506 U.S. 390, 399 (1993). When the State introduces evidence at sentencing that the defendant allegedly committed these other offenses, it constructively creates a presumption that those allegations are true. Smith, *Unreliable and Prejudicial* at 1289–90. That is a

problem, because the preceding trial and guilty verdict only extinguish the presumption of innocence *for that charged offense*—not for all other offenses the defendant may have allegedly committed. *See Herrera*, 506 U.S. at 399. Nor does the State's presentation of that evidence to a jury absolve the presumption of innocence concerns: the jury that just convicted the defendant of a capital crime cannot then serve as an impartial jury on those separate offenses as required by due process. Smith, *Unreliable and Prejudicial* at 1279 (citing *State v. Bobo*, 727 S.W.2d 945, 952 (Tenn. 1987)); Laufer, *Innocence* at 367–68 (summarizing evidence that suggests "the presumption of innocence is not well understood by jurors" and that at least some jurors "quickly abandon a presumption of innocence when presented with any incriminating evidence" of the defendant). Because the presumption of innocence remains until an offense is adjudicated, it is improper for the jury to base its sentencing decision on such evidence. Smith, *Unreliable and Prejudicial* at 1290.

Ultimately, substantive and procedural due process concerns, as well as the erosion of the presumption of innocence, prejudice the defendant during sentencing by: (1) creating the risk that an inaccurate allegation will not be detected and the jury will base its decision to sentence the defendant to death, in whole or in part, on that erroneous evidence; (2) creating a presumption that the allegations against the defendant are true; (3) forcing the defendant to engage in a series of mini trials before the same non-neutral jury that convicted him of murder; and (4) requiring defense counsel to devote valuable time to rebutting unadjudicated offense allegations, rather

than solely preparing for the sentencing hearing. *Id.*

The United States Supreme Court's

> principal concern has been more with the *procedure* by which the State imposes the death sentence than with the substantive factors the State lays before the jury as a basis for imposing death, once it has been determined that the defendant falls within the category of persons eligible for the death penalty.

*California v. Ramos*, 463 U.S. 992, 999 (1983). Accordingly, it has given states latitude to "prescribe the method by which those who commit murder shall be punished." *Romano v. Oklahoma*, 512 U.S. 1, 7 (1994) (quoting *Blystone v. Pennsylvania*, 494 U.S. 299, 309 (1990)). "This latitude extends to evidentiary rules at sentencing proceedings." *Id.* If the jury finds a "defendant falls within the legislatively defined category of persons eligible for the death penalty . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." *Ramos*, 463 U.S. at 1008.

Nevertheless, the admission of relevant evidence during sentencing cannot be "so unduly prejudicial that it renders the trial fundamentally unfair," and in those cases, "the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). Unfortunately, the high threshold established by the United States Supreme Court for assessing the admission of improper evidence during capital sentencing renders this constitutional protection effectively unavailable to most, if not all, capital defendants. *See Romano*, 512 U.S. at 10 (holding that admission of evidence regarding the defendant's prior

death sentence in a separate and unrelated trial did not "so infect[ ] the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process").

It is perhaps in part for this reason that other states have installed procedural safeguards that protect capital defendants from the use of unadjudicated offense evidence. At least six states have determined unadjudicated offense evidence is not admissible during the capital sentencing phase.[3]

For example, in *State v. Bobo*, 727 S.W.2d 945 (Tenn. 1987), the Tennessee Supreme Court concluded that evidence of the defendant's prior criminal activity must be accompanied by a conviction to be proper under Tennessee's state constitution. *Id.* at 952. The court rested its decision on the Due Process Clause's mandate of "fundamental fairness," concerns about "subjecting a defendant to what is in effect a trial" without substantive and procedural protections, and the bias that is likely to result from review of the defendant's unadjudicated offenses by the same jury that convicted him. *Id.*; *see also State v. Hale*, 840 S.W.2d 307, 312–13 (Tenn. 1992).

In the same vein, Indiana has held it impermissible to introduce evidence of other criminal acts for which the defendant has not been convicted. Namely because of the "prejudice inherent" in the process of first being tried by a jury for the charged offense, and then being tried again by that same jury for another unrelated criminal

---

[3] These are Tennessee, Indiana, Alabama, Pennsylvania, Florida, and Ohio.

offense. *State v. McCormick*, 272 Ind. 272, 280 (1979); s*ee also Lockhart v. State*, 609 N.E.2d 1093, 1101 (Ind. 1993).

Alabama has recited concerns regarding a defendant's presumption of innocence as a reason not to admit evidence of pending charges during capital sentencing and has held that courts may not rely on unadjudicated offense evidence to negate the existence of a mitigating factor. *Cook v. State*, 369 So. 2d 1251, 1257 (Ala. 1978); *see also Waldrop v. State*, 859 So. 2d 1138, 1147 (Ala. Crim. App. 2000). Pennsylvania has also elected not to allow evidence of unadjudicated criminal acts at the sentencing phase of a death penalty proceeding because admission of such evidence contradicts "the imperative that the death penalty be imposed only on the most reliable evidence." *Commonwealth v. Hoss*, 445 Pa. 98, 118 (1971); *see also Commonwealth v. Hughes*, 581 Pa. 274, 331 (2004).

Moreover, Florida has determined that its statute pertaining to aggravating factors only allows evidence of prior convictions to be admitted during sentencing— not "mere arrests or accusations." *Provence v. State*, 337 So. 2d 783, 786 (Fla. 1976) (citing Section 921.141(5)(b), Florida Statutes); *see also Dougan v. State*, 470 So. 2d 697, 701 (Fla. 1985). In making this finding, the court acknowledged the importance of following the language of its death penalty sentencing statute, which was enacted to cure the constitutional infirmities that arise from limitless discretion, that were previously addressed in *Furman v. Georgia,* 408 U.S. 238 (1972). *Provence,* 337 So. 2d at 786.

Ohio has also identified the disadvantage to the defendant that results from the admission of unadjudicated offense evidence as a reason not to allow this evidence during capital sentencing. *State v. Glenn*, No. 89-P-2090, 1990 WL 136629, at *10 (Ohio Ct. App. 1990). Ohio courts have specifically stated that, "disclosure of 'other acts' types of activities, for which a defendant was not convicted, is fraught with potential problems of prejudicial error, as the cumulative effect of the unadjudicated offenses may well turn a jury against a defendant who ostensibly has no criminal record." *Id.*

Other states that have not fully precluded a jury's consideration of this evidence have placed limitations on how and when it can be used. Arkansas, Georgia, Utah, Nebraska, and California require that unadjudicated offense evidence be proven beyond a reasonable doubt. *Ward v. State*, 338 Ark. 619, 628 (1999) ("[W]hen the prior violent felony has not resulted in a conviction, the State must present evidence showing that the defendant committed the act."); *Fair v. State*, 245 Ga. 868, 871 (1980) ("[T]he fact finder in a presentence trial must determine whether beyond a reasonable doubt any of the statutory aggravating circumstances exist under the evidence presented.") *State v. Maestas*, 299 P.3d 892, 970 (Utah 2012) ("[T]he State bears the burden of proving to the jury that the defendant actually committed the crime."); *State v. Galindo*, 278 Neb. 599, 662 (providing that when an unadjudicated offense is used to support an aggravating factor, "the State must prove the unadjudicated offense beyond a reasonable doubt"); *People v. Letner*, 50 Cal. 4th 99,

200 (2010) ("We previously have concluded that the requirement that such unadjudicated offenses be proved beyond a reasonable doubt before the jury may consider them in aggravation is sufficient to protect a defendant's constitutional rights.").

Louisiana has adopted a clear and convincing evidence standard, which requires "that the evidence of the defendant's commission or connection with the commission of the unrelated criminal conduct [be] clear and convincing." *State v. Comeaux*, 699 So. 2d. 16, 20 (La. 1997). Nevada has limited the use of unadjudicated offenses, stating that this evidence cannot be used to establish an aggravating factor. *Crump v. State*, 102 Nev. 158, 161 (1986). This evidence also cannot be "dubious, tenuous, nor of questionable probative value." *Robins v. State*, 106 Nev. 611, 626 (1990) (quoting *Crump*, 102 Nev. at 161). Similarly, South Carolina has limited the use of unadjudicated offense evidence and requires that the jury "be instructed these offenses may not be used as proof of the statutory aggravating circumstances." *State v. Young*, 305 S.C. 380, 384 (1991) (quoting *State v. Stewart*, 283 S.C. 104, 108 (1984)). Additionally, Wyoming has insisted that only convictions be used to support its aggravating factor that "[t]he [d]efendant was previously convicted of another murder in the first degree or a felony involving the use or threat of violence to the person." *Hopkinson v. State*, 632 P.2d 79, 170 (Wyo. 1981). As the court observed, "the statue refers to 'previous conviction' . . . not the previous commission of those crimes." *Id.*

Seven states allow for the use of unadjudicated offense evidence: Texas,

Oklahoma, Missouri, Oregon, Idaho, Arizona, and North Carolina.[4] Resting its decision on the requirement that "all relevant evidence concerning the defendant must be placed before the jury," Texas has found no constitutional issue with the use of unadjudicated offense evidence during sentencing. *Milton v. State*, 599 S.W.2d 824, 827 (Tex. Crim. App. 1980); *see also Cantu v. State*, 939 S.W.2d 627, 648 (Tex. Crim. App. 1997). Missouri has concluded the same, stating that "at the punishment phase [the jury] is entitled to full information about the defendant and his previous conduct." *State v. Jones*, 749 S.W.2d 356, 364 (Mo. 1988); *see also State v. Cole*, 71 S.W.3d 163, 174 (Mo. 2002). Oklahoma allows unadjudicated offense evidence during sentencing to support the State's submission of an aggravating factor. *Fuston v. State*, 470 P.3d 306, 329 (Okla. Crim. App. 2020). Moreover, Oregon has also allowed the jury to assess this type of evidence when determining whether to impose a death sentence. *State v. Wagner*, 305 Or. 115, 178 (1988); *see also State v. Montez*, 309 Or. 564, 611 (1990).[5] The same is true for Idaho which has "upheld the consideration of prior unconvicted crimes during sentencing." *State v. Hairston*, 133 Idaho 496, 516

---

[4] Several states appear not to have addressed the issue: Kansas, Kentucky, Mississippi, Montana, and South Dakota.

[5] While Oregon law allows for the death penalty, an amendment to the state's death penalty statute in 2019 significantly limited the crimes for which capital punishment can be imposed. Act effective Sept. 29, 2019, 2019 Or. Laws ch. 635. Oregon has also had a moratorium on executions since 2011, and in 2022 Governor Kate Brown commuted the death sentences of those on death row to life in prison without the possibility of parole. Governor Kate Brown, *Commutation of Sentence*, https://apps.oregon.gov/oregon-newsroom/OR/GOV/Posts/Post/governor-kate-brown-commutes-oregon-s-death-row-15087 (last accessed Dec. 10, 2024).

(1999). Arizona also allows prior bad acts, which are not accompanied by a conviction to be used to rebut a defendant's lack of a conviction record when it is advanced as a mitigating factor. *State v. Rossi*, 171 Ariz. 276, 279 (1992).

North Carolina has similarly "refused to require a conviction of [a criminal] offense before the State may use that offense to establish the course of conduct aggravating circumstance." *Cummings*, 346 N.C. at 328; *see also State v. Moseley*, 336 N.C. 710, 719 (1994). Under North Carolina law, during capital sentencing, "[e]vidence may be presented as to any matter that the court deems relevant to [the] sentence." *Golphin*, 352 N.C. at 464 (quoting N.C.G.S. § 15A-2000(a)(3) (1999)). This includes evidence relating to aggravating and mitigating circumstances contained in subsections (e) and (f) of N.C.G.S. § 15A-2000. *Id.* Because the Rules of Evidence do not apply to sentencing hearings, and because the State is permitted to present "competent and relevant" evidence to support an enumerated aggravating factor, "trial courts are not required to perform the Rule 403 balancing test during a sentencing proceeding." *Id.* (quoting *State v. Flippen*, 349 N.C. 264, 273 (1998)).

North Carolina's decision to allow unadjudicated offense evidence as it operated in this case raises serious constitutional questions about the reliability of Gillard's death sentence and the procedures used during that sentencing proceeding, which ultimately led the jury to sentence Gillard to death.

## A. Evidence of Unadjudicated Offenses

### 1. Rachel B.

a. *Testimony*

Rachel B.'s testimony from the guilt-innocence phase recounted an incident, which took place on 28 October 2016 at the Microtel in Morrisville, North Carolina, when she was twenty-three years old. She stated that she was scheduled to meet with a single customer at 4:00 a.m. but two men arrived at her room instead. Upon arrival, the men pushed their way into her room, told her they had been watching her, knew who she was, and demanded to know where her money was located. One of the men threatened her, stating she should think about her kids, "before you die," while the other man searched her belongings. The men then undressed Rachel B., tied her feet together and her hands behind her back, and took turns raping her. The men also forced her to perform oral sex on them.

When Rachel B. tried to get a look at the men, they hit her and put a pillowcase over her head. They also shoved a pair of underwear in her mouth and tied a pillowcase around her neck. After the rape, the men tied a telephone cord around her neck and strangled her. Rachel B. testified that as the men strangled her, she lost consciousness, and each time she regained consciousness the men strangled her again. According to Rachel B., this went on for hours. At one point, Rachel B. got up off the bed and sat up against the wall, only to be kicked in the face.

Rachel B. also testified that the more violent of the two men had a foreign accent and a tattoo with three spiders on his calf. Consistent with this, Rachel B. stated that during her attack, the man without the accent leaned down and told her

to pretend to be dead because the other man wanted Rachel B. killed. Rachel B. followed these instructions and prayed for her daughter because she was sure the men were going to kill her. Both men had guns. One of them pointed the gun at the back of Rachel B.'s head and said that he was going to kill her. Once the men left, Rachel B. was able to get up and exit the room, where she began yelling and hotel staff came to her aid.

The men took Rachel B.'s identification, social security card, birth certificate, phone, clothes, and other "random" items. Her driver's license and social security card were later found in connection with the investigation into the April Holland and Dwayne Garvey murders. Rachel B. suffered several injuries during her attack and photos of these injuries were entered into evidence. She explained that her esophagus had been crushed, that she had ligature marks on her wrists and legs, and that she had an injury on her face where she was kicked. She also testified that as a result of these injuries she was required to wear a neck brace for a month, and that she has since experienced memory problems and post-traumatic stress disorder (PTSD).

While Rachel B. reported the incident to law enforcement, she explained that the officers "didn't care" about what had happened to her and believed that she knew the men who attacked her. Rachel B. later learned about Holland's and Garvey's murders from a friend who was staying at the hotel where the murders occurred. After Googling the news story, Rachel B. identified the men who attacked her and called the Morrisville Police Department on 7 December 2016 to report the same.

The State introduced testimony from the employee of the Microtel who found Rachel B. naked, tied up, and with a pillowcase over her head and around her neck. Testimony from Detective Mullis from the Morrisville Police Department recounted Rachel B.'s statements to police immediately following the event while Rachel B. was in the hospital emergency room. The State also presented into evidence the telephone cord and pillowcase that were used on Rachel B. This evidence was accompanied by testimony from Detective Mullis about Rachel B.'s injuries.

b.  *Application to Gillard's Case*

The defense argued this evidence should be excluded on the grounds that it would "deny Defendant due process . . . and would be highly prejudicial" in violation of the Fourteenth Amendment to the United States Constitution.

As it pertains to the reliability of this evidence, Rachel B. told police that "she couldn't really give a good description of their faces" and that she recognized the perpetrators' races because she could see their legs during the assault. For that reason she also recognized the tattoos on their legs. Yet when Rachel B. called the Morrisville Police Department in December of 2016, she reported she had recognized her attackers from a surveillance photo in an online news story about Holland's and Garvey's murders. This inconsistency is incongruent with "the need for reliability" in imposing the death penalty for a separate offense, *see Woodson*, 428 U.S. at 305, and raises questions about the credibility of Rachel B.'s testimony.

Moreover, the United States Supreme Court has determined that the correct

photographic identification procedure involves police showing the witness "pictures of a number of individuals," without indication by police of whom they suspect. *Simmons v. United States*, 390 U.S. 377, 383 (1968). Although the police did not conduct Rachel B.'s identification procedure, it stands to reason that the use of a single photograph identification procedure, like the one present in this case, is highly suggestive and calls into question the veracity of Rachel B.'s identification. This is especially true given that Rachel B. discovered Gillard's photo in a news article discussing the circumstances of Holland's and Garvey's murders.[6]

Furthermore, two days after making her identification, Rachel B. was arrested in Las Vegas, Nevada, and charged with capital murder in connection with a homicide that occurred in November 2016 in Dallas, Texas. Dallas authorities allowed Rachel B. to plead guilty to robbery in exchange for a sentence of probation. During the course of North Carolina's investigation into Rachel B.'s rape, law enforcement spoke with Rachel B.'s mother, who described her daughter as a pathological liar who had made prior accusations of sexual assault. Although credibility of a witness is a question for the jury, *State v. Moore*, 366 N.C. 100, 108 (2012), the same jury that previously convicted Gillard is poorly positioned to then make those credibility determinations as to Rachel B.—which poses due process problems when that same evidence is considered at sentencing. *Williams v. Lynaugh*, 484 U.S. 935, 938 (1987)

---

[6] Single photograph identification issues are further discussed in Part VII of this opinion in relation to Keyona T.'s identification of Gillard.

(mem.) (Marshall, J., dissenting); *see also Lockhart,* 609 N.E.2d at 1101.

Additionally, Gillard has not been convicted of an offense against Rachel B. Thus, under our laws, the presumption of innocence should remain intact as to the crimes against Rachel B. *See Estelle v. Williams,* 425 U.S. 501, 503 (1976) ("The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice."). However, when the State introduced evidence about the offense against Rachel B. and stated that "there is no doubt" Gillard had "raped and brutalized seven other women," Gillard was stripped of that presumption of innocence. This undermined the fairness of Gillard's sentencing hearing.

## 2. Bessie A.

### a. Testimony

During the guilt-innocence portion of Gillard's trial, Bessie A. testified that she engaged in sex work and advertised on "Backpage." While staying at America's Best Value Inn, on 16 October 2016, a man solicited her services. Although she expected a single customer to arrive at her hotel room, when she opened the door two men rushed in. One of the men pointed a gun at her. According to Bessie A., the men forced her to remove her clothes and sit on the bed while they asked her for money. The two men stole eighty dollars, a bank card, a tablet, and a cell phone. One of the men used a condom to engage in nonconsensual oral and vaginal sex with Bessie A. When Bessie A. did not have a condom for the second man, he became angry and touched her

vaginal area with the gun.

Bessie A. was then tied up with a pillowcase, and the men forced her to give them the pin for her bank card by threatening to kill her and her children. The men subsequently covered her with blankets and left the room. Bessie A. testified that she believed she was going to die. After waiting several minutes, she got up and saw that the men were gone.

Bessie A. did not want to report the incident to the police and only did so after her mother and sister convinced her to. In her statement to police, Bessie A. omitted that she had been engaging in sex work and instead stated that she had been out for drinks with friends. She further explained that upon returning to her hotel room she heard a knock at the door, and when she opened the door, two black men rushed into her room.

While police did not initially investigate her case, they contacted her on 6 December 2016, and told her about what had happened to "the other girl," April Holland. Bessie A. then shared the truth about the work she was engaged in at the time of her attack. Police conducted a photo lineup and Bessie A. identified both Gillard and his co-defendant Brandon Hill. She also identified a photograph of Gillard as the man who raped her and later made an in-court identification of Gillard as well. Bessie A. confirmed the identity of her driver's license and bank card, which were found in Hill's car.

Two members of law enforcement also testified, Officer Lee and Detective

Meyers. Officer Lee was at the front desk of the Raleigh Police station when Bessie A. arrived and recounted her story about being raped and robbed. Detective Meyers testified about the photo lineup Bessie A. was shown.

### b. *Application to Gillard's Case*

The defense argued that evidence of Bessie A.'s attack should be excluded for the same reasons the evidence regarding Rachel B. should have been excluded: because "such evidence would deny Defendant due process . . . and would be highly prejudicial," in violation of the Fourteenth Amendment to the United States Constitution.

Questions regarding the reliability of Bessie A.'s testimony exist. Bessie A. provided law enforcement with differing accounts of what occurred on the night of her attack, which could not be corroborated by the friend that she was with for most of that night. Bessie A. also allegedly evaded law enforcement's attempts for follow-up interviews. Just as with the evidence regarding Rachel B.'s attack, Bessie A.'s credibility is an issue for the jury to decide. *Moore*, 366 N.C. at 108. However, the jury addressing Bessie A.'s credibility was not neutral as to Gillard, as it had already found him guilty of Holland's and Garvey's murders. *Williams*, 484 U.S. at 938; *see also Bobo*, 727 S.W.2d at 952. The "prejudice inherent" in this process, *McCormick*, 272 Ind. at 280, makes it difficult for the jury to "sort out the reliable from the unreliable evidence" presented to them, *Barefoot*, 463 U.S. at 901, thereby increasing the risk that Gillard's death sentence was erroneously imposed. *See Eddings*, 455

U.S. at 117–18 (O'Connor, J., concurring) ("Because sentences of death are qualitatively different from prison sentences, this Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." (cleaned up)).

Additionally, while Bessie A.'s driver's license was later found in Hill's car, no evidence connecting Gillard and Bessie A. was found on Gillard or his property. There is also no physical evidence linking Gillard to Bessie A.'s rape and Gillard has not been convicted of a crime against Bessie A. Thus the jury's ability to consider this evidence and base its decision to sentence Gillard to death, either in whole or in part on this offense, effectively eliminated the presumption of innocence that Gillard was entitled to. *Herrera*, 506 U.S. at 399; *see also Cook,* 369 So. 2d at 1257. Any claim that Gillard's presumption of innocence as to the offense against Bessie A.—or the six other women the State used to support the course of conduct aggravator—remained intact, is quelled by the State's closing argument, which described Gillard as a "serial rapist" who "preys on the vulnerable."

### 3. Kara L.

#### a. Testimony

Kara L. first testified during the guilt-innocence phase of Gillard's trial for the limited purpose of identifying "the person accused of committing the crime charged in this case . . . and also for the purpose of identifying firearms used in the crime

charged in this case." At trial, Kara L. stated that she began engaging in prostitution at age 17. In November 2016, at the time of her interaction with Gillard, Kara L. was using a website called "Plenty of Fish" to meet clients. There she met a man who identified himself as "Carlos." Kara L. later identified Carlos as Gillard, after seeing his identification.

Kara L. testified that after making contact with Gillard, he picked her up and took her to an apartment on Juniper Drive in Wake County, where she stayed for three or four days. Gillard's brother also stayed at that apartment. Kara L. further testified that during the time she stayed with Gillard, the two had a relationship and Kara L. developed feelings for Gillard. At one point during her stay, Kara L. borrowed Gillard's cell phone to text her mother and let her know she was okay.

Kara L. also testified that she saw another man at the residence, named "B," who carried a gun in his waistband. She also stated that Gillard had a gun, which he named "Lemon Squeeze." Kara L. recounted an incident where Gillard put the gun in her face and told her to show her teeth. She testified Gillard warned her that "[i]f you don't love me, my blood would be all over the walls." Once Kara L. returned to her mother's home, she reported the attack to the police. However, she admitted that she continued texting Gillard after the incident because she still had feelings for him.

During Gillard's sentencing hearing, the State referenced Kara L.'s trial testimony, bringing it before the jury once again. The State asserted that although Kara L. had previously only been allowed to testify about evidence that went to

"identity and the firearm," Kara L. now wanted to tell the jury "the rest of the story." In response, Kara L. testified that Gillard forced her into sex trafficking by taking her to a hotel in Raleigh, to "sell[ ] my body" and "get [Gillard] money." Kara L. explained that she tried to refuse, but Gillard stated, "You're going to do it anyways."

According to Kara L., Gillard instructed her to make at least $500 and forced her to use her phone to schedule dates with clients. During Kara L.'s testimony, the State asked about the "incident with the firearm," referring to Kara L.'s trial testimony that Gillard previously put a gun in her face. Kara L. explained this incident occurred a day or two after she arrived at the hotel, because she had refused to continue engaging in prostitution. She further testified that Gillard threatened to kill her if she did not comply. Kara L. claimed that in total, Gillard forced her to have sex in exchange for money with six to seven clients and took all the money she made during those encounters.

### b. *Application to Gillard's Case*

Similar to Rachel B.'s and Bessie A.'s testimony, the defense argued that Kara L.'s testimony should be excluded because admission of this evidence "would deny Defendant due process . . . and be highly prejudicial." Moreover, consideration of this evidence during the sentencing phase of Gillard's trial would, *inter alia*, violate Gillard's Fourteenth Amendment rights under the United States Constitution.

Just like with Rachel B.'s and Bessie A.'s testimony, there are questions regarding Kara L.'s credibility. Namely the defense alleges that Kara L. has been

diagnosed with schizophrenia and bipolar disorder, and although she has been prescribed psychiatric medication for these conditions, she has chosen not to take them because of the medication's side effects. *See State v. Whaley*, 362 N.C. 156, 160–61 (2008) (noting that evidence of a witness's psychiatric history may "cast doubt upon the capacity of the witness to observe, recollect, and recount" (quoting *State v. Williams*, 330 N.C. 711, 719 (1992))). To be sure, Kara L.'s mental illness would not render her testimony inherently unreliable. Instead, just like the existence of discrepancies or contradictions in witness testimony, it is a question for the jury to decide. *See Ward v. Carmona*, 368 N.C. 35, 37–38 (2015) ("Jurors are the sole judges of the witness's credibility and have the right to believe all, part, or none of the testimony."). The same is also true about Kara L.'s behavior following her attack, which is inconsistent with her testimony. Specifically, while her sentencing-phase testimony established that Gillard had threatened and coerced her into working as a prostitute, she subsequently sent him a Facebook message stating that she missed him. Because Kara L.'s credibility was assessed by the same jury that convicted Gillard, the fundamental fairness of Gillard's sentencing proceeding is called into question. *See Williams*, 484 U.S. at 938; *see also Bobo*, 727 S.W.2d at 952.

Despite Gillard never having been charged with a crime against Kara L., the State's use of this unadjudicated offense evidence and its description of Gillard as a "serial rapist" who had without a doubt "raped and brutalized seven other women" extinguished Gillard's presumption of innocence as to Kara L.'s attack. This was

improper, as the presumption of innocence is to remain intact unless the State proves a defendant guilty beyond a reasonable doubt. *See State v. Pabon*, 380 N.C. 241, 257 (2022); *Herrera*, 506 U.S. at 399.

### 4. Keyona T.

#### a. Testimony

Keyona T. was called to testify during the penalty phase of Gillard's trial about an incident, which took place on 16 April 2016. Her testimony was provided in support of the course of conduct aggravating factor. *See* N.C.G.S. § 15A-2000(e)(11). Lynda P., who Keyona T. had met through a friend, arranged a date through Backpage. Keyona T. and Lynda P. had adjacent rooms at the Motel 6 in Durham. According to Keyona T., Gillard and another man brought Lynda P. and her brothers into Keyona T.'s room at gunpoint. Gillard made everyone sit down, and the other man pistol whipped one of the brothers. They were all made to strip and were tied up. Keyona T. also testified that Gillard put a gun in her vagina and said that he was not going to hurt her. Once the men had taken money, identifications, and other valuables, they told their victims to count to fifteen. After reaching fifteen, Keyona T. got up and found the men were gone.

Following this incident, Keyona T. was initially unable to provide police with a physical description of her attackers. However, after Holland and Garvey were killed, Keyona T. was contacted by a detective from the Raleigh Police Department, who shared information with her about the murders, and told her that the

perpetrators in Holland's and Garvey's cases might be the same people who attacked her. This provided Keyona T. with the information necessary to conduct a Google search. Based on this search, Keyona T. identified Gillard as her attacker. Keyona T. noted she "read the article" and "knew it was him." Although Keyona T. did not know Gillard, she referred to him by name during her testimony.

*b. Application to Gillard's Case*

The defense objected to both Keyona T.'s identification of Gillard and to her testimony. Just like with the evidence concerning Rachel B., Bessie A., and Kara L., the defense indicated that the admission of the evidence pertaining to the Motel 6 robbery in Durham "would deny Defendant due process . . . and would be highly prejudicial." Additionally, introduction of this evidence was prohibited by the Fourteenth Amendment to the United States Constitution.

As will be discussed in Part VII of this opinion, the reliability of this evidence is called into question by the identification procedure used to obtain Keyona T.'s identification of Gillard. *See State v. Malone*, 373 N.C. 134, 146 (2019) (providing a two-part test to determine "whether the identification procedure [at issue] was so suggestive as to create a substantial likelihood of irreparable misidentification" (quoting *State v. Fowler*, 353 N.C. 599, 617 (2001))). Following her assault, Keyona T. was neither able to provide police with a physical description of her attackers, nor was a lineup administered. Crucially, Keyona T.'s initial identification of Gillard in an internet news article followed a conversation in which law enforcement provided

Keyona T. with Gillard's name and told her that Holland's and Garvey's murders might be related to her attack.

Moreover, police allegedly had difficulty reaching any of the victims of this offense to conduct a follow-up investigation after the robbery. To the extent this speaks to Keyona T.'s credibility, procedural due process concerns exist regarding the jury's ability to make that credibility determination impartially. *See Williams*, 484 U.S. at 938.

Additionally, on 4 December 2016, two days after Holland and Garvey were killed, Hill abandoned his car in an attempt to evade police. There, law enforcement found the identification of at least one victim of the robbery. No items relating to the robbery were found on Gillard's person or at his property. As with the Rachel B., Bessie A., and Kara L. incidents, there is no physical evidence tying Gillard to the Motel 6 robbery. Although Gillard had never been convicted for a crime against Keyona T., and there was no evidence tying Gillard to these crimes, the State's position was that Gillard should be sentenced to death because he had committed crimes against Keyona T. and six other women.

Just like with the evidence relating to Rachel B., Bessie A., and Kara L., introduction of the unadjudicated offense against Keyona T. implicates Gillard's substantive due process rights because there is no guarantee that the evidence used in his case was reliable. *See Woodson*, 428 U.S. at 305. Moreover, because the Rules of Evidence do not apply at sentencing, *Warren*, 347 N.C. at 325, the risk that

Gillard's death sentence was erroneously imposed is elevated. This risk was further increased by the almost inevitable assumption that attaches to unadjudicated offense evidence: that because the State introduced evidence of Keyona T.'s attack, and implicated Gillard in that offense, Gillard is in fact guilty of that crime. *Compare with In re Winship,* 397 U.S. at 363 (stating that the presumption of innocence requires that a defendant's guilt be proven beyond a reasonable doubt).

### 5. *Serena S.*

#### a. *Testimony*

Serena S. testified in support of the course of conduct aggravating factor during the sentencing phase of Gillard's trial. *See* N.C.G.S. § 15A-2000(e)(11). Serena S. testified that on 28 October 2016, while staying at the Extended Stay America in Durham, she was contacted on Backpage by a man with an island accent for a date. While she believed only one man was coming at around 5:00 or 6:00 a.m., two men showed up and rushed into her room. Both men had guns. Once in the room, the men took her phone and tied her up with a telephone cord. At the time, Serena S. only had fifty dollars with her, which the men said was not enough. To secure more money, the men used Serena S.'s phone to respond to customers that were contacting Serena S. on Backpage. They lured the customers to the room and beat them with guns. One of the customers, Sherod M., told the men he had money in his room at a nearby hotel. One of the men left Serena S.'s hotel room to obtain Sherod M.'s money.

Another woman, Sherod M.'s girlfriend—Asia G.—also provided testimony

about this incident during the sentencing portion of Gillard's trial. She had been staying in Sherod M.'s hotel room at the Econo Lodge. She testified that while she left the room before the man without the accent arrived, she was lured back to the room because the man claimed Sherod M. had been injured. Back at the hotel room, the man tied Asia G. up with a phone cord and took her pocketbook, which contained her social security card, birth certificate, driver's license, money, credit cards, and cell phone. After the man left, Asia G. called the police.

### b. *Application to Gillard's Case*

Similarly to the evidence about the Rachel B., Bessie A., Kara L., and Keyona T. incidents, the defense argued evidence of these assaults should be excluded because its admission would violate due process, "be highly prejudicial," and violate the Fourteenth Amendment to the United States Constitution.

To be sure, there are concerns regarding the reliability of this evidence. First, the defense alleged that the police expressed skepticism of Serena S.'s account of the robbery and that the police seemed to think Serena S. was an accomplice and not a victim. Consistent with this, Asia G. testified that the man without the island accent, who had gone to her hotel room at the Econo Lodge, told her that Serena S. had set Sherod M. up to be robbed. Furthermore, the defense alleged that despite efforts to contact the victims of these robberies, police were unable to reach them in the weeks following the crime. Questions regarding Serena S.'s credibility are for the jury to decide. *See Moore*, 366 N.C. at 108. However, just like with the evidence pertaining

to Rachel B., Bessie A., Kara L., and Keyona T., assessment of Serena S.'s credibility by a biased jury—one that already heard evidence on and found Gillard guilty of other offenses—does little to ensure that Gillard's death sentence was not erroneously imposed. *See Williams*, 484 U.S. at 938; *see also Lockhart*, 609 N.E.2d at 1101.

Moreover, while there is evidence linking Hill to the Extended Stay and Econo Lodge robberies, specifically that a victim's identification was found in his car, no items linking Gillard to these crimes were found on Gillard's person or on his property. In short, there is no physical evidence linking Gillard to these robberies. Because Gillard has not been convicted of a crime against Serena S. or Asia G., he is entitled to a presumption of innocence for those offenses. *See Herrera*, 506 U.S. at 399; *Pabon*, 380 N.C. at 257. When, however, the State introduces evidence of unadjudicated offenses during sentencing, it implicitly signals to the jury that it believes the defendant committed those crimes. Here such signals were explicit: the State referred to Gillard as a "serial rapist" and implored the jury to sentence him to death because he had committed crimes against seven other women.

## 6. *Keyana M.*

### a. *Testimony*

Keyana M. testified during the penalty phase of Gillard's trial in support of the course of conduct aggravating factor. *See* N.C.G.S. § 15A-2000(e)(11). On 28 August 2016, at around 3:30 a.m., Keyana M. received a call that a client was coming. The man who arrived had a walkie-talkie, acted like a police officer, and told Keyana M.

that he was with the police. Keyana M. begged the officer not to take her to jail. But Keyana M. soon realized the man was not actually a police officer when he became aggressive with her, tied her up with a phone cord, and put a pillowcase over her head. While the man searched Keyana M.'s clothing for money, another man then came into the room, put a gun to Keyana M.'s head, took her clothes off, and raped her. Once the men left, Keyana M. called the police.

After the attack, Keyana M. went to WakeMed Hospital where a rape kit was performed. A Y-STR DNA profile obtained from this exam was matched to Gillard or anyone in his paternal blood line—a particular profile that is statistically unlikely to present in other men.

### b. Application to Gillard's Case

Just like with the evidence pertaining to Rachel B., Bessie A., Kara L., Keyona T., Serena S., and Asia G., the defense argued that evidence pertaining to Keyana M.'s attack should be excluded because its consideration by the jury would violate Gillard's due process rights, be "highly prejudicial" and be prohibited by the Fourteenth Amendment to the United States Constitution.

There are questions about the reliability of Keyana M.'s testimony. First, Keyana M. was convicted of numerous assaults in the two years prior to Gillard's trial, including a felony assault with a deadly weapon. She was also allegedly charged for an incident where she bit police officers, spit on them, and kicked out the window of a patrol car. Keyana M. has also been convicted of receiving stolen goods and

malicious conduct by a prisoner. And she has been charged with giving false information to a police officer. Because witness credibility is to be determined by the jury, the review of Keyana M.'s testimony by the same biased jury that convicted Gillard raises procedural due process concerns. *See Williams*, 484 U.S at 938; *see also Bobo*, 727 S.W.2d at 952; *McCormick*, 272 Ind. at 280.

Despite Gillard never having been convicted for crimes against Rachel B., Bessie A., Kara L., Keyona T., Serena S., Asia G., or Keyana M., the State urged the jury to sentence Gillard to death for the crimes against these women. Specifically, the State implored:

> You are in the room with a serial-rapist, convicted killer. What's the appropriate punishment?
>
> He preys on the vulnerable. He doesn't go into stores and rob them. No, he finds the victims that he thinks don't matter.
>
> Sufficiently substantial,[7] let's talk about it.
>
> Forcing oral sex and raping [Bessie A.], throwing those blankets over her head. She told you, "I thought I was going to die so I started to pray." Is that sufficient? Is that substantial enough?
>
> Robbing and terrorizing [Serena S.] and [Asia G.]. You heard they had her hogtied with a cord. You saw the cord, the different cords and methods they used to bind their victims and torture their victims, all of them, leaving the

---

[7] The State is referring to the portion of pattern jury instruction 150.10, which instructs the jury that to recommend a death sentence it must find, among other things, "that any aggravating circumstances you have found are sufficiently substantial to call for the imposition of the death penalty when considered with any mitigating circumstances." N.C.P.I.—Crim. 150.10.

marks behind.

Raping. . . [Keyana M.], she talked to you, and she said they didn't just come to rob, they came to hurt.

. . . .

Trafficking [Kara L.], how many men did he force her to sleep with and then come and steal her money? And when she said, "I don't want to do it anymore," he said, "Show me your teeth." And he put the gun to her face, and he tells her, "I'm going to splatter your blood all over this room."

. . . .

Twirling the gun around inside of . . . [Keyona T.'s] vagina, let's talk about that. That is depraved. Why would you do that? You are torturing somebody, just sitting there twirling his gun inside her vagina? That's what this defendant did. She didn't know if he was going to pull the trigger. One can only imagine how terrifying that must have been, how scared. And that's what this defendant did to each and every one of these victims.

There is no doubt that the crimes against Rachel B., Bessie A., Kara L., Keyona T., Serena S., Asia G., and Keyana M. were horrific. Yet the horrific nature of these crimes does not vitiate a defendant's presumption of innocence. *See Herrera*, 506 U.S. at 399; *see also Pabon*, 380 N.C. at 257. Without a trial, and the substantive and procedural due process protections contained therein, it is not correct to conclude that Gillard was guilty of these offenses. Moreover, while it might be tempting to assign guilt in one case based on the DNA sample obtained from Keyana M.'s rape kit, note that this evidence has not been presented at a trial governed by the Rules of Evidence, *see Golphin,* 352 N.C. at 464, nor has an impartial jury determined the credibility of the related witness testimony, weighed alongside other contradictory evidence, and

ultimately decided "what the evidence proves or fails to prove," *see Moore*, 366 N.C. at 108.

## B. Conclusion Regarding Unadjudicated Offense Evidence

The admission of unadjudicated offense evidence at Gillard's sentencing (1) created a presumption that Gillard was guilty of those offenses despite never having been convicted, (2) allowed the jury to sentence Gillard to death based in whole or in part on evidence that has not been through the rigorous trial process and thus, amounted to nothing more than allegations, and (3) forced Gillard to rebut the allegations against him in a series of mini trials before the same biased jury that convicted him of first-degree murder.

The issues raised by this case, and others like it, support that North Carolina should join the states which exclude evidence of unadjudicated offenses during sentencing, or at the very least, join those states that demand the evidence meet a reasonable doubt or clear and convincing evidence standard. As it stands, North Carolina's use of unadjudicated offense evidence is in tension with constitutional substantive and procedural due process requirements as well as a defendant's right to be presumed innocent unless convicted. "In capital cases, the finality of the sentence imposed warrants protections that may or may not be required in other cases." *Ake v. Oklahoma*, 470 U.S. 68, 87 (1985) (Burger, C.J., concurring in judgment). In my view, the qualitative difference between death and life imprisonment, and the corresponding heightened need for reliability when a death

sentence is imposed, *Woodson*, 428 U.S. at 305, requires that a jury refrain from considering evidence of a defendant's unadjudicated offenses. At the very least, the extensive use of such evidence in the sentencing phase of this case casts doubt on the constitutionality of Gillard's death sentence.

## II.    The Trial Court's Admission of Victim Impact Evidence

### A. Applicable Legal Principles

Victim impact evidence has become a prevalent feature in capital sentencing since the 1970s. Wayne A. Logan*, Through the Past Darkly: A Survey of the Uses and Abuses of Victim Impact Evidence in Capital Trials*, 41 Ariz. L. Rev. 143, 144 (1999). This includes evidence about the victim's personal characteristics and the emotional impact of the murder on their family members. *Payne*, 501 U.S. at 827.

In 1987, the United States Supreme Court decided *Booth v. Maryland*, 482 U.S. 496 (1987), *overruled by Payne*, 501 U.S. 808, and held that victim impact evidence was "emotionally charged" and thus its admission was "inconsistent with the reasoned decisionmaking . . . require[d] in capital cases." *Id.* at 508–09. Namely because evidence about the victim's personal characteristics, the emotional impact of the crimes on the family, and the victim's family member's opinions and characterizations of the crimes and the defendant, "creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Id.* at 501–03.

Two years later, the Court extended its holding in *Booth* by determining that

prosecutors cannot make inferences about the victim's personal characteristics during closing arguments. *South Carolina v. Gathers*, 490 U.S. 805, 811–12 (1989), *overruled by Payne*, 501 U.S. 808. The Court again echoed the concerns it set forth in *Booth*: "allowing the jury to rely on [information about the victim's characteristics] could result in imposing the death sentence because of factors about which the defendant was unaware, and that were irrelevant to the decision to kill." *Id.* at 811 (cleaned up) (quoting *Booth*, 482 U.S. at 505).

Then in 1991, just two years after *Gathers*, the Court reversed course slightly in *Payne*, 501 U.S. 808. It determined that the Eighth Amendment "erects no *per se* bar" on victim impact evidence. *Id.* at 827. The Court reasoned that evidence about the victim and the impact the murder had on the victim's family could, in some cases, be relevant to the jury's decision of whether or not to impose the death penalty. *Id.* at 827, 831. At the same time, the Court acknowledged that this evidence, even if potentially relevant, could not be "so unduly prejudicial" as to "render[ ] the trial fundamentally unfair." *Id.* at 825. In cases where the evidence admitted is unduly prejudicial, "the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Id.* at 825, 831.

Furthermore, *Payne*'s holding is permissive, rather than mandatory. It does not compel states to include victim impact evidence at the sentencing phase of capital trials, and instead only provides that "a State may" allow the jury to hear this type of evidence during sentencing. *Id.* at 827. Indeed, as Justice O'Connor noted in her

concurrence, *Payne* did not hold "that victim impact evidence must be admitted, or even that it should be admitted." *Id.* at 831 (O'Connor, J., concurring).

At least one state, Wyoming, has held that victim impact statements are inadmissible under its laws. *Olsen v. State*, 67 P.3d 536, 595 (Wyo. 2003). Other states, such as Florida, Indiana, Idaho, Illinois,[8] and California, have placed limits on the use of victim impact evidence. *See generally Windom v. State*, 656 So. 2d 432 (Fla. 1995) (victim impact evidence cannot be admitted as an aggravator and instead is only admissible to show the victim's uniqueness and the loss to the community); *Bivins v. State*, 642 N.E.2d. 928 (Ind. 1994) (victim impact evidence is only relevant during capital sentencing hearings if it is relevant to an aggravating circumstance); Idaho Code § 19-5306(3) (limiting testimony to the family of homicide victims); *People v. Hope*, 702 N.E.2d 1282, 1287 (Ill. 1998) (narrowing the definition of "crime victim" to a spouse, parent, child or sibling of the victim); Cal. Penal Code § 1191.1 (West 2008) (providing that only "next of kin" may testify).

As is especially relevant to Gillard's case, at least four states, Oklahoma, Colorado,[9] Illinois, and Nevada, require that victim impact evidence relate to the victim in the case for which the defendant is on trial. *See Gilbert v. State*, 951 P.2d

---

[8] Illinois is among the twenty-three states that have abolished the death penalty. *See State by State*, Death Penalty Information Center, https://deathpenaltyinfo.org/states-landing (last accessed Dec. 10, 2024); 725 Ill. Comp. Stat. Ann. 5/119-1 (2011).

[9] Colorado revised its death penalty statute on 1 July 2020 to prohibit any imposition of the death penalty from that day forward. Act Concerning the Repeal of the Death Penalty by the General Assembly in All Circumstances Charged on or After July 1, 2020, 2020 Colo. Legis. Serv. ch. 61, 204 (West).

98, 117 (Okla. Crim. App. 1997) ("[T]he type of evidence contemplated by these statutes is restricted to the impact on the family members of the victim of the homicide on trial."); *People v. Dunlap*, 975 P.2d 723, 745 (Colo. 1999) ("Evidence regarding the impact of a capital defendant's prior crimes on the victims of those crimes . . . is not admissible because it is not relevant to the actual harm caused by the defendant as a result of the homicide for which he is being sentenced."); *Hope*, 702 N.E.2d at 1289 ("[E]vidence about victims of other, unrelated offenses is irrelevant and therefore inadmissible."); *Sherman v. State*, 965 P.2d 903, 914 (Nev. 1998) ("[W]e conclude that the impact of a prior murder is not relevant to the sentencing decision in a current case and is therefore inadmissible during the penalty phase.").

North Carolina has chosen to take the *Payne* approach and has determined that "[v]ictim impact statements are relevant and admissible to aid the jury in its decision whether to recommend a sentence of death." *State v. Allen*, 360 N.C. 297, 310 (2006). Consistent with *Payne*, this Court has implicitly acknowledged that the evidence presented at sentencing must relate to the victim of the crime for which the defendant is on trial. *See State v. Thompson*, 359 N.C. 77, 124 (2004) ("While a capital defendant must be permitted to present any aspect of the defendant's character, record, or any other circumstance which a jury could deem to have mitigating value[,] [t]he feelings, actions, and conduct of third parties have no mitigating value as to defendant and, therefore, are irrelevant to a capital sentencing proceeding." (cleaned

up)); *see also State v. Smith*, 352 N.C. 531, 554 (2000) (allowing testimony about the victim in the case the defendant was on trial for); *State v. Davis*, 353 N.C. 1, 19–20 (2000) (same). Moreover, the victim impact evidence presented during a capital sentencing proceeding cannot be "so prejudicial that it renders the proceeding fundamentally unfair." *Allen,* 360 N.C. at 310.

Because North Carolina allows the jury to consider all evidence during the capital sentencing phase, regardless of whether it was presented during the guilt-innocence phase or the sentencing phase of trial, evidence introduced at either stage can be prejudicial to a defendant's sentence. *See* N.C.P.I.—Crim. 150.10. Here, the State introduced evidence sure to elicit an emotional response from the jury: evidence of the sexual abuse Keyona T., Keyana M., and Rachel B. suffered as children at the hands of other perpetrators, not Gillard. This evidence was irrelevant, outside the scope of what is permissible under *Payne*, and unduly prejudicial to Gillard's death sentence.

**B. Keyona T.**

As previously noted, Keyona T. testified for the State at the sentencing phase of Gillard's trial to support an aggravating factor. Her testimony was offered to prove that Holland's and Garvey's murders had been "part of a course of conduct" by Gillard that "included the commission . . . of other crimes of violence against another person or persons." N.C.G.S. § 15A-2000(e)(11). Despite this specific reason for Keyona T.'s testimony, she was permitted to testify about sexual abuse by her mother's boyfriend,

which began in second grade and ended when she was in fifth grade. Keyona T. called the abuse "a curse" and explained that after the man was arrested, and Keyona T. testified at the trial that convicted him, her mother continued to support him. Keyona T. also experienced physical abuse by another one of her mother's boyfriends and was later removed from her mother's care by the Department of Social Services.

Keyona T.'s testimony established that while she graduated from the Durham School of the Arts and City of Medicine Academy and enrolled in college, she ultimately left college due to symptoms of PTSD, stress, and anxiety. Keyona T. was introduced to Backpage by her cousin and began advertising there for money. The defense objected to this evidence, but the trial court allowed the evidence because it determined it was relevant to Keyona T.'s credibility as she relayed the events of 16 April 2016 at the Motel 6.

First, the evidence presented about Keyona T.'s abuse was not relevant to Gillard's sentencing. In *Payne*, the victim evidence admitted was about the surviving child victim of the offense for which the defendant was on trial. *Payne,* 501 U.S. at 831–32 (O'Connor, J., concurring). The Court found that evidence relevant because it played a role in the jury's assessment of the defendant's "moral culpability and blameworthiness" in the crime. *Id.* at 825 (majority opinion). Based on this, the Court determined the statements at issue in *Payne* were relevant to the jury's decision of whether to impose a death sentence. *Id.* at 825–26. This Court has similarly allowed victim impact statements to be admitted when they relate to the victim in the case

the defendant is on trial for. *See, e.g.*, *Smith*, 352 N.C. at 554.

However, Keyona T. is neither a victim in the case Gillard is on trial for, nor did Gillard perpetrate the abuse she suffered as a child. Thus, it stands to reason that this evidence could not help the jury assess Gillard's "moral culpability and blameworthiness" in the current case. *See Payne*, 501 U.S. at 825. Rather, just like the State suggested during closing arguments at the penalty phase, the only effect this evidence had was to prejudice Gillard by portraying him as a man who "preys on the vulnerable."

Second, Keyona T.'s testimony is markedly different from the evidence in *Payne*, which was not considered unduly prejudicial to the defendant's sentencing procedure. *See id.* at 831. In *Payne*, the grandmother of the child victim who survived the crime gave "brief" testimony that the child "cried for his mother and baby sister and could not understand why they did not come home." *Id.* at 831–32. In contrast, here, Keyona T., who was not the victim in this case, gave testimony spanning several pages about the abuse she suffered at the hands of her mother's boyfriends, her difficulty with school, and her PTSD, stress, and anxiety. This testimony was irrelevant to Gillard's sentencing proceeding and was "so unduly prejudicial that it render[ed]" Gillard's hearing "fundamentally unfair." *Id.* at 825. This is a violation of Gillard's rights under the Fourteenth Amendment's Due Process Clause. *See id.*

Additionally, while the trial court stated it was allowing the evidence about Keyona T.'s childhood abuse because it was relevant to Keyona T.'s credibility, the

court did not explain how her childhood experiences could have any bearing on the credibility of her testimony. Common factors for analyzing witness credibility are: witness demeanor or bias, a witness's motive for testifying, whether the testimony was coerced, and whether the witness has been granted immunity. *State v. Mullis*, 233 N.C. 542, 544 (1951) (witness demeanor); *State v. Singletary*, 247 N.C. App. 368, 377 (2016) (witness bias); *State v. Stoner*, 59 N.C. App. 656, 659 (1982) (witness motive); *State v. Montgomery*, 291 N.C., 235, 244 (1976) (witness coercion); N.C.G.S. § 15A-1055(b) (2023) (impact of grant of immunity on witness credibility). None of these instances apply in this case.

It is true that the Court of Appeals has previously determined that a witness's profession may be relevant in determining witness credibility. In *State v. Staton*, 33 N.C. App. 270 (1977), the Court of Appeals determined that allowing a "witness[ ] to testify as to his occupation, i.e., that he was a probation officer" was relevant because parties "have the right to enhance their witnesses' credibility." *Id.* at 272. However, the facts in that case differ substantially from the facts here. Keyona T.'s occupation is not at issue. Rather, Keyona T.'s testimony offered details on how she became involved in prostitution, and the issue was whether such details "provided a standard for judging [her] credibility." *See id.* There is no reason that a person with Keyona T.'s experiences would be more credible, nor did the defense suggest that women in Keyona T.'s profession are not credible. Rather, the defense's objection was tied to the evidence not being probative of the reason it was offered—to prove the course of

conduct aggravating factor—and because it would be unduly prejudicial to Gillard's sentence. Put simply, Keyona T.'s testimony about her childhood and her experiences of childhood abuse were not relevant to her credibility as a witness. The same is true about Keyona T.'s decisions to leave college or begin advertising on Backpage. Instead, this evidence was unduly prejudicial and violated Gillard's rights under the Fourteenth Amendment Due Process Clause.

## C. Keyana M.

Keyana M. was called to testify during the penalty phase of Gillard's trial in support of the course of conduct aggravating factor. *See* N.C.G.S. § 15A-2000(e)(11). But before she testified about her experience with Gillard, she also testified about her childhood. Her testimony established that her parents had put her into foster care and that she then moved to Virginia where she was sexually assaulted. Keyana M. was twelve years old at the time of her assault, and her attacker was later convicted.

The admission of Keyana M.'s testimony poses issues similar to the admission of Keyona T.'s testimony. Namely that because she is not the victim of the crime Gillard was on trial for, her personal characteristics were not relevant to Gillard's "moral culpability and blameworthiness" in the current case. *See Payne*, 501 U.S. at 825. The Court's insistence that victim impact statements be about the victim in the crime charged is evident throughout the *Payne* opinion. The Court described victim impact evidence as a way to inform the "sentencing authority about the specific harm caused by the *crime in question*." *Id.* (emphasis added). In her concurrence, Justice

O'Connor also expressly noted that victim impact evidence was designed to prevent the victim in the charged crime from being turned into "a faceless stranger at the penalty phase of a capital trial." *Id.* at 831 (O'Connor, J., concurring). It follows that, at a minimum, any victim impact evidence presented by the State must pertain to Holland or Garvey. *See id.* at 825 (majority opinion). Just like the evidence admitted about Keyona T.'s personal characteristics and her past, the evidence admitted about Keyana M.'s past is outside the bounds of what is permissible under *Payne*. Thus, this evidence served no legitimate purpose, was unduly prejudicial to Gillard's sentence, and violated Gillard's rights under the Fourteenth Amendment's Due Process Clause.[10]

### D. Rachel B.

Although Rachel B.'s testimony was admitted during trial pursuant to Rule 404(b) to establish a common scheme or plan and defendant's identity and motive, the trial court also allowed Rachel B. to testify about her childhood. The evidence

---

[10] The majority has effectively no response to these points. On the jury's consideration of Keyona T.'s and Keyana M.'s testimony at sentencing, the majority states, without explanation, that "there is 'nothing in the instant case to suggest that the jury's decision to recommend a sentence of death was based on any unfair prejudice that may have been created by [admission of this evidence],' " quoting *State v. Moody*, 345 N.C. 563, 572 (1997) (alteration in original). But in *Moody* this Court applied standards from the rules of evidence to assess whether particular evidence was rightly considered during sentencing. *See id.* In fact, the majority's exact quote comes from a portion of *Moody* where this Court applied Rule 403 balancing to exhibits introduced during the sentencing phase. That is the very approach the majority seemingly disclaims in Part (II)(C)(2) of its opinion. In sum, the majority does not explain what standard it is applying to Gillard's claims that evidence considered during sentencing deprived him of a fair hearing or was unduly prejudicial under *Payne*, let alone what precedent justifies that standard.

elicited established that at age ten, Rachel B. was removed from her mother's care because her mother was addicted to heroin and cocaine. To pay for drugs, Rachel B. testified that her mother "used to sell [her] and [her] sister out." Rachel B. explained that although she went to live with her grandmother for a period of time, the abuse she experienced did not end because her grandfather took videos of her and her cousins through hidden cameras. Rachel B. stated that she caught him masturbating to the videos of them taking showers. Ultimately, Rachel B. testified about a childhood where she ran away from group homes and foster care, began stripping at age fifteen, and got "stuck in human trafficking" at age seventeen. As a victim of human trafficking, she also recounted being beaten by pimps and being sold from one pimp to another.

Rachel B.'s testimony was compelling and emotionally powerful. She described a life replete with hardship, sexual abuse, and violence, all of which began at a young age by people who were supposed to love and care for her. But similarly to Keyona T.'s and Keyana M.'s testimony, Rachel B.'s testimony was not relevant to Gillard's "moral culpability and blameworthiness" in the crime charged and accordingly, was outside the scope of permissible victim evidence allowed under *Payne*. *See Payne*, 501 U.S. at 825. Namely because just like Keyona T. and Keyana M., Rachel B. was not the victim in the crime Gillard was on trial for. *See id.* Rachel B.'s experiences with stripping, human trafficking, and sexual abuse as a child were irrelevant to the jury's consideration of whether Gillard should receive a death sentence. Rather, this

evidence was "so unduly prejudicial" that Gillard's sentence could not have been the product of a fundamentally fair proceeding. *See id.* Accordingly, this evidence was admitted in violation of the Fourteenth Amendment's Due Process Clause. *See id.*

Finally, I disagree with the majority that these details of Rachel B.'s abuse by others are merely "introductory evidence" that were relevant because they "provided context to the jury for how Rachel B. crossed paths with defendant on the night he attacked her." *Supra* Part II(C)(1). If that is the test, it seems to have no limiting principle. All manner of unduly prejudicial evidence can be repurposed as "introductory context" through minimally creative framing. That is why courts, including in a case cited by the majority, carefully police the line between testimony offered for "introductory and general purposes" and that which could "play[ ] upon the passions and prejudices of the jury." *E.g., State v. Sports*, 41 N.C. App. 687, 690 (1979), *disc. rev. denied*, 298 N.C. 205 (1979); *see id.* at 689–90 (rejecting a challenge to testimony regarding a witness's "orphan status, epileptic history, scholarship assistance and summer employment" partly because it did not appear "that [the testimony] must be considered prejudicial"). The majority errs, as did the court below, by disregarding this important distinction.

## III.    The Trial Court's Admission of Repetitive Crime Scene Photos

The admission of photographic evidence pursuant to Rule 403 of the North Carolina Rules of Evidence is left to the sound discretion of the trial court. *State v. Blakeney*, 352 N.C. 287, 309 (2000). On appeal, the trial court's ruling should not be

overturned unless it "was manifestly unsupported by reason or was so arbitrary that it could not have been the result of a reasoned decision." *Id.* (cleaned up).

## A. Photographic Evidence at Gillard's Trial

The State sought to admit sixteen photos of Holland's naked and bloody body in her hotel room. Gillard objected to ten of these. The trial court admitted all sixteen—in addition to a video of the crime scene, which similarly depicted Holland's naked body surrounded by blood. In making this determination, the court reasoned that these pieces of evidence "each have independent evidentiary value that shows the different angles or provides scale, distances, location of items of evidence, and specifically what the officers observed when they were on the scene." But the trial court's decision to admit all sixteen photos was an abuse of discretion. *See State v. Hennis*, 323 N.C. 279, 285 (1988). The photos were cumulative and served no legitimate evidentiary purpose. Instead, the only purpose these photos served was to provoke the jury's emotions, such that they would sentence Gillard to death.

There are nine photos at issue from the State's Exhibit 3. These photos were shown to the jury on a television (the record does not specify what size) in a color PowerPoint presentation. The photos are numbered as follows: 63, 64, 66, 69, 70, 71, 72, 75, and 76. The photos were accompanied by testimony from Agent Jones who investigated the hotel crime scene.

According to Jones, photo 63 portrayed a wound on Holland's chest, while photo 64 was "a[n] overall shot of Ms. Holland's body." Yet photos 63 and 64 appear to be

the same photo. The only difference is that photo 64 is a zoomed-out version of photo 63. Similarly, photo 64 is also a zoomed-in version of photo 62. The State even observed that photo 63 was a "close up" of photo 64, at a slightly different angle.

For photos 65 and 66, Jones specifically testified that photo 66 was a "closer view" of the bloody shoe impressions depicted in photo 65. Interestingly, while photo 65 was an "overall" view of Holland's body, which also contained bloody shoe impressions, and photo 66 was a close up of those same bloody shoe impressions, the State zoomed in and enlarged photo 65 so that Jones could point out the same bloody shoe impressions from photo 66. Bloody shoe impressions were also present in photos 75 and 76, and Jones testified that these were the same photos the jury had previously been shown, with the exception of placards which had been placed to mark the evidence.

Photos 69, 70, and 71 showed Holland's two gunshot wounds. Jones's testimony noted that photo 70 depicted "Ms. Holland's head and just blood." Photo 71, according to Jones, showed the chest and neck wounds, and photo 69 was "a close-up" of the chest wound evident in other photos. When the pathologist testified, the jury was shown another photo of Holland's chest wound (State's Exhibit 30).

Once all the photos were shown and the PowerPoint presentation was finished, the State played the crime scene video for the jury. This video was displayed on a television in the courtroom while Jones narrated. This video was repetitive because it depicted much of what had already been shown in the State's still photos. The trial

court then gave an instruction limiting the jury's consideration of the State's Exhibit 30, stating that it could only be used "for purposes of illustrating and explaining the testimony of a witness." The court also indicated that the State's Exhibit 3 "may be considered by [the jury] as evidence of the facts that they illustrate or show."

**B. Applicable Legal Principles**

Photographs can be used to explain or illustrate witness testimony. *State v. Holden*, 321 N.C. 125, 140 (1987). "The fact that [a] photograph may be gory, gruesome, revolting or horrible, does not prevent its use by a witness to illustrate his testimony." *State v. Watson*, 310 N.C. 384, 397 (1984) (quoting *State v. Cutshall*, 278 N.C. 334, 347 (1971)). At the same time, this Court has recognized that the probative value of photographic evidence can be "eclipsed by its tendency to prejudice the jury." *Hennis*, 323 N.C. at 284. This occurs in cases where photographs "that have inflammatory potential" are "excessive or repetitious." *Id.* Put simply, seeing the evidence is different from hearing testimony about it.

While this Court has not drawn a bright-line rule for when photographic evidence becomes prejudicial, a trial court is required to "examine both the content and the manner in which photographic evidence is used and to scrutinize the totality of circumstances composing that presentation." *Id.* at 285. Among these considerations are "[w]hat a photograph depicts, its level of detail and scale, whether it is color or black and white, a slide or a print, where and how it is projected or presented, [and] the scope and clarity of the testimony it accompanies." *Id.*

Consideration of these factors allows a court to determine "the illustrative value of [the] photographic evidence," which must then be weighed "against [the photograph's] tendency to prejudice the jury." *Id.* Importantly, "[w]hen a photograph adds nothing to the State's case, then its probative value is nil, and nothing remains but its tendency to prejudice." *Id.* at 286 (cleaned up). Indeed, this Court has stated that

> where a prejudicial photograph is relevant, competent and therefore admissible, the admission of an excessive number of photographs depicting substantially the same scene may be sufficient ground for a new trial when the additional photographs add nothing in the way of probative value but tend solely to inflame the jurors.

*State v. Mercer*, 275 N.C. 108, 120 (1969).

## C. Application to Gillard's Case

The photo and video evidence in this case was excessive. While color photos of Holland's body were relevant, the photos depicted substantially the same scene: Holland's body surrounded by blood, inflicted with two gunshot wounds, and almost completely naked except for her socks. The same scenes were then shown to the jury again in the crime scene video. The photos at issue served only to play on the jury's emotions and were especially excessive given that Gillard did not dispute the number of shots fired or Holland's cause of death. The photos also did not show any injuries aside from the gunshot wounds which might provide insight into what happened while Gillard was in Holland's room. Ultimately, no evidentiary value was gained by

repeatedly showing Holland's wounds in color photos on a television.[11]

The facts of this case would arouse emotion in almost any juror. The photos depicted Holland, a young pregnant woman, who was killed by a man that under the State's theory of the case had gone to rob and rape her. Garvey, the father of Holland's three children and her unborn child, was shot and killed in the hallway outside her hotel room. In emotionally charged cases such as this one, special care must be taken when admitting photographic evidence. *See Hennis*, 323 N.C. at 285. The trial court did not act in accordance with the special care required in this case and others like it. Given the other photos admitted and the crime scene video, the nine photos at issue lacked probative value, and it was an abuse of discretion for the trial court to admit them. *See id.*

Although I believe the admission of these photographs is harmless error beyond a reasonable doubt for purposes of Gillard's guilt-phase proceeding, in light of the other overwhelming evidence against him, *see State v. Temple*, 302 N.C. 1, 14 (1981), it is yet another error that affected the fairness of Gillard's sentencing hearing in regards to cumulative error review. *See infra* Part VIII.

## IV. *Enmund/Tison* Instruction for Dwayne Garvey's Murder

Gillard asserts that the trial court was required to provide the jury with North

---

[11] Contrary to the trial court's assessment, which the majority seemingly accepts at face value, *see supra* Part II(D), that a photo may have provided a different angle or view of the crime scene is insufficient to find it nonredundant or full of evidentiary value under our precedent. *See State v. Hennis*, 323 N.C. 279, 286–87 (1988).

Carolina Pattern Jury Instruction 150.10 (*Enmund/Tison* instruction), as it relates to the murder of Dwayne Garvey. Because the instructions given by the trial court do not establish whether the jury found Gillard eligible for the death penalty for Garvey's murder under *Enmund* and *Tison*, I agree with Gillard that this instruction should have been given at the sentencing proceeding. *See* N.C.P.I.—Crim. 150.10 (Death Penalty—Instructions to Jury at Separate Sentencing Proceeding); *Enmund*, 458 U.S. at 798; *Tison*, 481 U.S. at 158.

In *Gregg*, the Court explained that the death penalty serves "two principal social purposes: retribution and deterrence of capital crimes by prospective offenders." 428 U.S. at 183. Thus, in cases where the death penalty does not contribute measurably to these goals, that punishment "is nothing more than the purposeless and needless imposition of pain and suffering." *Enmund*, 458 U.S. at 798. In those cases, infliction of the death penalty is unconstitutional. *Id.*

For purposes of deterrence, the defendant's *mens rea* is increasingly important. Under our current laws, the death penalty cannot have its intended deterrent effect if it is imposed against a person who does not kill or intend to kill. Deterrence can likely only be effectuated "when murder is the result of premeditation and deliberation." *Id.* at 799 (quoting *Fisher v. United States*, 328 U.S. 463, 484 (1946) (Frankfurter, J., dissenting)). Similarly, for purposes of retribution, the defendant's degree of criminal culpability matters, and this rests on what the defendant's "intentions, expectations, and actions were." *Id.* at 800. Indeed, our Court has stated

that "capital punishment must be tailored to the particular defendant's personal responsibility and moral guilt." *State v. Brewington*, 352 N.C. 489, 524 (2000) (citing *Enmund*, 458 U.S. 782). Importantly, criminal penalties have been invalidated as excessive in the absence of intentional wrongdoing. *E.g., Robinson v. California*, 370 U.S. 660, 667 (1962); *Weems v. United States*, 217 U.S. 349, 363 (1910).

Consistent with this, the *Enmund* Court determined it was unconstitutional to impose the death penalty on a person who did not kill, attempt to kill, or intend to kill the victim. 458 U.S. at 798. Later, in *Tison*, the Court held that defendants who are major participants in a felony and exhibit reckless indifference toward human life also "satisfy the *Enmund* culpability requirement." 481 U.S. at 158. Taken together, *Enmund* and *Tison* protect from the death penalty defendants who: (1) did not kill; (2) did not attempt to kill; (3) did not intend to kill; and (4) were not major participants in a felony and did not exhibit a reckless indifference toward human life. *Enmund*, 458 U.S. at 798; *Tison*, 481 U.S. at 158.

This logic is undergirded by the Eighth Amendment's "individualized consideration" requirement for imposing death sentences. *Enmund*, 458 U.S. at 798 (quoting *Lockett v. Ohio*, 438 U.S. 586, 605 (1978)). This procedural safeguard, which helps guarantee that only those who are eligible for the death penalty are subjected to it, requires a focus on the "relevant facets of the character and record of the individual offender." *See id.* (quoting *Woodson*, 428 U.S. at 304). Thus, when determining whether a person is eligible for capital punishment, a reviewing court

must consider whether the defendant intended to cause harm and what kind of harm was intended. *See id.*; *Tison*, 481 U.S. at 157–58.

Gillard argues that the trial court was required to provide the jury with the *Enmund/Tison* instruction because the State is seeking a death sentence for Garvey's murder under a felony murder theory and there is evidence that Gillard did not commit the actual killing. *See* N.C.P.I.—Crim. 150.10. Specifically, Issue One-A of the *Enmund/Tison* instruction provides:

> Do you unanimously find from the evidence, beyond a reasonable doubt, that the defendant himself/herself:
>
> [a. Killed or attempted to kill the victim;] (or)
>
> [b. Intended to kill the victim;] (or)
>
> [c. Intended that deadly force would be used in the course of the underlying felony;] (or)
>
> [d. Was a major participant in the underlying felony and exhibited reckless indifference to human life.]]

*Id.* This instruction further states that if the answer to these questions is "no," then the jury must "recommend that the defendant be sentenced to life imprisonment." *Id.*

For Garvey's murder, Gillard was convicted under the theory of felony murder as well as the theory of malicious, premeditated, and deliberate murder. The evidence also showed that Gillard was guilty of Garvey's murder by acting in concert, and the trial court provided the jury with an acting in concert instruction during the guilt-innocence phase of trial.

Under North Carolina law, a defendant may be convicted of premeditated and

deliberate murder under the doctrine of acting in concert. *State v. Fletcher*, 354 N.C. 455, 480 (2001). Indeed, "a defendant may be found guilty of premeditated first-degree murder by acting in concert without regard to which person committed which particular acts if the acts are done in pursuance of a common purpose to commit a crime or as a natural or probable consequence thereof." *Id.* (citing *State v. Barnes*, 345 N.C. 184, 233 (1997)).

Although it is true that in *Fletcher* this Court stated that an *Enmund/Tison* instruction is not required when a defendant is convicted of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule, this case is distinguishable from *Fletcher*. *See* 354 N.C. at 480–81. Namely because in *Fletcher* the defendant was convicted of premeditated and deliberate murder without any evidence to support an acting in concert theory and without the jury having received an acting in concert instruction. *Id.* at 480. Indeed, the *Fletcher* Court specifically did not decide whether a defendant convicted of premeditated murder based on acting in concert was entitled to the *Enmund/Tison* instruction. *Id.* Its narrow holding sidestepped that issue: "[W]e hold that where the guilt-phase jury found defendant guilty of first-degree murder on the basis of premeditation and deliberation *without an instruction on acting in concert*, an *Enmund/Tison* instruction is not required at sentencing." *Id.* at 481 (first emphasis added).

But in Gillard's case, the hotel surveillance video evidence supports a finding that Gillard was only guilty under an acting in concert theory. The evidence showed

that Hill and Garvey were the only two people in the hallway at the time that Garvey was shot and that Hill fired the shot that killed Garvey. Consistent with this, the jury also found as a mitigating circumstance that Gillard "did not pull [the] trigger" in Garvey's murder. This leaves an open question: was the jury's verdict of first-degree murder based on Gillard's intent to kill Garvey or on the fact that Gillard was present during the commission of the underlying felonies and only shared Hill's purpose to commit those felonies?

This is important because under an acting in concert theory, the jury could have determined Gillard was guilty of first-degree murder without finding that he met the *Enmund/Tison* requirements for imposing the death penalty. If this is true, Gillard's death sentence for Garvey's murder is unconstitutional. *See Enmund*, 458 U.S. at 798; *Tison*, 481 U.S. at 158. Indeed, this Court has previously observed that a jury *can* find a defendant guilty of premeditated murder under a theory of acting in concert *while also* not imposing a death sentence pursuant to *Enmund/Tison* instructions—specifically because the defendant did not have the specific intent to kill the victim. *State v. Gaines*, 345 N.C. 647, 682 (1997) (concluding that a verdict that a defendant was guilty of "premeditated and deliberate murder either under the theory of acting in concert or by aiding and abetting . . . is not inconsistent with the jury's later indication that the defendant did not himself intend to kill the victim [under *Enmund*] as no evidence suggested that [the defendant] personally intended

to inflict the fatal wound himself").[12]

Gillard's case is also distinguishable from *State v. Watts*, 357 N.C. 366 (2003). In *Watts*, this Court determined an *Enmund/Tison* instruction was not required for a defendant convicted of first-degree murder under a theory of premeditation and deliberation and under the felony murder rule. *Id.* at 375–76. However, the instructions given in *Watts* differed substantially from the instructions given in Gillard's case. *See id.* at 375. Specifically, in *Watts*, the acting in concert instruction

---

[12] The *Gaines* Court did observe, without citation, that "[t]he *Enmund* rule does not apply to a defendant who has been found guilty of first-degree murder based on premeditation and deliberation," including the defendant. *State v. Gaines*, 345 N.C. 647, 682 (1997). But this overbroad observation is at most dicta because the defendant there did receive the *Enmund/Tison* instruction at sentencing and was awarded a life sentence. *Id.* This Court only reviewed that verdict for consistency with the jury's earlier guilt-phase verdict because of the defendant's challenge. *Id.*

*State v. Golphin*, 352 N.C. 364, 473 (2000) repeated that phrasing when holding that a defendant need not receive an *Enmund/Tison* instruction where the jury found him guilty of first-degree murder on the basis of premeditation and deliberation under either an acting in concert theory or by committing all of the elements himself. But the *Golphin* Court also noted that there was more than enough evidence of the defendant's requisite intent to overcome the *Enmund/Tison* instruction. *Id.* at 473–74. Indeed *Fletcher* (2001) came after *Golphin* (2000) and did not interpret it to decide the issue presented here—whether a defendant convicted of first-degree murder only on an acting in concert theory must receive the *Enmund/Tison* instruction. *State v. Robinson*, 342 N.C. 74 (1995) did not decide that issue either, as it pre-dated this Court authorizing acting in concert liability for first-degree murder. *Id.* at 88; *see also Barnes*, 345 N.C. at 233 (holding that a defendant may be held liable for premeditated first-degree murder by acting in concert); *Fletcher*, 354 N.C. at 480 (summarizing this doctrinal development).

The majority reasons that no *Enmund/Tison* instruction was necessary here because Gillard was "a major participant in criminal conduct known to carry a grave risk of death" and "actively involved in planning, arranging, and perpetrating an armed, violent felony." *Supra* Part II(H). But focusing only on Gillard's participation in the underlying felony reads out *Tison* and *Enmund*'s emphasis on the requisite mental state: that the defendant "[w]as a major participant in the underlying felony *and* exhibited reckless indifference to human life." *See* N.C.P.I.—Crim. 150.10(d) (emphasis added); *Tison*, 481 U.S. at 152. The jury in this case should have been instructed accordingly to determine Gillard's mental state based on the evidence before it.

prevented the jury from finding that the defendant had committed premeditated first-degree murder without also finding that the defendant intended to kill. *Id.* (requiring the jury to find beyond a reasonable doubt that "the defendant either by himself or acting with another intentionally killed the victim . . . and that the defendant intended to kill the victim" (emphases omitted)).

By contrast, in Gillard's case, the mandate allowed the jury to convict Gillard for the first-degree murder of Garvey, based on malice, premeditation, and deliberation, if "the defendant or *someone with whom the defendant was acting in concert* intended to kill the victim." (Emphasis added.) That means the jury could find Gillard guilty of this charge without also finding he had intent to kill. Accordingly, an *Enmund/Tison* sentencing instruction was warranted, and the trial court's failure to submit this issue to the jury was error.

Despite concluding that an *Enmund/Tison* instruction was not necessary in Gillard's case, the majority elaborates in a footnote that the "trial court instructed the jury on the substance of an *Enmund/Tison* instruction" in any event because it "provided the jury with an instruction on malice." *Supra* Part II(H) & n. 7. This unwarranted observation misconstrues the jury instructions actually provided in this case. The jury here was instructed that it should find Gillard guilty if "the defendant *or* a person with whom the defendant was acting in concert intentionally *and* with malice killed the victim." (Emphasis added.) Malice is conjunctive with intent. In turn, the jury was told that acting in concert liability occurs when "two or more

persons join in a common purpose to commit" a crime, and that the defendant is "not only guilty of that crime if the other person commits the crime but also guilty o*f any other crime committed by the other in pursuance of the common purpose*," so long as they are "actually or constructively present." (Emphasis added.) If these instructions were enough to satisfy *Enmund/Tison*, then the getaway driver for co-defendants who shot and killed two victims while robbing them, acting in concert to commit the armed robbery, can be found guilty of first-degree murder on the basis of malice, premeditation, and deliberation and receive the death penalty. This outcome contradicts *Enmund* and the majority's own reasoning. Thus this unwarranted observation is properly disregarded as dicta.[13]

## V. The Trial Court's Failure to Instruct the Jury that the Same Evidence Could Not be Used to Support More than One Aggravating Factor

### A. Standard of Review and Applicable Law

Challenges to "whether a jury instruction correctly explains the law" are reviewed de novo. *State v. Copley*, 386 N.C. 111, 119 (2024) (*quoting State v. Greenfield*, 375 N.C. 434, 440 (2020)). In capital cases, "the trial court may not submit

---

[13] Likewise, the majority's footnote would substantially expand what it means that the defendant got the "substance" of a required instruction. In *State v. Augustine*, 359 N.C. 709 (2005), this Court addressed a narrow circumstance where a defendant requested that a general pattern jury instruction be replaced with a context-specific instruction. *Id.* at 728–29. When the trial court failed to give the context-specific instruction verbatim, this Court held that the substance of the requested instruction was basically conveyed by the general pattern jury instruction that was given. *See id.* That case does not support the Court's conclusion here, that Gillard got the substance of the *Enmund/Tison* instruction because it got an acting in concert instruction on malicious, premeditated, and deliberate murder, for the reasons explained above. Concluding that the substance of an instruction was given when the instruction was not given at all seems to undermine that *Augustine* standard completely.

multiple aggravating circumstances supported by the same evidence." *State v. Lawrence*, 352 N.C. 1, 29 (2000) (citing *State v. Goodman*, 298 N.C. 1, 29 (1979)). However, an aggravating factor will not be "considered redundant absent a complete overlap in the evidence supporting them." *Id.* (cleaned up).

## B. Application to Gillard's Case

Two aggravating factors were submitted in Gillard's case. The first, the course of conduct aggravator, required the jury to find that "[t]he murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and that included the commission by the defendant of other crimes of violence against another person or persons." N.C.G.S. § 15A-2000(e)(11). The second, the felony murder aggravator, tasked the jury with determining whether the murder was committed "during the commission of, or flight after committing, the Attempted First Degree Rape of April Holland and the Attempted Robbery with a firearm of April Holland." *See* N.C.G.S. § 15A-2000(e)(5). The jury found both aggravating factors existed and recommended a death sentence for both Holland's and Garvey's murders.

The trial court gave the jury the following instructions:

> The following is the first aggravating circumstance which may be applicable to this case: Was this murder part of a course of conduct in which the defendant engaged, and did that course of conduct include the commission by the defendant *of other crimes of violence against other person or persons*?
>
> . . . .

> The following is the second aggravating circumstance which may be applicable to this case: Was this murder committed by the defendant while the defendant was engaged in or flight after committing *attempted first-degree rape of April Holland and/or attempted robbery of April Holland with a firearm*?

(Emphases added.) Although the pattern jury instruction explicitly states, "You are instructed that the same evidence cannot be used as a basis for finding more than one aggravating factor," N.C.P.I.—Crim. 150.10, that language was omitted in the trial court's instructions to the jury in this case. The trial court's failure to give the correct jury instruction was error because it left the jury free to rely on the same evidence to find both the course of conduct aggravator and the felony murder aggravator. *See Lawrence*, 352 N.C. at 29.

When two aggravating factors that are supported by the same evidence are submitted to the jury, it amounts "to an unnecessary duplication of the circumstances enumerated in the statute" and results "in an automatic cumulation of aggravating circumstances against the defendant." *Goodman*, 298 N.C. at 29. Stated another way, in cases like this, although there is only enough evidence to support one aggravating factor, that evidence is double-counted against the defendant and improperly used to support a second aggravating factor. This is problematic in part because the jury is required to weigh existing aggravating and mitigating circumstances together. N.C.G.S. § 15A-2000(b). If the jury finds that the aggravating factors outweigh the mitigating circumstances, then the jury recommends a death sentence. *Id.* Thus, the more aggravating factors are present in a case, the higher the likelihood a jury's final

recommendation will be death.

During closing argument, the State admitted that both aggravating factors were "somewhat related" because Gillard was "committing more crimes in addition to the murder at the time the murders t[ook] place." The evidence in this case did not, on its own, support attempted rape and robbery. Instead of showing attempted rape, the evidence here showed that Holland was not tied up or injured prior to being shot. There was also no evidence of attempted robbery, as Holland's cell phone and $140 were found at the scene.

Without relying on the evidence of Gillard's other alleged crimes, the jury could not have found the attempted felony murder aggravating factor. The evidence in Holland's and Garvey's murders only showed that Holland was killed by a person who she agreed to meet with to exchange sex for money. The same is true for the course of conduct aggravating factor, which also relies heavily on evidence pertaining to attacks against other women.

Moreover, the jury found the presence of eighteen mitigating circumstances. While it ultimately decided that the mitigating circumstances did not outweigh the aggravating circumstances present, the jury might have struck a different balance if it had weighed those eighteen mitigating circumstances against only one aggravating factor. Accordingly, the trial court's failure not to instruct the jury "that the same evidence cannot be used as a basis for finding more than one aggravating factor" was error. *See* N.C.P.I.—Crim. 150.10.

## VI.    The Trial Court's Failure to Give a Peremptory Instruction on Three Mitigating Circumstances

During the sentencing phase of Gillard's trial, the defense requested peremptory instructions on forty of the forty-one non-statutory mitigating circumstances it submitted to the court. Although the trial court initially stated that it would give a peremptory instruction for each of the requested mitigating circumstances, it ultimately decided not to give a peremptory instruction on nine mitigating circumstances.

The importance of evidence showing mitigating circumstances cannot be overstated. "Evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background may be less culpable." *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (per curiam) (cleaned up). Evidence of mitigating circumstances humanizes the defendant and allows the jury to "gauge his moral culpability." *Id.* Thus, it stands to reason that any errors regarding the jury's proper consideration of this evidence implicate the jury's ability to place the defendant's "life history on the mitigating side of the scale" and "appropriately reduce[ ] the ballast on the aggravating side of the scale." *Id.* at 42. When errors involving mitigating circumstances exist, there is a risk that absent the error, the jury "would have struck a different balance" in favor of life, instead of death. *Id.* (cleaned up).

"Where all of the evidence in a capital prosecution, if believed, tends to show

that a particular mitigating circumstance does exist, the defendant is entitled to a peremptory instruction on that circumstance." *State v. Gay*, 334 N.C. 467, 492 (1993) (cleaned up). The trial court is only permitted not to give the requested instruction if the evidence is controverted or obviously not credible. *See State v. McLaughlin*, 341 N.C. 426, 449 (1995). Giving the peremptory instruction does not mean a jury is required to find that a mitigating circumstance exists. *Gay*, 334 N.C. at 492. Juries are free to reject a mitigating circumstance if they find the supporting evidence unconvincing or, for non-statutory mitigating circumstances like those proffered by Gillard, because they find the circumstance does not have mitigating value. *See id.*

Still, a peremptory instruction in a capital sentencing hearing serves an important purpose: it limits the sentencer's discretion by eliminating the potential that the jury will reject the mitigating circumstance on the erroneous basis that not enough evidence was offered to support that circumstance. This requirement is consistent with the Eighth Amendment, which requires a sentencer's discretion to be directed and limited to "minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189. Thus, when a peremptory instruction is requested and the "defendant is otherwise entitled to it, it will be error for the trial judge not to give a peremptory instruction." *Gay*, 334 N.C. at 493 (cleaned up).

Here, Gillard presented "uncontroverted" and credible evidence to support three of the eight mitigating circumstances for which the court failed to give a peremptory instruction. *See id.*; *McLaughlin*, 341 N.C. at 499. Those circumstances

were: (1) that "Seaga Gillard's home environment made it difficult for him to succeed in school"; (2) that "Seaga Gillard's childhood asthma prevented him from participating in the same physical activities and sports as his younger brother"; and (3) that "Seaga Gillard suffers from other specified trauma and stressor related disorder."

## A. "Seaga Gillard's home environment made it difficult for him to succeed in school."

There was uncontroverted and credible evidence that Gillard's "home environment made it difficult for him to succeed in school." Dr. Amy James, who testified for the defense, identified two factors present in Gillard's life that can make it difficult for a child to succeed in school. These factors were poverty and lack of a strong parental figure.

All the evidence in Gillard's case showed that he grew up in poverty and that he sometimes could not afford socks or lunch. Evidence also showed that Gillard's parents were not a consistent part of his home environment. Specifically, Gillard's mother moved away when he was "five or six years old" and was largely absent during his formative years. This left him with no parental figure because his father was not present in his life at all. After his mother left, Gillard did not have a consistent place to live. He also skipped school to get money to buy food. Gillard ultimately missed a lot of school.

Similarly, all evidence showed that Gillard's home environment made it difficult for him to succeed when he was in school. This was established by Dr.

James's testimony in which she stated that a focus on "educational achievement becomes more difficult" when children do not have access to healthy nutrition. Namely because children who lack access to healthy foods exhibit decreased impulse and emotional control, which can manifest as "acting up in school."

Dr. James also testified that not having a strong parental figure can lead to similar problems. When a child lives in poverty and a parent is not present, there is a "potential to have the problems magnified." Dr. James explained that poverty contributes to problems with academic success because "[i]t's hard to focus on school when you're hungry" and "[i]f you don't have the financial means to purchase the books required for class or . . . the socks that are required for the uniform, it makes it difficult to attend [school] and participate fully." In addition, Dr. James noted that if a child does not "have a strong person guiding [them] towards [academic success], it makes it easier to skip school." Comments from Gillard's school teacher paralleled these concerns. She stated that Gillard's home environment made it difficult for him to succeed academically because "it affects your concentration," specifically because "[i]f you are hungry, then you can't hear what I'm saying, and if you didn't sleep well last night, how can you concentrate?"

When objecting to a peremptory instruction on this mitigating circumstance, the State did not dispute the evidence or its credibility. Rather, the State's objection was based on there being evidence of problems outside of Gillard's home environment that may have affected Gillard's performance in school. It was on this basis that the

trial court determined a peremptory instruction was not warranted. This was error.

According to our caselaw, "[w]here all of the evidence in a capital prosecution, if believed, tends to show that a particular mitigating circumstance does exist, the defendant is entitled to a peremptory instruction on that circumstance." *Gay*, 334 N.C. at 492 (cleaned up). Here, Dr. James's testimony established that Gillard's home environment, specifically evidence of poverty and the lack of a strong parental figure, made it difficult for Gillard to succeed in school. This evidence was further substantiated by testimony from Gillard's teacher who explained how the two factors identified by Dr. James manifested as difficulty concentrating at school.

Whether there is evidence of other factors that also may have made it difficult for Gillard to succeed in school is unrelated to whether a peremptory instruction should be given. Instead, what matters is that all of the evidence about Gillard's home environment, if believed, tends to show that his home environment made it difficult for him to succeed in school. *See id.* Accordingly, a peremptory instruction should have been given on this mitigating circumstance.

**B. "Seaga Gillard's childhood asthma prevented him from participating in the same physical activities and sports as his younger brother."**

The evidence presented on this mitigating circumstance showed that Gillard's younger brother played soccer very well, both in school and on a traveling team. As a result, Gillard's younger brother received a soccer scholarship. However, Gillard was not able to play sports because he had asthma. Gillard's friend testified that he had previously witnessed Gillard have an asthma attack while playing "football" (soccer).

Although the State did not initially object to a peremptory instruction on this mitigating circumstance, it later objected and asked that the word "sometimes" be added, such that the mitigating circumstance would read: "Seaga Gillard's childhood asthma *sometimes* prevented him from participating in the same physical activities and sports as his younger brother." In making this request, the State reasoned that "we heard testimony that he was out playing football." But the only testimony stating that Gillard played soccer was the testimony from the friend who saw Gillard have an asthma attack once while participating in the sport. The State did not dispute the credibility of this evidence. Ultimately the court left out the "sometimes" qualifier but demoted the circumstance to a non-peremptory instruction. This demotion was error.

Pursuant to our precedent, because "all of the evidence[,] . . . if believed, tend[ed] to show that [this] particular mitigating circumstance does exist," here that Gillard's asthma prevented him from participating in sports like his brother who did not have asthma, Gillard was "entitled to a peremptory instruction on that circumstance." *See Gay*, 334 N.C. at 492 (cleaned up).

**C. "Seaga Gillard suffers from other specified trauma and stressor related disorder."**

Testimony from Dr. James established that she had diagnosed Gillard with "other specified trauma and stressor related disorder." This disorder is different from PTSD because while PTSD requires "an identifiable stress or trauma or stressors and traumas" which are "the etiology or the cause" of the person's symptoms, other specified trauma and stressor related disorder only requires that the clinician "know

that the cause of the problem is [a] stressor and trauma."

Gillard's diagnosis was related to a fear of death from his asthma, having experienced a serious injury, and "a disruption in attachment." Dr. James based her diagnosis on the following symptoms: Gillard's nightmares and "distressing dreams"; his avoidance talking about "matters that caused [his] trauma"; "[d]ifficulty remembering aspects of the trauma"; his "[i]rritable behavior and angry outbursts"; his display of "[r]eckless and self-destructive behavior, hypervigilance, [and his feelings of] being on edge"; and problems with concentration and sleep. Dr. James also testified that Gillard had previously been diagnosed with another mental health disorder related to his nightmares.

On cross examination, the State elicited testimony about a March 2012 record from the Ohio Department of Rehabilitation and Correction, which had a box checked denying "any kind of mental health problems or depression or anything." The report itself was not introduced into evidence and no other mental health experts testified at Gillard's trial or during sentencing.

Initially, the State did not object to a peremptory instruction on this mitigating circumstance. However, it later withdrew its consent to a peremptory for this mitigating circumstance. The State's reason for this seems to be based on the fact that the jury was not required to believe Dr. James's testimony. The trial court agreed with the State and denied the peremptory. But that concern is beside the point, because a jury is never required to believe the evidence when a peremptory

instruction is given. *See Gay,* 334 N.C. at 492 (providing that jurors can reject a mitigating circumstance if they determine "the supporting evidence was not convincing" or if the non-statutory factor is not mitigating). In fact, this rationale skips the peremptory instruction analysis altogether. The jury's determination of whether to accept the evidence does not become a consideration until after the court rules on whether to give the peremptory instruction. This two-step process is no different for factors supported by expert witnesses, whose credibility and persuasive value are equally subject to jury scrutiny. *See* N.C.P.I.—Crim. 104.94 (instructing the jury in pattern instructions for expert witnesses that "you are not bound by" the opinion of an expert witness and that the expert's "training, qualifications, and experience," reasons given for their opinion, and the opinion's reasonableness bear on the testimony's credibility). Notably, the State made no objection to Dr. James's credibility when withdrawing its consent to the peremptory, nor was her testimony controverted by a single box checked in an extra-record document.[14]

Instead, by accepting the State's inapposite objection, the trial court failed to conduct the necessary inquiry and ask whether "all of the evidence[,] . . . if believed, tends to show that [this] mitigating circumstance does exist." *Gay*, 334 N.C. at 492. The answer to this question is "yes," and the trial court's failure to give a peremptory

---

[14] I do not read our caselaw to state as a per se rule that experts retained for trial or sentencing can never be "manifestly credible." *Cf. State v. Bishop*, 343 N.C. 518, 557 (1996). Instead, courts only review an expert's testimony for minimal credibility in light of the facts and circumstances before granting a peremptory, and then let the jury decide whether it is persuasive, consistent with *Gay*.

instruction on this mitigating circumstance was error.

## VII. The Trial Court's Admission of Keyona T.'s Identification

On appeal from the denial of a motion to suppress a witness's identification, this Court must determine "whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law." *State v. Malone*, 373 N.C. 134, 145 (2019) (quoting *State v. Biber*, 365 N.C. 162, 167–68 (2011)). The conclusions of law are reviewed de novo. *Id.*

Traditionally, juries, not judges, determine the reliability of evidence. *Id.* at 146 (citing *Perry v. New Hampshire*, 565 U.S. 228, 245 (2012)). But "due process considerations do place limitations upon the admission of eyewitness identification evidence obtained as the result of impermissible official conduct." *Id.* Accordingly, when a due process claim is raised regarding an identification procedure, the reviewing court must utilize a two-step test to determine "whether the identification procedure was so suggestive as to create a substantial likelihood of irreparable misidentification." *Id.* (quoting *Fowler*, 353 N.C. at 617). Step one asks "whether the identification procedures were impermissibly suggestive." *Id.* (quoting *Fowler*, 353 N.C. at 617). If the answer to this question is "yes," then the reviewing court proceeds to step two and asks "whether the procedures create a substantial likelihood of irreparable misidentification." *Id.* (quoting *Fowler*, 353 N.C. at 617).

In assessing whether the identification procedures used created a substantial likelihood of irreparable misidentification, a reviewing court must also ask whether

the in-court identification "has an origin independent of the invalid pretrial procedure." *Id.* (quoting *State v. Bundridge*, 294 N.C. 45, 56 (1978)). If so, the in-court identification testimony can still be admissible, despite the witness being subjected to impermissibly suggestive identification procedures, because, in those cases, it cannot be said that the procedures used created a substantial likelihood of irreparable misidentification. *Id.* (citing *Bundridge*, 294 N.C. at 56).

Reliability of the identification "is the linchpin" of this evaluation, and "[w]here the indicators of a witness'[s] ability to make an accurate identification are outweighed by the corrupting effect of law enforcement suggestion, the identification should be suppressed." *Perry*, 565 U.S. at 239 (cleaned up).

The in-court identification at issue here is Keyona T.'s identification of Gillard at the sentencing hearing. The pertinent facts showed that Keyona T. had been assaulted with three others at a Motel 6 in Durham by two men on 16 April 2016. While the incident was reported to police, no suspects were identified, and Keyona T. was not shown a photo lineup at the time of her attack. Moreover, the only identifying information Keyona T. provided to police about her attackers was that one of the men who attacked her had "an island accent."[15]

In December 2018, after the Holland and Garvey murders, Keyona T. was contacted by Detective Gibney from the Raleigh Police Department. Gibney told

---

[15] While Detective Gibney testified to a "general description of the suspects," which was included in the Durham Police Department's report, Gibney also testified that he did not know which of the five witnesses at the scene gave police this description.

Keyona T. that a mother and father had been killed, that the woman had been pregnant, and that these murders might be related to Keyona T.'s attack. Gibney also shared that property from one of the people Keyona T. had been assaulted with in 2016 was found in the car of one of the people charged with Holland's and Garvey's murders. Gibney even gave her the name of the person charged in the murder.

The information Gibney provided led Keyona T. to run a Google search for Holland and Garvey's case, which yielded a photo of Gillard. The photo Keyona T. found on the internet showed the way Gillard looked in 2018, not in 2016 at the time of Keyona T.'s attack. Keyona T. stated that she recognized Gillard because she saw a "familiar face." As mentioned above, at the time of her attack, the only identifying information Keyona T. could provide was that one of the men who attacked her had an island accent. Additionally, her 2018 identification of Gillard did not take place until two-and-a-half years after her attack, and this identification occurred only after she had been provided with information that the person charged with Holland's and Garvey's murders may have been the person who attacked her.

In her testimony, Keyona T. referred to her attacker as "Seaga" and testified that although she did not know Gillard, she had "read the article [on the internet] and . . . knew it was him." Keyona T. also stated, "I didn't know him at all, but in connection to when I spoke to [law enforcement] . . . that was something that I heard." Over objection, Keyona T. testified to the internet research she had conducted and her findings, including Gillard's arrest photograph and photographs of Gillard from

2018.

The defense moved to suppress the identification arguing there was government action, which tainted the identification procedure, and that the identification was unreliable. Furthermore, the defense argued that allowing Keyona T.'s identification violated Gillard's constitutional rights under both the United States Constitution and the North Carolina Constitution. While the trial court acknowledged that the procedures employed could be suggestive, it ruled against Gillard because it found no government action in Keyona T. having viewed Gillard's photograph online. The trial court also determined that Keyona T. had a "significant opportunity" to view the perpetrator of the April 2016 attack, that her identification of Gillard was "relatively certain," and that the reliability of Keyona T.'s identification was "bolstered" by her testimony that her attacker had an island accent.[16]

In *Malone*, this Court determined that the identification procedures used in that case were impermissibly suggestive. 373 N.C. at 148–49. To reach this conclusion, the Court explained that "single-suspect identification procedures clearly convey the suggestion to the witness that the one presented is believed guilty by the police." *Id.* at 148 (cleaned up). There, the witnesses had been shown a photograph and video of the defendant, and although the circumstances of this case may differ, the logic underpinning *Malone* is instructive here. Namely that by being subjected to

---

[16] It is unclear how this would have "bolstered" the reliability of Keyona T.'s identification since Keyona T.'s attacker's accent played no part in her photo or in-court identification of Gillard. Neither identification involved hearing Gillard speak.

a single-suspect identification procedure, the witnesses were "effectively told" they were viewing photos of the men police believed responsible for the shooting. *Id.* Here, the information Gibney provided, including Gillard's name, led Keyona T. to find a photo of Gillard on the internet. By providing Gillard's name and that in connection with the Holland and Garvey investigation police had located the belongings of someone with whom Keyona T. had been assaulted, Gibney effectively said, "We think the man who attacked Holland and Garvey also attacked you." *See id.* This was impermissible.

Moreover, in *Malone*, this Court concluded that the identification procedures used did not give rise to a substantial likelihood of irreparable misidentification because the in-court identification in question was of independent origin and sufficiently reliable. *Id.* at 149. There, this Court reviewed five factors for each witness that had been subjected to the impermissibly suggestive identification procedure: "the opportunity of the witness to view the defendant at the time of the crime, the witness's degree of attention, the accuracy of any prior description of the defendant, the level of certainty demonstrated by the witness at the time of the confrontation, and the time between the crime and the confrontation." *Id.* (citing *State v. Pigott*, 320 N.C. 96, 99–100 (1987)). This assessment requires the trial court to make findings of fact, because "[w]hether there is a substantial likelihood of misidentification depends upon the totality of the circumstances." *Id.* at 152 (quoting *Pigott*, 320 N.C. at 99).

Here, the trial court failed to properly consider whether the information Gibney provided Keyona T. undermined the reliability of Keyona T.'s in-court identification. Namely because the impermissibly suggestive procedures—the information Gibney provided that was the basis for Keyona T.'s Google search, Gibney telling Keyona T. Gillard's name, and Gibney saying that one of Keyona T.'s friend's belongings, which had been taken during Keyona T.'s 2016 assault, had been found during the Holland and Garvey murder investigation—must be weighed against *Malone*'s five factors to determine whether a substantial risk of misidentification exists. Here, the trial court only made three determinations: (1) that Keyona T. had a significant opportunity to view her attacker during the 2016 April attack; (2) that Keyona T.'s identification was "relatively certain"; and (3) that Keyona T.'s identification of Gillard was bolstered by her testimony that her attacker had an island accent.

However, the complete analysis as required by *Malone* shows that while the trial court did determine Keyona T.'s "degree of attention" during the 2016 attack, her testimony supports that after the attack she was unable to provide police with a physical description of her attacker. Additionally, no lineup was conducted at the time of her attack, which could have enhanced the reliability of her identification. There was also a two-and-a-half-year gap between the April 2016 incident and Keyona T.'s internet search in December 2018. These facts magnify concerns regarding the reliability of her identification.

Weighing these factors "is not an exercise employed with mathematical precision." *Malone*, 373 N.C. at 152. "Certain factors may be more important than others depending upon the nature of the impermissibly suggestive procedure as well as the particular facts of the case." *Id.* In my view, Keyona T.'s inability to provide a physical description of her attacker immediately after the attack, the fact that no lineup was conducted following the April 2016 incident, and the two-and-a-half years between Keyona T.'s attack and her identification of Gillard bear heavily on this analysis. Accordingly, I cannot "conclude that in the totality of the circumstances" the procedures in this case did not give rise to a substantial likelihood of irreparable misidentification. *See id.* at 150, 152.

Moreover, based on the actions Gibney took, I disagree with the trial court's conclusion that there was no government action. When determining whether there was government action, the question is: Is the person taking the action acting as a private citizen or as part of a governmental entity? *Lindke v. Freed*, 144 S. Ct. 756, 762 (2024). Importantly, "[c]ourts do not ordinarily pause to consider whether [claims requiring state action] appl[y] to the actions of police officers." *Id.* at 765. This was evident in *Griffin v. Maryland*, 378 U.S. 130 (1964), where the United States Supreme Court held that a security guard working at a privately owned amusement park had engaged in state action when he enforced the amusement park's policy of segregation against black protestors. *Id.* at 132–35; *see also Lindke*, 144 S. Ct. at 765 (discussing *Griffin*'s holding). This holding was predicated on the fact that the

security guard had been previously deputized as a "sheriff" in the county and had the same power and authority as any other deputy sheriff. *Griffin*, 378 U.S. at 132, 132 n.1. Here, there is no question that Detective Gibney was acting as a member of the Raleigh Police Department at the time he provided Keyona T. with the information that formed the basis of the impermissibly suggestive identification procedure.

Police cannot provide witnesses with information they can reasonably believe will be used in a way that is inconsistent with the Constitution. While the context of *Brewer v. Williams*, 430 U.S. 387 (1977), is different from this case, the actions the officers took there are analogous to those taken by Gibney. In *Brewer*, the defendant had been charged with the murder of a ten-year-old girl and was being transported by police officers who knew the defendant was represented by counsel. *Id.* at 390, 392. Despite the constitutional impropriety of questioning a defendant who is represented and has not waived their right to counsel, one officer who knew Brewer was religious told Brewer that only he could help locate the girl's body, such that her parents could give her a proper Christian burial. *Id.* at 392–93, 397. In doing so, the officer psychologically coerced the defendant, which led the defendant to disclose the location of the child's body. *Id.* at 393, 404–05; *see also id.* at 412 (Powell, J., concurring) (discussing the detective's use of "psychological coercion that was successfully exploited").

Just like it was reasonably certain the defendant in *Brewer* would disclose the location of the child's body, it was reasonably certain that Keyona T. would take some

steps, such as conducting an easily accessible Google search to see if she recognized Gillard as her attacker. This is especially true given that Gibney provided Keyona T. with Gillard's name. And just like in *Brewer,* the police in Gillard's case employed psychological tactics by telling Keyona T. they believed the man responsible for Holland's and Garvey's murders was the same person who attacked her. *See id.* at 412. They also told Keyona T. that Holland had been pregnant when she was killed, adding to the outrage of the crime. *See id.* There is no realistic attenuation here, and Gibney's actions are sufficient to show government action.

Because government action led to an impermissibly suggestive identification that was not otherwise free from a substantial likelihood of misidentification based on the totality of the circumstances, Keyona T.'s identification at the sentencing hearing was constitutional error. *See Malone*, 373 N.C. at 146, 152.

## VIII. Whether Cumulative Error Denied Gillard a Fair Sentencing Hearing

Although a "trial court's errors, when considered in isolation," are insufficient to establish prejudice, "the cumulative effect of the errors" can create sufficient prejudice to deny a defendant a fair proceeding. *See State v. Canady*, 355 N.C. 242, 246 (2002). Because "the choice to exact our state's most extreme punishment is morally infused and deeply personal," death penalty cases carry a heightened risk of cumulative error at the sentencing phase. *State v. Richardson*, 385 N.C. 101, 248 (2023) (Earls, J., concurring in part and dissenting in part) (cleaned up).

Viewed in the aggregate, the cumulative effect of the trial court's errors and

the accompanying prejudice impacting Gillard's death sentence is evident, and it becomes harder to guarantee that his sentence was not imposed out of "passion, prejudice, or any arbitrary factor." *See Sanderson*, 336 N.C. at 9. In cases such as this, where cumulative error strips a defendant of a fair sentencing hearing, the proper remedy is a new sentencing hearing. *See State v. Rogers*, 355 N.C. 420, 465 (2002).

Without the cumulative effect of these errors, the jury may have chosen to sentence Gillard to life imprisonment without parole instead of death. Because the death penalty requires unanimous agreement among jurors, N.C.G.S. § 15A-2000(b), all that was needed for the jury to reach a different result was for one juror to strike a different balance in favor of life. *See Wiggins v. Smith*, 539 U.S. 510, 535 (2003); *McCollum*, 558 U.S. at 42. Gillard's sentencing jury was allowed to consider Keyona T.'s unreliable identification, improper and irrelevant victim impact statements, and repetitive photos of Holland's almost naked body surrounded by blood, which had no probative value. The trial court also failed to provide an *Enmund/Tison* instruction, *see Enmund*, 458 U.S. at 798; *Tison*, 481 U.S. at 158, gave an incomplete instruction regarding aggravating factors, and did not provide a peremptory instruction on three mitigating circumstances where all the evidence tended to show that those factors existed. Additionally, the use of unadjudicated offense evidence during the sentencing phase of Gillard's trial not only implicates Gillard's substantive and procedural due process rights but also increases the risk that his death sentence was arbitrarily and

capriciously imposed. *See Godfrey*, 446 U.S. at 428.

The majority refuses to engage with the consequence of these compounding errors while it denies Gillard a new sentencing. Instead, it concludes that "there can be no cumulative error because the trial court did not err." *Supra* Part II(L). That holding contradicts this Court's precedent because it conflates "error" for purposes of cumulative error review with other, higher standards of "error" review—namely plain error and abuse of discretion.

Despite what it says, the majority's own analysis does not support that it finds the proceedings below "free from error." Rather it finds none prejudicial enough, standing alone, to overturn Gillard's conviction or sentence. For example, it announces there was no "error" because the trial court did not abuse its discretion[17] and because the trial court is entitled to deference.[18] Elsewhere it pronounces "no error" while in reality applying a more exacting test. For example, the majority determines there was "no error" in the trial court's failure to instruct the jury that it was prohibited from using the same evidence to support more than one aggravating factor. *Supra* Part II(I). But it bases that conclusion on the existence of "substantial

---

[17] *See supra* Part II(A)(2) (concluding no abuse of discretion in the Rule 403 balancing for the Rule 404(b) evidence by Bessie A. and Rachel B. admitted at trial); Part (II)(B)(2) (declining to review for plain error whether the trial court abused its discretion under Rule 403 in admitting Kara L.'s testimony of the prior firearm assault); Part II(D) (no abuse of discretion in decision to admit inflammatory photos).

[18] *See supra* Part II(C)(2)(a) (concluding no "error" in allowing testimony on Keyona T.'s and Keyana M.'s abusive backgrounds unrelated to Gillard at sentencing because the trial court is entitled to "considerable leeway").

additional evidence" to support the varying factors, which is in actuality the plain error test.[19] Even when it concedes an "arguable error" committed by the trial court for failing to give an *Enmund/Tison* instruction, the majority again relies on the absence of a plain error to dismiss any effect this had on Gillard's claim of cumulative error.[20]

That conflation, treating all "errors" alike, defies the purpose and operation of cumulative error review as articulated in numerous precedents. "Regardless of whether any single error would have been prejudicial in isolation," this review asks whether the "cumulative effect" of the trial court's errors "deprived defendant of a fair trial." *State v. Hembree*, 368 N.C. 2, 20 (2015); *accord Richardson*, 385 N.C. at 187 (majority opinion); *Canady*, 355 N.C. at 246; *State v. Wilkerson*, 363 N.C. 382, 426 (2009); *Thompson*, 359 N.C. at 106. By summarily concluding it found "no errors" despite the varied, demanding tests underlying its analysis, the majority breaks from that precedent. That is unfortunate. If the majority wishes to overrule and discard such bedrock law, it should do so explicitly and explain its rationale for doing so.

Finally, the Court's insistence on finding the proceedings below "free from

---

[19] *See supra* Part II(I) (noting that a failure to give this instruction "does not rise to the level of plain error . . . [when there is] *substantial separate evidence* supporting each aggravating circumstance" (emphasis added) (quoting *State v. Conaway*, 339 N.C. 487, 531 (1995))).

[20] *See supra* Part II(N) n. 8 ("The only arguable error committed by the trial court concerns the *Enmund-Tison* instruction. As we have discussed above, there can be no cumulative error."); Part II(H) ("Therefore, even if we assume that the trial court erred, defendant has not demonstrated plain error because a rational juror could find that defendant was not merely a minor participant in the crimes detailed herein.").

error" has the further consequence of subtly changing the underlying applicable law. For example, as discussed in Part II(D) of this opinion, the majority appears to expand the definition of general, introductory testimony to include testimony that is unfairly prejudicial so long as it is sufficiently framed as "context." As discussed in Part VI and footnote thirteen of this opinion, the majority appears to expand substantially our precedent on what it means that a defendant received the "substance" of a requested instruction. That may limit future defendants' rights to receive jury instructions to which they are entitled. While purporting not to reach cumulative error review since it found no error, the majority injects new language seemingly aimed at amplifying a defendant's burden in a cumulative error challenge: it stresses that there must be "multiple significant errors" for a defendant to meet "the high bar." It does not explain what distinguishes a "significant" error from a "prejudicial" one. These substantive changes would have the effect of granting further leeway to State prosecutors while undermining meaningful appellate review of criminal convictions. That is especially unfortunate for our capital sentencing system, where appellate review "serves as a check against the random or arbitrary imposition of the death penalty." *See Gregg*, 428 U.S. at 206.

## IX.  Conclusion

I agree with the majority's judgment affirming Gillard's convictions for the first-degree murders of Dwayne Garvey and April Holland. But because Gillard's trial and sentencing were replete with errors, which when taken together denied Gillard

a fair sentencing hearing, I dissent from the part of the majority opinion upholding Gillard's death sentence and would remand this case to the trial court for a new sentencing hearing.

Justice RIGGS joins in this concurring in part and dissenting in part opinion.